# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

SUSANNE MEHLMAN, JOY
HULTMAN, MINDY BENDER, and
ROBERT SULLIVAN, Individually and on
Behalf of All Others Similarly Situated,

             Plaintiffs,

    v.

AMERIPRISE FINANCIAL, INC.,
AMERIPRISE FINANCIAL SERVICES,
LLC, and AMERICAN ENTERPRISE
INVESTMENT SERVICES, INC.

             Defendants.

Case No. 24-CV-03018-JRT-DLM

JURY TRIAL DEMANDED

## CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page

I.   PARTIES...................................................................................................... 3

     A.   Defendants........................................................................................ 3

     B.   Plaintiffs .......................................................................................... 4

     C.   Relevant Non-Parties....................................................................... 5

II.  JURISDICTION AND VENUE ................................................................ 6

III. AMERIPRISE'S CASH SWEEP ACCOUNT MISCONDUCT ............. 6

     A.   Ameriprise's Duties to Its Clients .................................................. 6

     B.   Ameriprise Used Its Affiliated Bank, Ameriprise Bank, to Siphon Net
          Interest Income from the Billions of Dollars of Clients' Cash Sweep
          Deposits ......................................................................................... 12

     C.   Ameriprise Established Unreasonably Low Interest Rates on the
          Billions of Dollars Its Clients Held in Cash Sweep Accounts .................... 15

     D.   Ameriprise Has Unjustly Enriched Itself by Paying Unreasonably
          Low Interest Rates on Its Clients' Bank Sweep Deposits .......................... 17

     E.   Ameriprise Owes Several Independent Duties
          and Obligations to Its Clients ....................................................... 20

          1.   Ameriprise Owes Fiduciary Duties to Its Clients ........................... 22

          2.   Ameriprise Has a Contractual Obligation to Pay and Secure
               Reasonable Interest Rates For Advisory Clients .............................. 24

          3.   Ameriprise Has a Contractual Obligation to Make
               Reasonable Arrangements Regarding Its Clients'
               Cash Balances In Qualified Retirement Accounts .......................... 25

          4.   Ameriprise Has a Contractual Obligation to Base
               Its Sweep Account Interest Rates on Prevailing
               Economic, Market and Business Conditions ................................... 26

      5.     Ameriprise's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for Ameriprise to Provide Clients with a Reasonable Rate of Interest ...................................... 28

  F.     Ameriprise Breached Its Duties, Contracts and the Implied Covenant, and Profited Thereby ...................................... 28

  G.     Ameriprise Secured and Paid Unreasonably Low Interest Rates on Its Clients' Cash Sweep Deposits .................................... 30

      1.     Sweep Account Rates Paid by Other Institutions ............................ 31

      2.     The Federal Funds Rate Benchmark ................................ 33

      3.     The Interest Rates on Sovereign Short-Term Debt Benchmark ....... 35

      4.     The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements .................................. 37

CLASS ACTION ALLEGATIONS ................................................ 37

FIRST CLAIM FOR RELIEF Breach of Contract Brought on Behalf of Plaintiffs and the Class Against All Defendants ............................ 42

SECOND CLAIM FOR RELIEF Breach of Contract Brought on Behalf of the IRA and Advisory Subclass Against All Defendants ............... 43

THIRD CLAIM FOR RELIEF Breach of the Implied Covenant of Good Faith and Fair Dealing Brought on Behalf of Plaintiffs and the Class Against All Defendants ....... 44

FOURTH CLAIM FOR RELIEF Breach of Fiduciary Duty Brought on Behalf of Plaintiffs and the Class Against All Defendants ............................ 45

FIFTH CLAIM FOR RELIEF Unjust Enrichment Brought on Behalf of Plaintiffs and the Class Against All Defendants ............................ 46

DEMAND FOR RELIEF ........................................................ 47

JURY TRIAL DEMAND ........................................................ 47

1.     This class action arises out of Ameriprise's drastic under-payment of interest to its clients in its cash sweep programs.  Ameriprise underpaid its clients in violation of its fiduciary and contractual duties in order to enrich itself at its clients' expense.  Rather than pay its clients a "reasonable rate" of interest on their cash that properly took into account "prevailing economic and market conditions" and "prevailing economic and business conditions," as Ameriprise was required to do, Ameriprise instead paid de minimis rates to its clients while it earned hundreds of millions of dollars on that cash in periods of rising interest rates.

2.     In a typical cash sweep program for a brokerage client, the brokerage firm, acting as its client's agent with respect to the cash sweep program, automatically transfers cash from the client's brokerage account into an interest-bearing bank account that generates returns for the client.  However, when Ameriprise sweeps its clients' cash through its cash sweep programs, Ameriprise uses that cash to generate returns primarily for itself rather than its clients, due to the spread between the interest income that Ameriprise earns on the cash and the amount of interest that it pays its clients.

3.     As an agent of its clients with respect to its cash sweep programs, Ameriprise is required to act as a fiduciary in the best interests of its clients in connection with those programs.  That includes a duty to put its clients' interests ahead of its own when recommending and/or conducting transactions for them, including transactions within the scope of its cash sweep programs.  In addition, under the law, the agreement between Ameriprise and its clients carries with it an implied covenant of good faith and fair dealing.

4.      Rather than act as a fiduciary in the best interests of its clients with respect to its cash sweep program or fulfill its contractual and implied covenant obligations to its clients, Ameriprise used its clients' funds to enrich itself at their expense.

5.      Ameriprise underpaid interest to sweep account clients, including by controlling and increasing the profits to itself by channeling its clients' cash sweep deposits to an affiliated—rather than an independent third party—bank.  This included, starting in May 2019, Ameriprise's use of its subsidiary, Ameriprise Bank, FSB ("Ameriprise Bank") to funnel cash from its clients' accounts to Ameriprise Bank through its Bank Sweep Programs to thereby capture even greater profits from the Programs. In the subsequent years, Ameriprise's Net Interest Income skyrocketed due to the clients' swept cash, resulting in massive profits.

6.      Periods of rising interest rates presented an opportunity for Ameriprise clients to earn more on their cash sweep account balances.  By improperly keeping the interest rates paid by Ameriprise Bank on cash sweep accounts artificially low, however, Ameriprise usurped that opportunity for itself, leveraging its clients' cash for its own benefit and earning massive profits for itself.

7.      In setting Ameriprise's cash sweep interest rates—which Ameriprise has kept largely static over the past several years—Ameriprise ignored market conditions.  For example, the yield on short-term U.S. Treasury bills increased dramatically over the past two years, and it has been above 5.25% for most of the past year.  By contrast, for years the vast majority of Ameriprise clients with cash sweep accounts have only been paid interest rates of 0.01% to 0.30%.

8.    There is nothing reasonable or fair about the rates Ameriprise secured for, and paid to, its clients with cash sweep accounts or about Ameriprise using its clients' cash balances to reap windfall profits.

9.    Nor does Ameriprise set its sweep interest rates based on competitive interest rates; brokerages that do ***not*** sweep their cash to affiliated banks (as Ameriprise does) pay far higher interest rates than Ameriprise.

10.    Ameriprise's misconduct constituted and continues to constitute an ongoing series of breaches of its fiduciary duties, an ongoing series of breaches of its contracts with accountholders, and an ongoing series of breaches of the implied covenant of good faith and fair dealing.  Indeed, it was particularly harmful to Ameriprise's clients who, like all other Americans, have suffered through record inflation over the past few years. Plaintiffs, individually and on behalf of the proposed Class defined herein, bring this class action to remedy the significant financial harm caused by Ameriprise's misuse of its cash sweep programs to enrich itself at the expense of its clients.

**I.    PARTIES**

**A.    Defendants**

11.    Defendant Ameriprise Financial, Inc. ("AFI") is a financial services company incorporated in Delaware with its principal place of business in Minnesota. AFI is a holding company that primarily engages in business through its subsidiaries, including its broker-dealer subsidiaries Defendants Ameriprise Financial Services, LLC and American Enterprise Investment Services, Inc. AFI provides financial planning and advice, as well as brokerage services to clients through its financial advisors in its Advice

& Wealth Management business segment. Among the products and services it offers are cash management and banking products, including cash sweep programs.

12. Defendant Ameriprise Financial Services, LLC, d/b/a Ameriprise Financial ("AFS"), formerly known as Ameriprise Financial Services, Inc., is incorporated in Delaware, maintains its principal place of business in Minnesota, is a wholly owned subsidiary of AFI, and operates as AFI's introducing broker-dealer.

13. Defendant American Enterprise Investment Services, Inc. ("AEIS") is incorporated and maintains its principal place of business in Minnesota, is a wholly owned subsidiary of AFI, and operates as AFI's clearing broker-dealer.

14. As used in this Complaint, the term "Ameriprise" collectively refers to AFI, AFS, and AEIS.

**B.    Plaintiffs**

15. Plaintiff Mindy Bender held an Individual Retirement Account ("IRA") and a traditional brokerage account with Ameriprise and is a resident of New York. Ms. Bender's cash balances held in her Ameriprise IRA account were swept into Ameriprise's Bank Sweep Programs during the period when her accounts were open, and she received unreasonably low interest on those deposits.

16. Plaintiff Susanne Mehlman is a resident of Maryland who maintains retirement, advisory, and traditional brokerage accounts with Ameriprise. Ms. Mehlman's cash balances held in her Ameriprise accounts were swept into Ameriprise's Bank Sweep Programs during the period when her accounts were open, and she received unreasonably low interest on those deposits.

17.     Plaintiff Joy Hultman is a resident of Florida who maintains retirement, advisory, and traditional brokerage accounts with Ameriprise. Ms. Hultman's cash balances held in her Ameriprise accounts were swept into Ameriprise's Bank Sweep Programs during the period when her accounts were open, and she received unreasonably low interest on those deposits.

18.     Plaintiff Robert Sullivan is a resident of North Carolina who maintains an advisory relationship with Ameriprise, including an Ameriprise Select Separate Account. Mr. Sullivan's cash balances held at Ameriprise were swept into Ameriprise's Bank Sweep Programs, and he received unreasonably low interest on those deposits.

### C.     Relevant Non-Parties

19.     Non-party Ameriprise Bank, FSB ("Ameriprise Bank") is a national banking association and a wholly-owned subsidiary of AFI. AFI formed Ameriprise Bank in May 2019 by converting its subsidiary Ameriprise National Trust Bank into a federal savings bank. AFI reports its financial results, and that of its subsidiaries, including Ameriprise Bank, on a consolidated basis, and as a result Ameriprise Bank's earnings inure directly to the benefit of AFI.

20.     Ameriprise also arranged for non-party Ameriprise Trust Company ("ATC") to serve as custodian for all of Ameriprise's clients' IRA accounts. In its capacity as custodian, ATC was a "disqualified person" under 26 U.S.C. § 4975(e)(2) and based on the statutory language had a duty to ensure that all IRA account holders received a reasonable rate of interest on their cash sweep balances.  AFI is the 100% owner of ATC and as such, is also a "disqualified person" under Section 4975(e)(2)(G)(i).  As a disqualified person,

AFI had a duty to ensure that all IRA accounts received a reasonable rate of interest on their cash sweep balances.

## II. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction of this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiffs and other class members are citizens of States different from Defendants.

22. The Court has personal jurisdiction over Defendants because they are incorporated in and/or maintain their principal places of business in Minnesota.

23. Venue is proper under 28 U.S.C. § 1391 because, among other things, Defendants maintain their principal places of business in this District and a substantial part of the events and/or relevant conduct by them giving rise to Plaintiffs' claims occurred in this District.

## III. AMERIPRISE'S CASH SWEEP ACCOUNT MISCONDUCT

### A. Ameriprise's Duties to Its Clients

24. The Ameriprise Bank Sweep Programs consist primarily of: (i) the Ameriprise Insured Money Market Account ("AIMMA") and (ii) the Ameriprise Bank Insured Sweep Account ("ABISA").

25. AIMMA is the cash sweep program available to most Ameriprise accounts, and ABISA is only available "for discretionary investment advisory accounts in a tax-qualified ownership, and for certain non-discretionary investment advisory qualified accounts with trustee-directed pooled investment 401(a) ownership."

26.     Ameriprise offers both the AIMMA and the ABISA accounts as money settlement options that sweep uninvested cash daily to interest-bearing, FDIC-insured bank accounts.

27.     Under the AIMMA program, AEIS sweeps cash from its clients' accounts, then allocates the cash into money market deposit accounts. Ameriprise characterizes the money market deposit account as "a type of savings deposit" bank account. When an Ameriprise client participates in AIMMA, their funds are automatically swept to Ameriprise Bank.  In the relatively rare circumstance that the client's cash funds exceed the FDIC limit, Ameriprise then sweeps the excess client cash funds to a non-affiliated participating bank.

28.     It is rare for Ameriprise's accounts to exceed the FDIC limit because the average client cash sweep balance subject to the Ameriprise Bank Sweep Programs is approximately $6,000 to $8,000.  As a result, the vast majority of Ameriprise's clients' cash is deposited with its affiliate Ameriprise Bank.

29.     If a client is enrolled in ABISA as their sweep option, then Ameriprise Bank is the *only* bank option.

30.     Despite the fact that the average client balance in Ameriprise Bank Sweep Programs is approximately $6,000 to $8,000, the aggregate total of Ameriprise cash sweep balances is staggering.  As of June 2024, Ameriprise client cash sweep balances at Ameriprise Bank were *$21.5 billion*.

31.     Ameriprise has numerous fiduciary, contractual, and implied duties to its own clients with respect to its Bank Sweep Programs, including to put its clients' best

interests ahead of its own, to pay clients a "reasonable rate" of interest on their cash sweep balances, and to take into account "prevailing economic and market conditions" and "prevailing economic and business conditions."

32.     Ameriprise has repeatedly recognized the existence of these duties but acted in ways directly contrary to them by appropriating for itself the profits that belong to its own clients.

33.     For example, the Ameriprise Custom Advisory Relationship Agreement stated that it relates to "a number of investment advisory programs," and "managed account" and "investment advisory" relationships, including IRA relationships. Under the heading "**Sweep Program and Expenses**," Ameriprise expressly contracted with its clients that, as part of the Bank Sweep Programs, Ameriprise would deposit or invest client cash balances "in deposits of itself or its affiliates, including Ameriprise Bank, FSB, that bear *a reasonable rate of interest* . . . ."[1]

34.     The Ameriprise Select Separate Account Client Agreement stated that the Ameriprise Select Separate Account ("Select Separate Account") is a "service that enables [clients] to own a portfolio of individual securities, exchange traded funds ('ETFs'), and in some circumstances, mutual funds managed by a professional Investment Manager." Under the heading "**Sweep Program and Expenses**," Ameriprise also contracted with Select Separate Account clients that, as part of the Bank Sweep Programs, Ameriprise

---

[1] All emphasis using bold and italics together is added.

would deposit or invest client cash balances in deposits of itself or its affiliates, including Ameriprise Bank, that bear "*a reasonable rate of interest*."

35.     In the fall of 2023, the SEC launched an investigation into brokerage firms' cash sweep accounts. For example, in November 2023, Wells Fargo announced that its cash sweep program was under investigation by the SEC. In March 2024, in the wake of the deepening SEC investigation, Ameriprise tried to remove its obligation to pay a "reasonable rate" of interest.  Specifically, in or before March 2024, Ameriprise deleted the underlined phrase in the following quote from its Ameriprise Custom Advisory Relationship Agreement and from its Select Separate Account Client Agreement, which is the same line from the "**Sweep Program and Expenses**" section of the Agreements quoted above:  "You further authorize Sponsor [i.e., AFS] or its affiliates to invest, directly or indirectly, in deposits of itself or its affiliates, including Ameriprise Bank, FSB, <u>that bear a reasonable rate of interest, determined solely by Sponsor, to facilitate money settlement option services</u>."  These documents now state only that clients "authorize Sponsor [i.e., AFS] or its affiliates to invest, directly or indirectly, in deposits of itself or its affiliates, including Ameriprise Bank, FSB."

36.     Ameriprise's attempt to delete the obligation to secure for, and pay, its clients a "reasonable rate of interest" from its agreements with its clients:  (i) demonstrated that Ameriprise had such an obligation; (ii) showed Ameriprise understood it had such an obligation and sought to alter its contractual duties to its clients; (iii) constituted a breach of Ameriprise's fiduciary, contractual, and implied duties to its clients because, among other things, it was in Ameriprise's own self-interest, contrary to clients' interests, and in

violation of its existing agreements with clients; and (iv) was invalid because it attempted to remove a material obligation owed by Ameriprise to its clients.

37.     Ameriprise's obligation to secure for, and pay, its clients a reasonable rate of interest on their cash sweep balances also included an obligation to take into account prevailing economic, market, and business conditions. The Ameriprise Brokerage Client Agreement incorporates by reference a "Form 402469" that includes "Other Important Brokerage Disclosures." Under a heading for "Ameriprise Insured Money Market Account," the Other Important Brokerage Disclosures document provides that "AEIS offers the Ameriprise Insured Money Market Account ('AIMMA'), a program that provides for the automatic deposit or 'sweep' of available cash balances in your account into interest-bearing FDIC-insured deposit accounts ('Deposit Accounts') at unaffiliated banks and our affiliate bank, Ameriprise Bank, FSB ('Ameriprise Bank') (altogether 'Program Banks')." That same section goes on to state:

> Interest rates on the Deposit Accounts will be tiered based on the cash balances in individual accounts ("Interest Rate Tiers"). We do not aggregate accounts for purposes of interest rate tiers. We reserve the right to change the methodology used to determine the interest rates in our sole discretion and without prior notice to you. ***The rate is generally based on a variety of factors including, but not limited to, prevailing economic and market conditions***.

38.     Similarly, under a heading for "Ameriprise Bank Insured Sweep Account," the Other Important Brokerage Disclosures states that, with regard to ABISA, "Interest rates on the Deposit Accounts are tiered and ***will vary*** based upon your account cash balance ***as well as prevailing economic and business conditions***."

39. In addition, in the Ameriprise Other Important Brokerage Disclosures document, under the subheading "Interest on Cash Sweep Balances in Your Deposit Accounts," Ameriprise stated that "The interest income you receive will vary based upon the value of deposits related to your particular account in the Deposit Accounts ('Interest Rate Tiers') and *can fluctuate daily depending on prevailing economic and business conditions*."

40. The Ameriprise brokerage disclosure documents also admitted that the aggregation of clients' cash through the omnibus sweep account gave the Ameriprise clients with cash sweep balances cumulative financial leverage through the sheer amount of cash they deposited with Ameriprise Bank. That leverage should have led to *higher interest rates* for clients' cash sweep deposits than on competing financial products, had their agent, Ameriprise, adequately discharged its fiduciary duties and negotiated a deal with Ameriprise Bank in their best interest. Specifically, the disclosures provide that:

> Any cash in your Managed Account(s) that is swept to AIMMA is aggregated with cash held by other Ameriprise clients that utilize AIMMA and is held in an omnibus account at one or more Program Banks. Omnibus accounts, *by virtue of their ability to raise significant balances for the Program Banks*, are generally able to earn *higher interest rates* than those *you would be able to earn if you deposited cash individually at a bank*.

41. The foregoing statement also constituted a contractual term that the higher interest rates achieved as a result of that aggregation would inure to the benefit of "you," *i.e.*, the Ameriprise client.

42. Ameriprise breached its express and implied contractual obligations because, among other things, Ameriprise: (i) failed to secure and pay a reasonable rate on cash sweep

deposits; (ii) attempted to remove its contractual obligation to secure and pay a reasonable rate of interest on its clients' cash sweep deposits; (iii) failed to properly take into account "prevailing economic and market conditions" and "prevailing economic and business conditions" when setting the interest rates on cash sweep accounts; and (iv) failed to use the massive leverage and bargaining power of the $20 billion-plus amount of client assets in its cash sweep accounts to obtain higher interest rates for its clients with cash sweep accounts.

**B.** **Ameriprise Used Its Affiliated Bank, Ameriprise Bank, to Siphon Net Interest Income from the Billions of Dollars of Clients' Cash Sweep Deposits**

43.     In creating and operating its Bank Sweep Programs, Ameriprise exercises control over what sweep vehicles it makes available to its clients. Ameriprise also exercises control over the setting of the interest rates that its affiliated banks, including Ameriprise Bank, pay on its clients' cash balances.

44.     In May 2019, as market interest rates increased, Ameriprise began operating Ameriprise Bank primarily to take advantage of the cash in Ameriprise clients' accounts and capture for Ameriprise more of the spread between the interest paid to Bank Sweep Program clients and the interest income it could earn using such clients' Bank Sweep Program deposits.

45.     As explained in Ameriprise's 2020 Form 10-K:

In 2018, we made the strategic decision to seek to expand the banking products and services we can provide directly to our clients, and commenced the process to convert our subsidiary Ameriprise National Trust Bank into a federal savings bank with the capabilities to offer FDIC insured deposits and a range of lending products. We completed that process, received regulatory

approvals and converted Ameriprise National Trust Bank to Ameriprise Bank, FSB in May 2019, at which time Ameriprise Financial became a savings and loan holding company that is subject to regulation, supervision and examination by the Board of Governors for the Federal Reserve System ("FRB").

46. On Ameriprise's second quarter 2018 earnings call held on July 25, 2018, CFO Walter S. Berman discussed the benefit of launching a bank to capture more of the spread on swept cash. He stated:

> We have already … an installed base of credit cards that would be transferring over. And certainly, as you indicated, ***sweep accounts will certainly come in and then we will be able to leverage on and play with the balance sheet then to provide the appropriate risk return***.

47. Ameriprise subsequently operated Ameriprise Bank primarily to take advantage of the cash in Ameriprise clients' accounts, which Ameriprise directed to it through the Bank Sweep Programs. Indeed, most of Ameriprise Bank's assets—at least 90% at certain times during the Class Period—is cash deposited by Ameriprise as agent on behalf of Ameriprise's clients.

48. Ameriprise's top executives, and market analysts, highlighted the formation of Ameriprise Bank as part of Ameriprise's strategy to maximize its profits from its swept cash. For example, on Ameriprise's second quarter 2019 earnings call held on July 25, 2019, CFO Berman explained that "the bank is going to transfer over, as we said, ***substantial amounts of sweep accounts*** as we go through the period and, certainly, ***picking up the spread on that*** as we look at investing differently. So that is really going to be ***the lion's share of the benefit*** that we are going to derive on that."

49. Similarly, *Morningstar* explained on July 25, 2019, that:

The company moved about $2 billion of client money market fund balances into its bank, but can probably shift at least high-single-digit billions into the bank over time. While traditional banks are facing the prospect of declining net interest margins due to the interest rate environment, ***Ameriprise will earn more net interest income on client cash shifted into its bank than any fee revenue it was earning on money market fund balances***.

50. The following table illustrates the dramatic increase in the ***billions of dollars*** in "cash sweep balances" held at Ameriprise Bank since Ameriprise converted the bank and began operations in 2019:

| Date | Cash Sweeps Balances in Ameriprise Bank (in billions)[2] |
|---|---|
| June 30, 2019 | $2.2 |
| September 30, 2019 | $2.5 |
| December 31, 2019 | $3.8 |
| March 31, 2020 | $6.2 |
| June 30, 2020 | $5.3 |
| September 30, 2020 | $6.3 |
| December 31, 2020 | $7.4 |
| March 31, 2021 | $8.0 |
| June 30, 2021 | $8.7 |
| September 30, 2021 | $9.8 |
| December 31, 2021 | $11.4 |
| March 31, 2022 | $13.2 |
| June 30, 2022 | $15.5 |
| September 30, 2022 | $18.6 |
| December 31, 2022 | $18.3 |
| March 31, 2023 | $20.0 |
| June 30, 2023 | $20.9 |
| September 30, 2023 | $21.0 |
| December 31, 2023 | $21.5 |
| March 31, 2024 | $21.3 |
| June 30, 2024 | $21.5 |

---

[2] Ameriprise Form 10-Qs and 10-Ks filed with the SEC.

51.     Ameriprise also disclosed the size of its overall Bank Sweep Program balances on its earnings conference calls. For example, on the second quarter 2018 earnings call, Ameriprise disclosed that overall "Brokerage cash balances remain substantial at $24.5 billion." On Ameriprise's fourth quarter 2018 earnings call, the Company stated "we're earning competitive returns on our $28 billion of brokerage cash balances, which were up 6%, an all-time high." Then, on Ameriprise's first quarter 2020 earnings call, the Company disclosed that, "[c]lient brokerage cash balance increased close to 30% to ***more than $32 billion***."

### C.     Ameriprise Established Unreasonably Low Interest Rates on the Billions of Dollars Its Clients Held in Cash Sweep Accounts

52.     The interest rates to be paid to clients pursuant to the Bank Sweep Programs are established by Ameriprise. Contrary to the terms of Ameriprise's agreements with its clients, Ameriprise has not secured for or paid its clients a fair or reasonable rate of interest on their swept cash, and Ameriprise in fact ignored or failed to properly take into account prevailing economic, market, and business conditions in setting rates.

53.     For example, and without limitation, since 2022, the Federal Funds Rate— the interest rate at which banks lend to one another—increased significantly from a low of 0.08% to a high of 5.33% in 2024. However, Ameriprise failed to secure and pay increasing interest rates on its clients' swept cash.

54.     In fact, Ameriprise maintained nearly flat Bank Sweep Program rates for years, at a fraction of a percent, securing high interest returns for itself on the cash but securing far less than a fair and reasonable rate for its clients—thereby retaining the sharply

increased spread for itself. This is reflected in the graph below, which compares the Federal Funds Rate to Ameriprise's Bank Sweep Program interest rate on cash deposits up to $99,999:



55. As this graph illustrates, Ameriprise is able to derive significant profits from having its clients' funds invested in its Bank Sweep Programs because Ameriprise establishes rates to be paid to its clients that are neither fair nor reasonable—contrary to Ameriprise's legal, contractual, and implied duties.

56. Ameriprise's Brokerage Client Agreement and Other Important Brokerage Disclosures do not specify the applicable interest rates on its cash sweep accounts. Instead, Ameriprise directs clients to a website to obtain current interest rate information. Over the past several years, Ameriprise's cash sweep rates have been set artificially low by Ameriprise, including, as discussed below, in comparison to numerous industry

benchmarks. Below is a chart listing examples of the Annual Percentage Yield rates in each of the previous seven years:

| From | To | 2018-12-31 APY | 2019-12-31 APY | 2020-12-31 APY | 2021-12-30 APY | 2022-12-30 APY | 2023-12-29 APY | 2024-09-17 APY |
|---|---|---|---|---|---|---|---|---|
| $0 | $4,999 | 0.13% | 0.08% | 0.01% | 0.01% | 0.25% | 0.30% | 0.30% |
| $5,000 | $24,999 | 0.13% | 0.08% | 0.01% | 0.01% | 0.25% | 0.30% | 0.30% |
| $25,000 | $49,999 | 0.13% | 0.08% | 0.01% | 0.01% | 0.25% | 0.30% | 0.30% |
| $50,000 | $99,999 | 0.13% | 0.08% | 0.01% | 0.01% | 0.25% | 0.30% | 0.30% |
| $100,000 | $249,999 | 0.20% | 0.10% | 0.01% | 0.01% | 0.40% | 0.50% | 0.50% |
| $250,000 | $499,999 | 0.25% | 0.10% | 0.01% | 0.01% | 0.55% | 0.65% | 0.65% |
| $500,000 | $999,999 | 0.30% | 0.10% | 0.01% | 0.01% | 0.70% | 0.85% | 0.85% |
| $1,000,000 | $4,999,999 | 0.50% | 0.25% | 0.01% | 0.01% | 1.50% | 1.90% | 1.90% |
| $5,000,000 | and above | 0.60% | 0.30% | 0.01% | 0.01% | 1.75% | 2.20% | 2.20% |

57. The vast majority of Ameriprise's accounts had balances of less than $100,000 and therefore earned a maximum of 0.30%.

**D.    Ameriprise Has Unjustly Enriched Itself by Paying Unreasonably Low Interest Rates on Its Clients' Bank Sweep Deposits**

58. Ameriprise has derived significant financial benefits for itself from the payment of unreasonably low interest rates on its clients' cash sweep deposits. For example, and without limitation, as a result of the increasing interest rates in 2022, Ameriprise saw a rise in margins fueled by its Bank Sweep Programs. In public statements, Ameriprise addressed these rising rates, the coinciding margin benefits that Ameriprise captured as a result of not increasing rates for its clients, and the fact that Ameriprise expected the margins to actually increase going forward. For example, on Ameriprise's third quarter 2022 earnings call held on October 26, 2022, Ameriprise CFO Water Berman stated:

> I would say, listen, our margin, the base business are increasing. ***But really, we are getting lift from the interest rates***, and that is an important contributor. And ***certainly, we do see margins from those activities of being***

**larger elements as you look at the bank and you look at the sweet [sweep] cash**. So yes, the answer is, yes, **we do see the margins will be increasing based upon the current assumptions** that we see.

59.     On Ameriprise's first quarter 2023 earnings call held on April 25, 2023, CFO Berman was asked about Ameriprise cash accounts, and he explained that Ameriprise cash sweep accounts were a source of "additional yield" and that Ameriprise was planning to "shift[] additional funds into the bank, which has a higher profitability."

60.     Ameriprise Bank functions as a highly profitable arbitrage operation of Ameriprise, making it possible for Ameriprise to take advantage of the nearly-cost-free cash entrusted to it by its clients pursuant to the Bank Sweep Programs, and retaining for itself, through Ameriprise Bank, the vast majority of the profits generated by its clients' cash deposits.

61.     For example, an analyst report from William Blair on January 26, 2023, stated:

> Accelerating spread income: Spread income is expanding as the gross yield rose to 3.7%, from 2.5% last quarter, on cash balances of $47 billion. ***Brokerage sweep cash is being shifted to the bank to earn a higher spread***, and the certificates business is capturing some cash sorting, which is already minimal given the client mix. Most of the bank portfolio is in fixed-rate investments, and new money yields are at 6.5% (3- to 4-year durations), which means yields should remain high even when interest rates fall. ***With interest rates likely to move higher, we expect spread income to double*** to $2 billion in 2023.

62.     Ameriprise has continued to take advantage of its clients' cash sweep accounts, even as regulatory and industry scrutiny of cash sweep accounts increased, and competitors raised the interest rates paid on cash sweep balances in late 2023 and throughout 2024.

63.     In November 2023, Wells Fargo announced that its cash sweep program was under investigation by the SEC. Then, in July 2024, both Wells Fargo and Morgan Stanley announced that they were raising interest rates on cash sweep accounts. Morgan Stanley then announced on August 5, 2024, that the SEC was investigating its "advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940."

64.     Despite the increased regulatory scrutiny of sweep accounts and Ameriprise's competitors reacting by raising interest rates, Ameriprise has failed to increase the interest rates on its Bank Sweep Programs.  On an Ameriprise earnings call held on July 25, 2024, Ameriprise admitted that although it is bound to "operate within regulatory and fiduciary standards," it would not be increasing rates.

65.     Ameriprise executives' resistance to increasing sweep account interest rates—in a high-interest rate environment where its competitors were publicly increasing their rates—demonstrates its breach of its fiduciary and contractual obligations to its clients.

66.     On Ameriprise's second quarter 2024 earnings call held on July 25, 2024, Ameriprise CFO Berman described Ameriprise's Bank Sweep Programs in general terms and said, "At this point, we do not anticipate any changes in our approach to cash sweep." Later in the call, analyst Suneet Kamath from Jefferies remarked that he was trying to reconcile that position with the facts that: (i) Ameriprise had, in the past stated that its sweep program was "always subject to the competitive environment" and (ii) he had

already "seen a handful of companies take some actions on their cash sweep rates," whereas Ameriprise had not.

67. Other analysts remarked on the competitive and regulatory pressure to increase rates. As William Blair reported on July 25, 2024, "Recent competitive and regulatory pressures have caused some of the wirehouses to start raising sweep rates for advisory accounts, which have fiduciary obligations, given the large disparity with prevailing money market fund yields." The analyst added that "We believe further pressure is likely and would not be surprised to see regulatory action by year-end." The William Blair analyst further wrote that "Ameriprise has $12 billion of client cash in advisory accounts, and we believe the current sweep rate averages around 80 basis points. *If the sweep rate were increased to 2.5%* in early 2025, we estimate this would reduce spread income by $222 million and EPS by $1.80."

### E. Ameriprise Owes Several Independent Duties and Obligations to Its Clients

68. As a registered investment adviser and broker-dealer, and acting as an agent for its clients with respect to the Bank Sweep Programs, Ameriprise owes fiduciary duties to its clients as well as express contractual obligations and obligations implied as a matter of law.

69. AFS is a registered investment adviser bound by the fiduciary duties imposed by the Investment Advisers Act of 1940, including duties of care and loyalty. This includes a duty for AFS to act in the best interests of its clients, and to place the best interests of its clients ahead of its own self-interest. Similar duties are imposed on Ameriprise under

principles of broker-dealer law and as an agent of its clients in connection with its Bank Sweep Programs.

70.     For all advisory accounts, Ameriprise was contractually obligated to pay to or secure for its clients a "reasonable rate of interest" on the clients' cash balances.

71.     For all advisory (or managed) accounts (including advisory IRAs), Ameriprise was required to act as a fiduciary to its clients with respect to all aspects of the accounts, including the Bank Sweep Programs, pursuant to the Investment Advisers Act of 1940.

72.     For all accounts, Ameriprise agreed to act as "agent" for its clients with respect to the Bank Sweep Programs, and, as a result, Ameriprise was required to act as a fiduciary for its clients as its principal with respect to the Bank Sweep Programs.

73.     In addition, Ameriprise is bound by the implied covenant of good faith and fair dealing to secure for, and pay, its clients with sweep accounts a fair and reasonable rate of interest.

74.     Ameriprise contracted with its clients that the interest rate on its Bank Sweep Program deposits would be based on prevailing economic, market, and business conditions.

75.     Ameriprise breached its express and implied contractual duties and fiduciary duties to its clients by failing to pay to, or secure for, them a fair and reasonable rate of interest on their cash sweep balances.  Ameriprise further breached its express and implied contractual duties and fiduciary duties to its clients by, among other things: (i) structuring the Bank Sweep Programs to place client assets in the Bank Sweep Programs and secure for, and pay, clients artificially low interest rates so as to benefit Ameriprise and its affiliates

to its clients' detriment; (ii) failing to adjust the interest rates paid on sweep account balances to be consistent with prevailing economic, market, and business conditions as marked by increased interest rates in the industry and, including, as paid by brokerages with sweep accounts that swept cash to non-affiliated banks; (iii) failing to properly take into account competitive interest rates when setting sweep account interest rates; and (iv) attempting to remove from its client disclosures the provision that imposed on Ameriprise the contractual obligation to provide a "reasonable rate" of interest to its clients.

### 1.     Ameriprise Owes Fiduciary Duties to Its Clients

76.     As an investment adviser for its clients, Ameriprise must adhere to certain standards of care and conduct.

77.     Specifically, for its advisory clients, Ameriprise owes its clients a fiduciary duty under the Investment Advisers Act of 1940, which is based on equitable common law principles and fundamental to its relationship with its clients. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

78.     Under this fiduciary duty, Ameriprise "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.*

79.     If there is a conflict between its interests and its client's interests, then Ameriprise is also required to "eliminate or make full and fair disclosure of all conflicts of interest which might incline an adviser—consciously or unconsciously—to render advice

which is not disinterested such that a client can provide informed consent to the conflict."
*Id.*

80.     Where Ameriprise "cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent," then Ameriprise "should either **eliminate** the conflict or adequately **mitigate** (*i.e.*, modify practices to reduce) the conflict[.]" *Id.* (emphasis in the original).

81.     Ameriprise owes substantially similar duties to its brokerage clients under broker-dealer rules and regulations, *see* Reg. BI, 17 C.F.R. § 240.15l-1, 84 Fed. Reg. 33318-64, which Ameriprise expressly acknowledges and incorporates in its client agreements, including an obligation to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation." 84 Fed. Reg. 33318, 33321.

82.     Moreover, in creating and operating its Bank Sweep Programs, Ameriprise also agreed to act as an agent (and therefore a fiduciary) on behalf of its clients in establishing, maintaining, and operating their cash sweep accounts.  For example, pursuant to the Other Important Brokerage Disclosures, Defendant AEIS acted as its clients' agent and exercised control over the establishment and operation of the Bank Sweep Programs, including the establishment of rates to be paid to its clients.  This included AEIS's contractual agreements with clients that:

- "AEIS will . . . open Deposit Accounts **as your agent**. . ."

- "AEIS, **as your agent**, will establish the Deposit Accounts for you at each Bank and make deposits to and withdrawals from the Deposit Accounts."

- "When funds are first available for deposit, AEIS, **as your agent**, will deposit available cash balances in your brokerage account into your [money market deposit account] and a linked [transaction account] at one or more of the Banks on the then-current Bank List. . ."

- "All withdrawals necessary to satisfy debits in your brokerage account **will be made by AEIS as your agent**."

- "**AEIS is acting as your agent** in establishing the Deposit Accounts at each Bank, depositing funds into the Deposit Accounts, withdrawing funds from Deposit Accounts and transferring funds among Deposit Accounts."

83. Accordingly, in its capacity as an adviser, broker, and/or agent in exercising complete control in creating, offering, automatically enrolling, and maintaining cash sweep accounts under the Bank Sweep Programs and the rates to be paid thereunder, Ameriprise assumed fiduciary and other duties of loyalty and care to its clients.

84. Contrary to its duties to its clients, at the same time that Ameriprise was supposed to be acting as its clients' agent in connection with the Bank Sweep Programs, it was actually acting to advance its own interests, and those of its affiliates, at the expense of its clients.

### 2. Ameriprise Has a Contractual Obligation to Pay and Secure Reasonable Interest Rates For Advisory Clients

85. For client cash balances maintained in advisory accounts, Ameriprise may utilize those cash balances for investments or loans, but only if it pays to, or secures for, the client a "reasonable rate" of interest on those cash balances.

86. In the Ameriprise Custom Advisory Relationship Agreement and in the Ameriprise Select Separate Account Client Agreement, under the heading "**Sweep**

**Program and Expenses**," Ameriprise expressly contracted with clients that, as part of the Bank Sweep Programs, Ameriprise would deposit or invest client cash balances "in deposits of itself or its affiliates, including Ameriprise Bank, FSB, that bear *a reasonable rate of interest* . . . ." This obligation survived Ameriprise's unilateral and void attempt to delete it from client agreements in or about March of 2024.

87. Accordingly, Ameriprise has explicitly agreed to deposit its advisory clients' cash sweep money in bank accounts that pay a "reasonable rate of interest" on that cash.

      **3.**      **Ameriprise Has a Contractual Obligation to Make Reasonable Arrangements Regarding Its Clients' Cash Balances In Qualified Retirement Accounts**

88. Additionally, Ameriprise, in its guide to IRA accounts, disclosure and custodial agreement, contractually agrees to make "reasonable" arrangements with Ameriprise Bank or Ameriprise's affiliates and delegates regarding the Ameriprise cash sweep program.

89. This contractual provision is required to comply with Section 4975 of the Internal Revenue Code ("IRC"). IRC Section 4975 taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account." 26 U.S.C. § 4975(c).

90. A "disqualified person" includes companies or individuals "providing services to the plan."[3] 26 U.S.C. § 4975(e)(2)(B). This includes IRA custodians and banks

---

[3] "Plan" is defined as including "an individual retirement account described in Internal Revenue Code § 408(a)." 26 U.S.C. § 4975(e)(1)(B).

that receive deposits swept from Ameriprise client accounts; in this case, Ameriprise Bank and other participating banks.

91.     The Internal Revenue Code provides several "exemptions" or safe harbors for these "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution."  26 U.S.C. § 4975(d)(4).

92.     Treasury regulations extend this same obligation to situations when "a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates." 26 CFR § 54.4975-6(b)(3)(i).  When this occurs, the client's authorization "must name" the institution and "must state that such bank or similar financial institution may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." *Id*.

93.     Ameriprise thus has both legal and contractual duties to act in the best interests of its clients with respect to its Bank Sweep Programs and to pay to or secure for its clients fair and reasonable interest rates on its clients' cash balances.

**4.     Ameriprise Has a Contractual Obligation to Base Its Sweep Account Interest Rates on Prevailing Economic, Market and Business Conditions**

94.     In Ameriprise's Other Important Brokerage Disclosures document distributed to Ameriprise clients, Ameriprise states that the interest rates paid on its Bank Sweep Program deposits are "***generally based on a variety of factors including, but not limited to, prevailing economic and market conditions***."

95.     Similarly, under a heading for the "Ameriprise Bank Insured Sweep Account," the Other Important Brokerage Disclosures document created the contractual obligation that, with regard to ABISA, "Interest rates on the Deposit Accounts are tiered and **will vary** based upon your account cash balance **as well as prevailing economic and business conditions**."

96.     The Ameriprise Other Important Brokerage Disclosures document also created the contractual obligation, under the subheading "Interest on Cash Sweep Balances in Your Deposit Accounts," that "[t]he interest income you receive will vary based upon the value of deposits related to your particular account in the Deposit Accounts ('Interest Rate Tiers') and **can fluctuate daily depending on prevailing economic and business conditions**."

97.     Accordingly, pursuant to Ameriprise's agreements with its clients, the interest rates paid to clients in Ameriprise cash sweep accounts must reflect the prevailing economic, market, and business conditions, and the interest rates paid to clients must be competitive with other benchmark interest rates, including, for example, the rates paid by brokerages who sweep cash to non-affiliated banks.

98.     The Ameriprise Other Important Brokerage Disclosures document also created the contractual obligation that the aggregation of clients' cash through the omnibus sweep account, which gave the Ameriprise clients with cash sweep balances cumulative financial leverage through the sheer amount of cash at issue, would result in **higher interest rates** paid to clients than if they deposited cash individually at a bank.  Specifically, Ameriprise's brokerage disclosures provided that:

Any cash in your Managed Account(s) that is swept to AIMMA is aggregated with cash held by other Ameriprise clients that utilize AIMMA and is held in an omnibus account at one or more Program Banks. Omnibus accounts, ***by virtue of their ability to raise significant balances for the Program Banks***, are generally able to earn ***higher interest rates*** than those you would be able to earn if you deposited cash individually at a bank.

99. The foregoing statement constituted a contractual obligation that the higher interest rates would inure to the benefit of "you," i.e., the client.

### 5. Ameriprise's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for Ameriprise to Provide Clients with a Reasonable Rate of Interest

100. Ameriprise's clients' agreements all include an implied covenant of good faith and fair dealing. This implied covenant includes but is not limited to a duty not to perform the parties' agreement based on an ulterior motive and act in a way that evades the spirit of the bargain. In this case, that implied covenant included a duty for Ameriprise to secure for, and pay, its clients a fair and reasonable rate of interest on their cash sweep balances.

101. In failing to secure for or pay to its clients a fair and reasonable rate of interest, Ameriprise breached the implied covenant of good faith and fair dealing.

### F. Ameriprise Breached Its Duties, Contracts and the Implied Covenant, and Profited Thereby

102. Ameriprise has breached, and continues to breach, its duties and agreements to secure and pay fair and reasonable interest rates for its clients' deposits, its contractual agreements that the interest rates would be based on prevailing economic, market, and business conditions, as well as its implied covenant to pay its clients a fair and reasonable rate of interest.

103.     Ameriprise has breached, and continues to breach, its duties, its contractual obligations, and the implied covenant of good faith and fair dealing to, and with, its clients by creating and operating its Bank Sweep Programs for its own principal benefit, over which Ameriprise exercises complete control, all while failing to pay or secure fair and reasonable rates of interest on client cash balances.

104.     Through its legal and contractual duties, Ameriprise was obligated, but failed, to: (i) set, secure or pay fair and reasonable interest rates on clients' cash balances deposited in the Bank Sweep Programs; (ii) properly take into account prevailing economic, market, and business conditions in setting rates; and (iii) elevate its clients' interests above its own in creating, implementing, maintaining, recommending, and operating the Bank Sweep Programs.

105.     Ameriprise's conduct of failing to pay to or secure for its clients a fair or reasonable rate of interest on their cash balances that properly took into account prevailing economic, market, and business conditions unjustly enriches Ameriprise at the direct expense of its clients.

106.     Ameriprise and its affiliates gained significant financial benefits from the cash balances swept into its Bank Sweep Programs through the spread the affiliate banks earn on the Bank Sweep Program deposits, the fees Ameriprise received from the Program Banks, and other incentive arrangements with the affiliate banks that are based, at least in part, on deposit balances and number of accounts in the Bank Sweep Programs.

107.     Ameriprise's Net Interest Income increased dramatically over the past several years due, in large part, to Ameriprise taking improper advantage of its relationships

with its clients, appropriating to itself the benefit of the rising interest rate environment, and failing to pass on such benefit to its clients for whom it acted as agent and fiduciary.

108. The relationships between Ameriprise and its clients, the imbalance of negotiating power between Ameriprise and its clients, and Ameriprise's exercise of control over the interest paid in the Bank Sweep Programs are circumstances that create an equitable obligation (in addition to any fiduciary, contractual or implied duty) running from Ameriprise to its clients.

109. Ameriprise's continual sweep of Plaintiffs' and the other Class members' cash into the Bank Sweep Programs during the entire period in which they held accounts with Ameriprise while paying them an unreasonably low interest rates constitutes a continuing wrong and was an ongoing and continuing series of breaches of Ameriprise's duties to, and contracts with, Plaintiffs and the other Class members.

## G. Ameriprise Secured and Paid Unreasonably Low Interest Rates on Its Clients' Cash Sweep Deposits

110. Ameriprise established, implemented, and maintains the Bank Sweep Programs to maximize its profits through increased Net Interest Income by securing for its clients unfair and unreasonably low interest rates from its affiliate Ameriprise Bank, while appropriating almost all of the interest earned at significantly higher rates for itself.

111. IRS regulations define an "arm's-length interest rate" as:

[A] rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 CFR § 1.482-2(a)(2).

112. In 2003, the Department of Labor issued an exemption to certain transactions and, in granting the exemption, gave the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, at 34648 (June 10, 2003).

113. Under these terms, and any reasonable understanding of what a reasonable rate of interest is, Ameriprise did not secure for or pay to its clients a reasonable rate of interest to its clients, including Plaintiffs and Class members. Nor did Ameriprise base its sweep account interest rates on competitive rates or prevailing economic, market and business conditions. This is supported by reference to other leading indicators of interest rates being paid during the relevant time periods.

### 1. Sweep Account Rates Paid by Other Institutions

114. The interest rates paid by other brokerages that sweep cash demonstrate that the interest rates paid to Ameriprise cash sweep accountholders were not fair or reasonable. This includes brokerages that sweep cash to a bank that is not affiliated with the brokerage, such as Fidelity.

115. As shown in the graph below, an index of interest rates paid by five brokerages that did ***not*** sweep client cash balances to a bank affiliated with its own brokerage more closely tracks the movement of the Federal Funds Rate (set forth above)

than Ameriprise's de minimis cash sweep rates. By contrast, the interest rate that Ameriprise paid its clients was much lower during much of the relevant time:



116. As shown in the above graph, from mid-2018 to 2023, Ameriprise sweep rates had minimal movement, even as the sweep rates paid by brokerages using unaffiliated banks increased during 2018 and 2019 and remained much higher than Ameriprise in the beginning of 2020. In addition, starting in mid-2022, Ameriprise's sweep rate stayed consistently low with miniscule increases while the rates paid by brokerages that swept cash to unaffiliated banks increased consistent with the market.

117. Specific firms that swept cash to unaffiliated banks paid interest rates that more closely resembled arm's-length negotiations, and therefore at least partially reflected the prevailing economic, market, and business conditions, compared to the rates paid by Ameriprise.

118. For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and they have consistently paid significantly higher rates of interest than Ameriprise. At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of asset tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). Ameriprise Bank, in contrast, paid 0.25% up to $99,999 as of year-end 2022. As mentioned above, Class members' cash balances in the Bank Sweep Programs were primarily allocated to Ameriprise Bank.

119. Additional examples of brokerage firms that sweep their clients' cash into accounts with banks that are not affiliated with the firm include Robinhood's rate of 4.9% for Robinhood Gold members as of July 27, 2023, and WeBull's rate of 5%.

120. Fidelity and R.W. Baird have significantly increased the rates they paid on swept cash. As of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of asset tier, and R.W. Baird paid 2.03% interest (on cash balances up to $1 million). In comparison, in the same time period, Ameriprise paid only 0.30% APY on cash balances up to $99,999.

121. In addition, the interest rate offered by Vanguard on its sweep program is currently 4.15% regardless of asset tier, and the interest rate offered by Dreyfus is 2.50% regardless of asset tier.

### 2.    The Federal Funds Rate Benchmark

122. A number of interest rate benchmarks increased dramatically over the past several years, but Ameriprise's rates barely changed (in its asset tiers up to $99,999) or changed by only miniscule amounts (in its higher asset tiers).

123.     Ameriprise acknowledges in its Other Important Brokerage Disclosures the importance of the Federal Funds Rate as a benchmark. A December 2021 version of the document provides that third party banks participating in the AIMMA agreed to pay AEIS "the Federal Funds Rate plus 0.20%." This disclosure was revised and in September 2022 provided, "total compensation paid by each participating Bank to AEIS is negotiated and is based on a reference rate, such as the Federal Funds Rate, plus or minus a spread."

124.     The Federal Funds Rate benchmark further demonstrates that the interest rate paid to Ameriprise Bank Sweep Program accountholders was not reasonable and did not properly take into account the prevailing economic, market, and business conditions.  The federal funds market consists of domestic unsecured borrowings by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises.  In other words, it is the market of unsecured borrowing transactions, principally between banks.  The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

125.     The Federal Funds Rate increased dramatically in recent years. For example, the effective Federal Funds Rate on August 28, 2024, was 5.33%.  The graph below (the same as reproduced above) shows the Federal Funds Rate over the past several years and the rate paid on the Bank Sweep Programs on deposits up to $99,999.  As the comparison shows, the interest rates paid to Ameriprise cash sweep account holders have been drastically lower and have failed to reflect changes in the market:



Ameriprise Sweep Rate vs. Federal Funds Rate

126.    The above graph demonstrates that the interest rates Ameriprise secured for its clients' sweep accounts were unreasonably low, when considered in light of prevailing economic, market, and business conditions.

### 3.    The Interest Rates on Sovereign Short-Term Debt Benchmark

127.    The yield on short-term U.S. Treasury Bills also demonstrates that the interest rate paid on Ameriprise cash sweep accounts was not reasonable and did not properly take into account the prevailing economic, market, and business conditions.  U.S. Treasury Bills are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks.  They are sold at a discount to their face value, and when they mature, the investor is paid the face value.  Treasury Bills are considered extremely safe investments, but they generally do not produce high returns over time, especially in a low-interest-rate environment.

128.    The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage.  As shown in the graph below, over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill: (i) increased through mid-2019; (ii) dropped to close to zero throughout the COVID pandemic; and (iii) steadily increased from close to zero in early 2022 to approximately 5.5% in mid-2023, and remained at approximately that level through August 2024:



129.    During the entire timeframe when the U.S. Treasury Bill yield was appreciably above zero, the interest rate Ameriprise paid to cash sweep account holders remained a tiny fraction of that benchmark.

### 4. The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements

130. The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2019 to the present were also significantly higher than Ameriprise's cash sweep account interest rates. This further demonstrates that the interest rate paid on Ameriprise cash sweep accounts was not reasonable and did not properly take into account the prevailing economic, market, and business conditions.

131. A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities. In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees to buy it back at a specified date and price. The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period. The security serves as collateral for the lender. A repo can be based on any security, but it usually involves government debt or other debt instruments with steady values.

132. The overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs. From April of 2023 through April of 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023. These rates are significantly higher than the cash sweep interest rates offered by Ameriprise.

## <u>CLASS ACTION ALLEGATIONS</u>

133. Plaintiffs re-allege and incorporate by reference the allegations set forth above. Plaintiffs seek certification of the following Class:

> **Clients of Ameriprise who had cash deposits or balances in Ameriprise's Bank Sweep Programs from July 29, 2018 until the unlawful conduct alleged herein ceases.**

134.    Plaintiffs also seek certification of the following Sub-Class (the "IRA and Advisory Subclass"):

> **Clients of Ameriprise who held an Individual Retirement Account or advisory account with Ameriprise and had cash deposits or balances in Ameriprise's Bank Sweep Programs from July 29, 2018 until the unlawful conduct alleged herein ceases.**

135.    Plaintiffs reserve the right to amend the Class and Subclass definitions if further investigation and discovery indicates that such definitions should be narrowed, expanded, or otherwise modified.

136.    Excluded from the Class are Ameriprise and any of its affiliates, legal representatives, employees, or officers.

137.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

### Numerosity
### Rule 23(a)(1)

138.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time.  However, Ameriprise's wealth management program provides financial planning and advisory services to approximately 6.4 million client accounts through the work of over 10,000 financial advisors.  Accordingly, Plaintiffs and the Class satisfy the numerosity

requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

**Existence and Predominance of**
**Common Questions of Law and Fact**
**Rule 23(a)(2), 23(b)(3)**

139. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a. whether Ameriprise's interest rates paid on its sweep accounts were fair and reasonable;

b. whether in setting interest rated to be paid in its sweep accounts Ameriprise properly accounted for prevailing economic, market, and business conditions;

c. whether Ameriprise owed fiduciary duties and other duties of care to the Class, and whether Ameriprise violated those duties;

d. whether Ameriprise breached the contractual terms of its account agreements and other written communications to Class members;

e. whether Ameriprise breached the contractual terms with members of the IRA and Advisory Subclass;

f. whether Ameriprise breached the implied covenant of good faith and fair dealing;

g. whether Ameriprise was unjustly enriched by its wrongful conduct;

h. whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

i. whether and to what extent Class members are entitled to damages and other monetary relief; and

j. whether and to what extent Class members are entitled to attorneys' fees and costs.

140. Ameriprise client agreements contain a choice of law provision that provides, in relevant part, that they and their enforcement shall be governed by the laws of Minnesota.

141. The Ameriprise client agreements also expressly incorporate the rules of applicable federal, state and self-regulatory organizations, including the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"). Specifically, they provide:

> Applicable Rules and Regulations. All transactions for your account shall be subject to the regulations of all applicable federal, state and self-regulatory agencies, including the U.S. Securities and Exchange Commission (SEC), Financial Industry Regulatory Authority (FINRA), the Board of Governors of the Federal Reserve System, and the constitution, rules and customs of the exchange or market (and its clearing house, if any) where executed.

### Typicality
### Rule 23(a)(3)

142. Plaintiffs' claims are typical of the claims of the Class because they were account holders with Ameriprise that were paid unreasonably low interest rates in their cash sweep accounts that did not take into account prevailing economic, market, and business conditions, and were not competitive interest rates. Thus, Plaintiffs' claims are typical of the claims of the Class members as they arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the Class members.

### Adequacy of Representation
### Rule 23(a)(4)

143. Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action

litigation, and Plaintiffs will prosecute this action vigorously.  Plaintiffs have no interests adverse or antagonistic to those of the Class.

<b>Superiority<br>Rule 23(b)(3)</b>

144.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

145.   Even if Class members could afford individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

146.   Superiority is particularly satisfied in a circumstance such as this where the law of a single state will apply.  Under the uniform contract terms with Ameriprise, the law of Minnesota will apply to each Class member's claims, allowing the Court to adjudicate the claims of all Class members under a single state analysis.

147. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

    b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract**
**Brought on Behalf of Plaintiffs and the Class**
**Against All Defendants**

148. Plaintiffs, on behalf of themselves and the Class, hereby re-allege the paragraphs above as if fully set forth herein.

149. Defendants' governing documents related to the Bank Sweep Programs constitute a binding agreement between Defendants and their accountholders. For example, the Ameriprise Other Important Disclosures document bears an "Ameriprise Financial, Inc." legend and defines "We," "our" and "us" to mean AFS "and/or" AEIS.

150. The governing documents provide that Defendants will pay to or secure for their clients a rate of interest on cash deposits or balances maintained in the Bank Sweep Programs that properly takes into account prevailing economic, market, and business conditions.

151.     As set forth herein, Defendants failed to pay to or secure for Plaintiffs and Class members an interest rate on their Bank Sweep Program holdings that accounted for prevailing economic, market, and business conditions and Defendants thereby breached the contracts.

152.     Defendants' past, continuous, and ongoing breaches damaged and continue to damage Plaintiffs and the Class.

## SECOND CLAIM FOR RELIEF
**Breach of Contract**
**Brought on Behalf of the IRA and Advisory Subclass**
**Against All Defendants**

153.     Plaintiffs, on behalf of themselves and the IRA and Advisory Subclass, hereby re-allege the factual allegations above as if fully set forth herein.

154.     Defendants' governing documents related to the accounts held by members of the Subclass constitute a binding agreement between Defendants and their accountholders.  For example, the Ameriprise Custom Advisory Relationship Agreement, and the Ameriprise Select Separate Account Client Agreement, both bear the Ameriprise Financial, Inc. legend, define AFS as the "Sponsor" of the accounts described therein, and define AEIS as the Sponsor's "affiliate" that provides the Ameriprise clients with brokerage and custodian services in connection with their accounts.

155.     The governing documents provide that Defendants will "invest" their clients' cash sweep deposits in accounts that bear a "reasonable rate of interest" and that Defendants will make "reasonable" arrangements with Ameriprise Bank or Ameriprise's affiliates and delegates regarding the Ameriprise Bank Sweep Programs.

156.     As set forth herein, Defendants failed to pay to or secure for Plaintiffs and the IRA and Advisory Subclass members a "reasonable rate of interest" on those deposits or secure a "reasonable" arrangement with Ameriprise Bank or Ameriprise affiliates concerning the Bank Sweep Programs and therefore, Defendants breached the contracts.

157.     Defendants' past, continuous, and ongoing breaches damaged and continue to damage Plaintiffs and the IRA and Advisory Subclass.

## THIRD CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Brought on Behalf of Plaintiffs and the Class
### Against All Defendants

158.     Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

159.     Defendants' governing documents related to their accounts constitute a binding agreement with those accountholders.

160.     Implicit in these contracts (all of which incorporated Defendants' Bank Sweep Program disclosure documents, including the Other Important Brokerage Disclosures), and under Minnesota law which governs them, is a covenant of good faith and fair dealing, requiring Defendants to deal fairly with their clients, to fulfill their obligations under the contract in good faith, and to not deprive Class members of the fruits of their bargain.

161.     Through the implied covenant of good faith and fair dealing, Defendants were obligated to pay to or secure for Class members a fair and reasonable rate of interest on their cash balances; and to properly account for current or prevailing economic, market,

and business conditions and competitive interest rates when paying or securing interest rates on their clients' cash sweep balances. By failing to do so, Defendants breached the implied covenant of good faith and fair dealing.

162. Defendants' past, continuous, and ongoing breaches of the implied covenant damaged and continue to damage Plaintiffs and the Class.

**FOURTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**Brought on Behalf of Plaintiffs and the Class Against All Defendants**

163. Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein.

164. Defendants AFS and AEIS owed fiduciary duties to Plaintiffs and Class members with respect to the Bank Sweep Programs.

165. These duties include, but are not limited to:

a.  a duty of care;

b.  a duty of loyalty;

c.  a duty to act in the best interests of its clients; and

d.  a duty not to place Ameriprise's interests above those of its clients.

166. AFS and AEIS breached the foregoing duties when they (i) failed to pay to or secure for Plaintiffs and the Class a fair or reasonable rate of interest on their free credit balances that properly took into account prevailing economic, market, and business conditions; (ii) failed to act in the best interests of Plaintiffs and the Class with respect to the Bank Sweep Programs; and (iii) recommended to Plaintiffs and the Class that they utilize and continue to utilize the Bank Sweep Programs.

167.     AFS's and AEIS's past, continuous, and ongoing breaches of duties damaged Plaintiffs and the Class.

168.     Defendant AFI knowingly encouraged, directed, participated in, and benefitted from the breaches of fiduciary duty by AFS and AEIS.

169.     AFI is also liable for such breaches, including under the doctrine of respondeat superior, because AFS and AEIS are agents of AFI, and AFS and AEIS committed their breaches of fiduciary duty within the scope of their employment.

### FIFTH CLAIM FOR RELIEF
**Unjust Enrichment**
**Brought on Behalf of Plaintiffs and the Class Against All Defendants**

170.     Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim in the alternative to the preceding Claims to the extent it is duplicative of any such claim.

171.     As a result of Ameriprise's wrongful conduct, Plaintiffs and the Class received unfair and unreasonably low interest payments on their cash sweep deposits.

172.     As a result of Ameriprise's wrongful conduct, Ameriprise was unjustly enriched because, among other benefits, it received significantly greater Net Interest Income than it would have but for its wrongful conduct.

173.     Ameriprise appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class.

174.     It would be inequitable and unjust for Ameriprise to retain these wrongfully obtained profits.

175.    Ameriprise's retention of these unjustly obtained benefits would violate the fundamental principles of justice, equity, and good conscience.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class (including the IRA and Advisory Subclass), demand judgment and relief as follows:

   a.    certifying the proposed Class and IRA and Advisory Subclass, and appointing Plaintiffs and their counsel to represent the proposed Class and Subclass;

   b.    awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

   c.    awarding Plaintiffs and Class members restitution, disgorgement of profits, and forfeiture of compensation;

   d.    awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

   e.    awarding such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class (including the IRA and Advisory Subclass), demand a trial by jury on all issues so triable.

DATED: November 4, 2024          _/s/ John G. Albanese_____
                                 E. Michelle Drake, Bar No. 0387366
                                 John G. Albanese, Bar No. 0395882
                                 Joseph C. Hashmall, Bar No. 0392610
                                 **BERGER MONTAGUE PC**
                                 1229 Tyler Street NE, Suite 205
                                 Minneapolis, MN 55413
                                 Telephone: (612) 594-5999
                                 emdrake@bm.net
                                 jalbanese@bm.net
                                 jhashmall@bm.net

Michael Dell'Angelo (admitted *pro hac vice*)
Alex B. Heller (admitted *pro hac vice*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net
aheller@bm.net

Alan L. Rosca (admitted *pro hac vice*)
Jonathan A. Korte (admitted *pro hac vice*)
**ROSCA SCARLATO LLC**
2000 Auburn Dr. Suite 200
Beachwood, OH 44122
Telephone: (216) 946-7070
arosca@rscounsel.law
jkorte@rscounsel.law

Paul J. Scarlato (admitted *pro hac vice*)
**ROSCA SCARLATO LLC**
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: (216) 946-7070
E-mail: pscarlato@rscounsel.law

Salvatore J. Graziano (admitted *pro hac vice*)
John Rizio-Hamilton (admitted *pro hac vice*)
Avi Josefson (admitted *pro hac vice*)
Adam Wierzbowski (admitted *pro hac vice*)
Michael D. Blatchley (admitted *pro hac vice*)
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
salvatore@blbglaw.com
johnr@blbglaw.com
avi@blbglaw.com
adam@blbglaw.com
michaelb@blbglaw.com

Matthew L. Dameron (admitted *pro hac vice*)
Clinton J. Mann (admitted *pro hac vice*)
Claire M. Terrebonne (admitted *pro hac vice*)
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone: (816) 945-7110
Facsimile: (816) 945-7118
matt@williamsdirks.com
cmann@williamsdirks.com
cterrebonne@williamsdirks.com

Michael J. Angelides (admitted *pro hac vice*)
Thomas I. Sheridan, III (admitted *pro hac vice*)
Sona R. Shah (admitted *pro hac vice*)
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue
New York, NY 10016
Telephone: (212) 784-6404
mangelides@simmonsfirm.com
tsheridan@simmonsfirm.com
sshah@simmonsfirm.com

*Court-Appointed Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*