# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| SUSANNE MEHLMAN, JOY HULTMAN, MINDY BENDER, and ROBERT SULLIVAN, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>v.<br><br>AMERIPRISE FINANCIAL, INC., AMERIPRISE FINANCIAL SERVICES, LLC, and AMERICAN ENTERPRISE INVESTMENT SERVICES, INC.<br><br>                    Defendants. | Case No. 0:24-cv-03018-JRT-DLM |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION OF PLAINTIFFS' INVESTMENT ADVISORY CLAIMS

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 4

    A.    **Plaintiffs' Account Applications And Agreements With Ameriprise Clearly Distinguish Investment Advisory Services From Brokerage Services.** ................................... 4

    B.    **The Parties Agreed To Distinct Arbitration Clauses For Investment Advisory Services And Brokerage Services.** ............. 7

    C.    **The Complaint Purports To Make Claims With Respect To Investment Advisory Services As Well As Brokerage Services.** ......................................................................... 9

ARGUMENT ............................................................................................................. 11

    I.    **Plaintiffs' Investment Advisory Agreements Include Valid Arbitration Clauses With AFS.** ...................................... 12

    II.    **Plaintiffs' Investment Advisory Claims Fall Within The Scope Of Plaintiffs' AAA Arbitration Agreement With AFS.** ....................... 13

    A.    **The Parties' Agreements Use Broad Language To Describe The Scope Of Their AAA Arbitration Obligations.** .................................................... 15

    B.    **Plaintiffs Cannot Invoke FINRA's Arbitration Rules To Justify Class Litigation Over Ameriprise's Alleged Investment Advisory Services.** ...................................... 17

    III.    **Plaintiffs Must Arbitrate Their Investment Advisory Claims Against The Other Defendants As Well.** ............................... 19

CONCLUSION .......................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Acuity Ins. v. Vivint Inc.*,
   2023 WL 4186303 (D. Minn. June 26, 2023)..........................................................12, 13

*Bakas v. Ameriprise Financial Services., Inc.*,
   651 F. Supp. 2d 997 (D. Minn. 2009) .....................................................................19, 20

*Burnett v. Nat'l Ass'n of Realtors*,
   75 F.4th 975 (8th Cir. 2023)..........................................................................................21

*CD Partners, LLC v. Grizzle*,
   424 F.3d 795 (8th Cir. 2005)....................................................................................22, 23

*Compare Eckert/Wordell Architects Inc. v. FJM Props. of Willmar LLC*,
   756 F.3d 1098 (8th Cir. 2014) ......................................................................................21

*Eckert/Wordell Architects Inc.* ...........................................................................................21

*First Options of Chi., Inc. v. Kaplan*,
   514 U.S. 938 (1995)......................................................................................................15

*Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.*,
   118 F.3d 619 (8th Cir. 1997) ........................................................................................16

*Glover v. Verizon Wireless*,
   2022 WL 14005725 (D. Minn. Oct. 24, 2022) ............................................................17

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   586 U.S. 63 (2019)........................................................................................................15

*In re Petters Co.*,
   480 B.R. 346 (Bankr. D. Minn. 2012) ..........................................................................22

*Mainville v. College Town Pizza, Inc.*,
   629 F. Supp. 3d 913 (D. Minn. 2022) ............................................................................7

*McMurray v. AT&T Mobility Servs., LLC*,
   2021 WL 3293540 (D. Minn. Aug. 2, 2021) ................................................................13

*Onvoy, Inc. v. SHAL, LLC*,
   669 N.W.2d 344 (Minn. 2003)......................................................................................22

*Parm v. Bluestem Brands, Inc.*,
   898 F.3d 869 (8th Cir. 2018)....................................................................................16, 17

*Pleasants v. Am. Exp. Co.*,
   541 F.3d 853 (8th Cir. 2008) ........................................................................................14

*PRM Energy Sys., Inc. v. Primenergy, L.L.C.*,
   592 F.3d 830 (8th Cir. 2010) ........................................................................................21

*Pro Tech Indus., Inc. v. URS Corp.*,
  377 F.3d 868 (8th Cir. 2004) .................................................................... 12

*Rent-A-Ctr., W., Inc. v. Jackson*,
  561 U.S. 63 (2010) .................................................................................... 14

*Stinson v. Best Buy Co.*,
  2018 WL 3850739 (D. Minn. June 26, 2018) ............................................ 14

*Unison Co. v. Juhl Energy Dev., Inc.*,
  789 F.3d 816 (8th Cir. 2015) .................................................................... 17

**Other Authorities**

*Law and Rules*, SEC (May 13, 2020), https://www.sec.gov/investment/laws-and-rules .... 2

*SEC Regulation Best Interest and Form CRS: What You Need to Know*, FINRA (March
  22, 2024), https://www.finra.org/investors/insights/sec-regulation-best-interest-and-
  form-crs-what-you-need-know. ................................................................... 2

*What It Means to Be Regulated by FINRA*, FINRA (April 22, 2024),
  https://www.finra.org/investors/insights/regulated-by-FINRA ...................... 2

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................ 10

FINRA Rule 12204 ...................................................................................... 17

**Regulations**

84 Fed. Reg. 33318 (July 12, 2019) ............................................................... 2

84 Fed. Reg. 33669 (July 12, 2019) .......................................................... 2, 10

Defendants[1] respectfully submit this memorandum of law in support of their motion to compel arbitration of all claims in the Consolidated Complaint (the "Complaint") allegedly arising out of the investment advisory services provided by Defendants pursuant to Plaintiffs'[2] investment advisory agreements.  To the extent the Court determines that Plaintiffs' claims are not subject to compulsory, individualized arbitrations before the American Arbitration Association ("AAA"), as Plaintiffs' investment advisory agreements require, the Court should dismiss those claims with prejudice for the reasons set forth in Defendants' separate Motion to Dismiss.

## INTRODUCTION

Plaintiffs' relationship with Ameriprise is governed by two sets of agreements.  One set governs the **brokerage services** Plaintiffs received from Defendants American Enterprise Investment Services, Inc. ("AEIS") and Ameriprise Financial Services, LLC ("AFS"), and the other is for the separate **investment advisory services** Plaintiffs received from AFS.  AEIS is a registered broker-dealer while AFS is a registered broker-dealer **and** a registered investment adviser.  When Ameriprise is acting in its capacity as broker-dealer, it is regulated by the Securities and Exchange Commission ("SEC") and the Financial

---

[1] For ease of reference, this Memorandum uses the terms "Defendants" and "Ameriprise" to refer to the defendants as a whole or to any subset of them.  In doing so, Defendants do not concede that Defendants all played the same roles with respect to the alleged conduct. To the contrary, as discussed in Defendants' Motion to Dismiss, Plaintiffs have not alleged that Defendant Ameriprise Financial, Inc. played any relevant role.

[2] For purposes of this Motion, the term "Plaintiffs" refers to Susanne Mehlman, Joy Hultman, and Robert Sullivan, as the Complaint alleges these three Plaintiffs maintained investment advisory accounts with Ameriprise.

Industry Regulatory Authority ("FINRA")[3] and is subject to the SEC's Regulation Best Interest ("Reg BI"), which imposes a "best interest" standard of care.[4]  By contrast, when Ameriprise is acting in its capacity as an investment adviser, *i.e.*, providing advice to customers regarding securities and other investments, it is subject to fiduciary standards under the Investment Advisers Act of 1940 ("IAA").[5]  The relationship formed between customers and investment advisers is distinct from the relationship formed between broker-dealers and customers, and so too is the relevant standard of care.  *See* Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33319 (July 12, 2019) (explaining that broker-dealers and investment advisers play "similarly important, though distinct, role[s]" and have "different types of relationships with investors, offer different services, and have different compensation models"); *id.* at 33333 (stating that Reg BI "is tailored to the broker-dealer relationship and distinct from the investment adviser fiduciary duty").

---

[3] FINRA is a not-for-profit self-regulatory organization that oversees U.S. member broker-dealers.  *See What It Means to Be Regulated by FINRA*, FINRA (April 22, 2024), https://www.finra.org/investors/insights/regulated-by-FINRA ("Alongside the SEC, FINRA oversees U.S. member broker-dealers and their personnel .  .  . Membership in FINRA requires a significant commitment, including compliance with numerous safeguards designed to protect investors and the integrity of the securities markets.").
[4] *See SEC Regulation Best Interest and Form CRS: What You Need to Know*, FINRA (March 22, 2024), https://www.finra.org/investors/insights/sec-regulation-best-interest-and-form-crs-what-you-need-know.
[5] *See* Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Investment Advisers (July 12, 2019), 84 Fed. Reg. 33669, 33669 (July 12, 2019); *Law and Rules*, SEC (May 13, 2020), https://www.sec.gov/investment/laws-and-rules.

Disputes arising under Plaintiffs' brokerage agreements are subject to compulsory arbitration pursuant to rules published by FINRA, but those rules require courtroom proceedings for purported class claims. Plaintiffs' investment advisory agreements, on the other hand, include arbitration clauses that are not subject to FINRA dispute-resolution rules, and require all disputes to be arbitrated before AAA on an individualized basis— with no courtroom exception for purported class claims.

Plaintiffs' Complaint challenges the rate of return received on uninvested cash sitting in Plaintiffs' brokerage and investment advisory accounts that is automatically swept to the designated money settlement option for the account ("Sweep Programs").[6] Had Plaintiffs elected to sue only under their brokerage agreements, the Court would only have to determine whether the Complaint fails to state a claim under Rule 12(b)(6), as Ameriprise contends in its separate Motion to Dismiss. But Plaintiffs also purport to sue over the ***investment advisory services*** they received, and many of the claims and legal theories they invoke—including fiduciary status under the IAA—arise out of their investment advisory agreements. Under the express terms of Plaintiffs' investment advisory agreements, these claims and legal theories belong exclusively before AAA in individualized arbitrations. Defendants therefore move to compel AAA arbitration of all

---

[6] Ex. G, at 4 (September 2023 Disclosure Brochure) ("A money settlement option is a feature offered by Ameriprise Financial Services that is primarily intended to hold cash (i) pending investment into your Managed Account; (ii) to cover your Asset-based Fee and if applicable, SPS Advisor Investments and Infrastructure Support Fee; (iii) to cover systematic cash withdrawals you have established for your Account(s); (iv) for certain pre-existing nonqualified SPS Advantage Accounts check writing or debit card activity and to make bill payments (cash management activities); and (v) for settling transactions in your Managed Account.")

claims and legal theories except those arising out of Plaintiffs' brokerage agreements with Ameriprise.

**FACTUAL BACKGROUND**[7]

A.    **Plaintiffs' Account Applications And Agreements With Ameriprise Clearly Distinguish Investment Advisory Services From Brokerage Services.**

Plaintiffs Susanne Mehlman, Joy Hultman, and Robert Sullivan at one time maintained "investment advisory" accounts with Ameriprise through which they received investment advisory services.  Specifically, Sullivan maintained an "Active Portfolios Account" and two "Select Separate Accounts," while Mehlman and Hultman both maintained "SPS Advisor Accounts."  *See* Ex. A (Sullivan's February 2010 Active Portfolios Account Application); Exs. B–C (Sullivan's February 2020 Select Separate Account Applications); Ex. D (Mehlman's April 2023 SPS Advisor Account Application); Ex. E (Hultman's April 2023 SPS Advisor Account Application).[8]  In connection with maintaining these accounts, Plaintiffs each submitted a "Custom Advisory Relationship" Application ("CAR Application") to Ameriprise, through which they acknowledged that a "Custom Advisory Relationship Agreement" ("CAR Agreement") and a separate "Managed Accounts Client Disclosure Brochure" ("Disclosure Brochure") governed their

---

[7] The background facts presented here are limited to the question of arbitrability. Defendants' Motion to Dismiss provides additional factual detail regarding the underlying Sweep Programs challenged in the Complaint.

[8] All references to Exhibits ("Ex.") refer to the exhibits attached to the Declaration Of Amara Chesson In Support Of Defendants' Motion To Compel Arbitration Of Plaintiffs' Investment Advisory Claims And Defendants' Motion to Dismiss, filed concurrently herewith.

investment advisory relationship.[9]  *See* Ex. L, at 8 (Sullivan's November 2019 CAR Application) ("You understand that by signing this form you are establishing an advisory relationship governed by the terms of the Custom Advisory Relationship Agreement (the 'Relationship').  You understand that by establishing the Relationship, you will be able to open, close, or modify accounts, now or in the future, governed by the terms of the Custom Advisory Relationship Agreement, as may be amended by us."); Ex. M, at 11 (Mehlman's April 2023 CAR Application) (same); Ex. N, at 11 (Hultman's April 2023 CAR Application) (same).[10]

Plaintiffs also maintained separate brokerage accounts with Ameriprise.  To open these accounts, Plaintiffs submitted account applications acknowledging that they had received and read the Ameriprise Brokerage Client Agreement (the "Brokerage Client Agreement") and the Other Important Disclosures (the "Brokerage Disclosures") and agreed to abide by the terms and conditions stated in those other documents.  Ex. R (Sullivan's February 2020 Brokerage Application); Ex. S (Mehlman's May 2023

---

[9] For completeness, Defendants have included as exhibits the CAR Agreement and Disclosure Brochure in effect when Plaintiffs executed their CAR Applications as well as the versions in effect as of October 5, 2023—the date on which Plaintiffs closed the last of their investment advisory accounts.  *See* Ex. F (September 2023 CAR Agreement); *See* Ex. G (September 2023 Disclosure Brochure); Ex. H (March 2023 CAR Agreement); Ex. I (March 2023 Disclosure Brochure); Ex. J (October 2019 CAR Agreement); Ex. K (September 2019 Disclosure Brochure).

[10] The controlling status of the CAR Agreement is also reflected in separate agreements for Plaintiffs' specific account types.  *See* Ex. O, at 10 (March 2023 SPS Advisor Client Agreement) ("This Agreement will terminate automatically when you enter into an *Ameriprise*® Custom Advisory Relationship Agreement ('Relationship Agreement') and the Relationship Agreement will govern all Managed Accounts included in the Custom Advisory Relationship."); Ex. P, at 9 (June 2019 Active Portfolios Client Agreement) (same); Ex. Q, at 9 (July 2019 Select Separate Account Client Agreement) (same).

Brokerage Application); Ex. T (Hultman's May 2023 Brokerage Application).    The Brokerage Client Agreement, in turn, expressly incorporated the Brokerage Disclosures by reference, Ex. U, at 1 (December 2022 Brokerage Client Agreement), and the Brokerage Disclosures identified those disclosures, the Brokerage Client Agreement, and "any account or product application you complete" as "form[ing] the contract governing our relationship." Ex. V, at 1 (March 2023 Brokerage Disclosures).[11]

While, as noted, Plaintiffs submitted CAR Applications to open or maintain their investment advisory accounts, those Applications also addressed aspects of Plaintiffs' brokerage accounts, and emphasized that Plaintiffs' "advisory relationship[s]" and "brokerage relationship[s]" with Ameriprise were distinct.    Among other things, the CAR Applications highlighted that separate and distinct arbitration provisions were applicable to each relationship, as detailed further below. *See* Ex. M, at 17–18 ("By signing this application, you . . . [u]nderstand that you are entering into . . . an advisory relationship . . . governed by its own terms and conditions, including . . . [a] distinct arbitration provision[.]"); Ex. N, at 17–18 (same); Ex. L, at 15 (same).[12]

---

[11] Only one version, each, of the Brokerage Client Agreement and Brokerage Disclosures are cited in Defendants' Motion to Compel Arbitration because, during the time Plaintiffs maintained their accounts with Ameriprise, the arbitration provisions in these documents have not varied materially.

[12] In deciding whether any of Plaintiffs' claims and legal theories must be arbitrated, the Court can consider any agreements stating arbitration terms whether or not those agreements are cited in the Complaint. *See Mainville v. College Town Pizza, Inc.*, 629 F. Supp. 3d 913, 920 n.2 (D. Minn. 2022) ("[T]he Court may consider an arbitration agreement outside the pleadings when analyzing a motion to compel arbitration.").

Importantly, the Disclosure Brochure made clear that the Sweep Programs available for Plaintiffs' accounts—including Plaintiffs' investment advisory accounts—were *brokerage* services, and therefore governed by the agreements and disclosures detailing Plaintiffs' brokerage relationship with Ameriprise.  Specifically, the Disclosure Brochure states:

> Sweep Programs made available in Managed Accounts are offered by Ameriprise Financial Services in its capacity as a broker-dealer, and services are provided by our affiliate AEIS as part of the overall brokerage services provided to your Account(s) pursuant to the "Money Settlement Options" section of the Ameriprise Brokerage Client Agreement.  Your financial advisor does not recommend the Sweep Program offered to you for any particular Account(s) and revenues received by our affiliates related to the Sweep Programs are not shared with financial advisors.  Ex. I, at 46; Ex. G, at 47.

*See also* Ex. F, at 3 ("You understand that Money Settlement Option ('Sweep Program') for which you are eligible, as described in Disclosure Brochure, is subject to the terms and conditions set forth in the Brokerage Agreement"); Ex. H, at 3 (same); Ex. V App'x, at 2 ("Sweep Programs are made available in accounts offered by Ameriprise Financial Services in its capacity as a broker-dealer[.]").

### B.  The Parties Agreed To Distinct Arbitration Clauses For Investment Advisory Services And Brokerage Services.

The CAR Applications signed by Plaintiffs call attention, in boldface type and in close proximity to the signature line, to two separate "predispute arbitration" clauses in each of Plaintiffs' investment advisory and brokerage agreements, one for Plaintiffs' "investment advisory relationship" with AFS and the other for Plaintiffs' "brokerage relationship" with Ameriprise.  As to the former, Plaintiffs' CAR Applications provide:

> **Your investment advisory relationship, as defined in the *Ameriprise* Custom Advisory Agreement and the Brochure, is governed by a predispute arbitration provision which includes a class action waiver, and is found in . . . the General Terms of the *Ameriprise* Custom Advisory Relationship Agreement. As more particularly described in the Ameriprise Custom Advisory Relationship Agreement and Brochure, this means that any disputes shall be resolved solely by arbitration on an individual basis. There shall be no right or authority for any claims arising out of those agreements to be arbitrated or litigated on a class action basis or bases involving claims brought in a purported representative capacity.** Ex. L, at 15; Exs. M–N, at 18 (emphasis in original).

The CAR Agreement, in turn, details the precise arbitration obligations governing investment advisory claims, including provisions requiring individualized proceedings and stating the waiver of the right to pursue class action claims, as follows:

> **Any controversy or claim arising out of the investment advisory services offered or delivered pursuant to this Agreement shall be resolved solely by arbitration on an individual basis in accordance with the Rules of the American Arbitration Association ("AAA")**, and the arbitrator(s) will decide all issues related to any such controversy or claim, including whether any controversy or claim is subject to this arbitration agreement . . . **AAA shall be the sole venue for resolving claims arising out of or relating to the investment advisory services**, and all of the parties to the arbitration (including without limitation Ameriprise Financial and you) irrevocably waive trial by jury or by judge in any action, proceeding or counterclaim, whether at law or in equity. Ex. F, at 20; Ex. H, at 20; Ex. J, at 19 (emphasis added).

> **There shall be no right or authority for any claims to be arbitrated or litigated on a class action basis or bases involving claims brought in a purported representative capacity on behalf of the general public, clients or other persons similarly situated.** *Id.* (emphasis in original).

As to Plaintiffs' "brokerage relationship" with Ameriprise, Plaintiffs' CAR Applications explain:

> **This brokerage account is governed by a predispute arbitration provision which is found in . . . the [Brokerage Client] Agreement. You**

8

**acknowledge receipt of the predispute arbitration provision.** Ex. L, at 15; Exs. M–N, at 18 (emphasis in original).

The dispute-resolution clause governing Plaintiffs' "brokerage relationship," however, operates differently. That clause requires "arbitration in accordance with . . . the rules then prevailing of [FINRA]," and "only before [FINRA]." Ex. U, at 7. And unlike the provision governing Plaintiffs' investment advisory relationship with Ameriprise, the clause governing the brokerage relationship does not include a class action waiver but instead altogether excepts class claims from its scope, providing as follows:

> No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. *Id.* at 8.

### C. The Complaint Purports To Make Claims With Respect To Investment Advisory Services As Well As Brokerage Services.

Plaintiffs' Complaint attacks the rate of return Plaintiffs received on idle cash in their investment advisory and brokerage accounts pursuant to Ameriprise's Sweep Programs, alleging that it was unreasonably low in comparison to rates paid by other firms, the Federal Funds Rate, short-term U.S. Treasury Bills, and short-term instruments such as repurchase agreements. Compl. ¶¶ 114–32. As noted, Plaintiffs' contracts with Ameriprise provide that the Sweep Programs—whether applied to investment advisory account or brokerage account balances—are ***brokerage services***, and much of Plaintiffs' Complaint is devoted to alleging that Ameriprise's operation of its Sweep Programs violated its duties as a broker-dealer and the terms of the brokerage service agreements. Because the

arbitration clause applicable to Plaintiffs' brokerage relationship allows in-court pursuit of putative class claims, it is proper for the Court to address those claims on the merits—and, as Defendants urge in their separate Motion to Dismiss, to hold that they fail to state a claim under Fed. R. Civ. P. 12(b)(6).

But Plaintiffs do not limit themselves to asserting claims for breach of the brokerage agreements or Ameriprise's responsibilities as a broker-dealer. Plaintiffs also contend that Ameriprise breached duties tied to its status as an investment adviser when sweeping the uninvested cash in Plaintiffs' accounts to depository banks. Plaintiffs' claims thus rely in significant part on Ameriprise's alleged investment advisory duties and associated contractual obligations. For instance, Plaintiffs charge Defendants with breaching their "fiduciary duties" to Plaintiffs and invoke Ameriprise's purported duties under the IAA. Compl. ¶¶ 77, 83, 84. Plaintiffs claim that "for its advisory clients," "Ameriprise 'must, at all times, serve the best interest of its clients and not subordinate its client's interest to its own.'" *Id.* ¶¶ 77–78 (citing Commission Interpretation Regarding Standard of Conduct for Investment Advisers, 84 Fed. Reg. 33669, 33671 (July 12, 2019)). Plaintiffs' allegations supporting their unjust enrichment and good faith and fair dealing claims reallege prior Complaint paragraphs, including those pertaining to Ameriprise's conduct as an investment adviser, "as if fully set forth herein." *Id.* ¶¶ 158, 170. And to support their breach of contract claim, Plaintiffs allege, for example, that Ameriprise breached an alleged "require[ment]" to pay customers "a reasonable rate of interest" on swept cash, citing the CAR Agreement defining Plaintiffs' investment advisory relationships with Ameriprise. *Id.* ¶¶ 33, 86, 154.

## ARGUMENT

Plaintiffs agreed to resolve all disputes arising out of the investment advisory services they obtained from AFS exclusively on an individualized basis before AAA. Plaintiffs allege nothing that draws into question the validity and enforceability of these arbitration agreements, and the clarity of the agreements leaves no room for debate on this score. Under the parties' agreements, AAA arbitrators in the first instance must determine the arbitrability of Plaintiffs' claims concerning Ameriprise's investment advisory services—and so it is sufficient for the Court to simply compel Plaintiffs to submit that issue to individual AAA arbitrators. However, in the interest of efficiency, Ameriprise is willing to agree to allow the Court to resolve the arbitrability issue in this proceeding— waiving its arbitration rights *only* as to the arbitrability issue—if Plaintiffs stipulate (and the Court agrees) that Ameriprise's right to an arbitrator's determination of the *merits* of any issues adjudged to be within the scope of the AAA clause is preserved. Ameriprise submits Plaintiffs' investment advisory claims fall plainly within the scope of the parties' AAA arbitration clause, and the Court should so hold assuming the parties agree to have arbitrability resolved by the Court under the limitations proposed by Ameriprise.

In short, to the extent Plaintiffs seek to link their alleged injuries from Ameriprise's Sweep Programs to investment advice by or on behalf of Ameriprise, or otherwise seek to advance any of the claims in the Complaint by pleading and proving conduct undertaken by AFS in its capacity as an investment adviser, they must each do so exclusively on an individualized basis before a AAA arbitrator.

I.    **Plaintiffs' Investment Advisory Agreements Include Valid Arbitration Clauses With AFS.**

In addressing a motion to compel arbitration, a court's first task is to determine whether the parties formed a valid agreement to arbitrate. *Acuity Ins. v. Vivint Inc.*, 2023 WL 4186303, at *2 (D. Minn. June 26, 2023) (citing *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004)). That question is easily answered affirmatively here.

The CAR Applications that Plaintiffs individually signed expressly identify in boldface type that the CAR Agreement terms include "**a predispute arbitration provision**" with "**a class action waiver**." Ex. L, at 15; Exs. M–N, at 18. By signing the CAR Applications, Plaintiffs acknowledged receiving, reviewing, and agreeing to the terms of the CAR Agreement. In turn, the CAR Agreement outlines the details of the arbitration agreement in plain English. Under a boldface header entitled "**Arbitration Agreement for Investment Advisory Services**," the CAR Agreement explains that "[a]ny controversy or claim arising out of the investment advisory services offered or delivered pursuant to this Agreement shall be resolved solely by arbitration on an individual basis in accordance with the Rules of the American Arbitration Association[.]" Ex. F, at 20; Ex. H, at 20; Ex. J, at 19. Also in boldface type, the CAR Agreement states: "**There shall be no right or authority for any claims to be arbitrated or litigated on a class action basis or bases involving claims brought in a purported representative capacity on behalf of the general public, clients or other persons similarly situated.**" *Id.* This clear and unambiguous language creates a valid agreement to arbitrate. *See Acuity*, 2023 WL 4186303, at *3 (finding an arbitration clause valid where its language was clear and

12

unambiguous); *McMurray v. AT&T Mobility Servs., LLC*, 2021 WL 3293540, at *6 (D. Minn. Aug. 2, 2021) (finding an unsigned arbitration agreement enforceable where there was valid offer, acceptance, and consideration).

Plaintiffs offer no basis in the Complaint for disputing the validity of their agreement to arbitrate all claims arising out of investment advisory services. Indeed, they do not even acknowledge their arbitration agreements. Plaintiffs purport to bring class claims, of course, and may object that the arbitration agreements require their investment advisory claims to be resolved exclusively on an individual, non-class basis. But the presence of a class action waiver does not negate the validity of Plaintiffs' arbitration agreements, as courts in this District regularly enforce arbitration clauses with such features. *See, e.g.*, *Acuity*, 2023 WL 4186303, at *1, *4; *Stinson v. Best Buy Co.*, 2018 WL 3850739, at *5, *11 (D. Minn. June 26, 2018) (compelling plaintiff to arbitrate her claims individually rather than litigate them in federal court as part of a class action based on the agreement's arbitration provision and class-action waiver language); *see also Pleasants v. Am. Exp. Co.*, 541 F.3d 853, 859 (8th Cir. 2008) (finding a class action waiver within an arbitration provision enforceable and compelling plaintiff to arbitrate her claim on an individual basis).

## II.    Plaintiffs' Investment Advisory Claims Fall Within The Scope Of Plaintiffs' AAA Arbitration Agreement With AFS.

Under the arbitration agreement at issue, the parties agreed that "the arbitrator(s) will decide . . . whether any controversy or claim is subject to this arbitration agreement." Ex. F, at 20; Ex. H, at 20; Ex. J, at 19. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63,

13

68–69 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy . . . This line of cases merely reflects the principle that arbitration is a matter of contract.").  In these circumstances, a court's duty is simply to send the dispute to the arbitrator for the bargained-for determination as to the scope of the arbitration—and any ensuing merits pronouncements on questions determined to be arbitrable.  *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract . . . even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."); *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute . . . the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." (citations omitted)).

Here, however, the dividing line between those claims that Plaintiffs must arbitrate individually and the putative class claims that they must present in court is straightforward. To the extent that Plaintiffs assert violations of Ameriprise's duties or obligations as an investment adviser, those claims inherently arise out of the investment advisory service relationship and must be presented individually before a AAA arbitrator.  To the extent that Plaintiffs instead assert violations of Ameriprise's duties and obligations as a broker-dealer, they are subject to FINRA arbitration rules making clear that any putative class claims may be pursued only in Court.  Accordingly, in the interest of efficiency, Ameriprise is willing

14

to waive its arbitration rights *as to the question of arbitrability only*—and submit the arbitrability dispute to the Court—if Plaintiffs agree (and the Court accepts the parties' agreement) that there will be no waiver of Ameriprise's right to arbitral determinations on the merits.  On this understanding only, the Court can and should readily determine that Plaintiffs' investment advisory claims against AFS must be arbitrated individually before AAA.  Otherwise, the Court should simply compel Plaintiffs to submit the dispute to AAA for a threshold determination on arbitrability, as well as any merits determinations.

A.    **The Parties' Agreements Use Broad Language To Describe The Scope Of Their AAA Arbitration Obligations.**

The CAR Agreement used language that courts have recognized as deliberately expansive to describe the parties' arbitration obligations, with the parties agreeing to arbitrate any claims "arising out of the investment advisory services offered or delivered pursuant to" the CAR Agreement.  Ex. F, at 20; Ex. H, at 20; Ex. J, at 19.  *See Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 874 (8th Cir. 2018) ("Arbitration clauses covering claims arising out of or relating to an agreement are broad." (quotations and citation omitted)); *Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997) (finding arbitration clause covering claims "arising out of or relating to [the] Agreement" broad).  In cases where contracting parties have adopted a broad arbitration clause and reserved questions of arbitrability for the court, the court must "send a claim to arbitration" if "the underlying factual allegations simply touch matters covered by the arbitration provision."  *Parm*, 898 F.3d at 874 (citation omitted); *see also Glover v. Verizon*

15

*Wireless*, 2022 WL 14005725, at *2 (D. Minn. Oct. 24, 2022); *Unison Co. v. Juhl Energy Dev., Inc*., 789 F.3d 816, 818 (8th Cir. 2015).

Plaintiffs' Complaint does far more than "touch matters covered by the arbitration" clause; it is rife with allegations that Defendants provided investment advisory services with respect to Sweep Programs made available to Plaintiffs through their accounts, and that those services fell short of those required for fiduciary investment advisers and the agreements governing investment advisory customers. Plaintiffs allege, among other things, that:

- Defendants breached duties arising from their status as investment advisers, pursuant to the IAA. Compl. ¶¶ 77, 78, 84.

- "[F]or its advisory clients, Ameriprise owes its clients," the duty to "serve the best interest of its client[s] and not subordinate its client[s'] interest[s] to its own." *Id.* ¶ 77–78.

- "[I]n its capacity as an adviser . . . in exercising complete control in creating, offering, automatically enrolling, and maintaining cash sweep accounts under the Bank Sweep Programs . . . Ameriprise assumed fiduciary and other duties of loyalty and care to its clients." *Id.* ¶ 83.

To be clear, the Complaint does not ***plausibly*** allege that the challenged conduct fell within the scope of Ameriprise's role as investment adviser as opposed to its role as broker-dealer and alleges nothing to indicate that Ameriprise violated investment advisory standards. Indeed, the Complaint never once describes any purported investment advice that Plaintiffs received with respect to the Sweep Programs. But the sufficiency of Plaintiffs' investment advisory claims is for the arbitrators to decide. However insubstantial, any claim that Ameriprise violated its duties as an investment adviser

necessarily arises out of its investment advisory services and so can only be resolved through individualized AAA arbitration.

### B.    Plaintiffs Cannot Invoke FINRA's Arbitration Rules To Justify Class Litigation Over Ameriprise's Alleged Investment Advisory Services.

As detailed above, Plaintiffs' brokerage-related claims against FINRA members AFS and AEIS are subject to unique dispute-resolution procedures under Plaintiffs' brokerage agreements.  Under those procedures, individual, non-class brokerage claims must be arbitrated before panels constituted by FINRA; however, class claims against broker-dealers must be pursued in court.  *See* Ex. U, at 8 (providing that "[n]o person shall bring a putative or certified class action to arbitration"); FINRA Rule 12204.  Yet, while Plaintiffs are entitled to litigate class claims against AFS and AEIS in their capacity as **broker-dealers** in court, the FINRA class litigation exception does not apply to disputes over Ameriprise's investment advisory services.  With respect to disputes arising out of investment advisory services furnished by AFS, a distinct arbitration agreement requires Plaintiffs to submit disputes individually to AAA.

In *Bakas v. Ameriprise Financial Services., Inc.*, Judge Kyle of this Court addressed the interaction of FINRA dispute resolution rules with AAA arbitration clauses on very similar facts.  In that case, the plaintiff had entered into an investment services agreement (analogous to Plaintiffs' investment advisory agreements here) that required the parties to submit any disputes arising out of the agreement to individualized arbitration before AAA. 651 F. Supp. 2d 997, 999 (D. Minn. 2009).  When the plaintiff filed class claims in court challenging Ameriprise's financial planning advice under the investment services

agreement, Ameriprise sought to compel arbitration under the agreement's AAA clause. *Id.* The plaintiff argued that the dispute was instead subject to FINRA dispute-resolution rules, including the rule excepting class claims from arbitration requirements. *Id.* The court rejected the plaintiff's contention, finding that because her claims related to Ameriprise's role as an investment adviser, they were not subject to FINRA Rules. *Id.* at 1003. Judge Kyle explained that "a broker/dealer that also happens to be an investment adviser" does not "subject[] itself to FINRA's rules for *all* of its activities—including those undertaken in its capacity as an investment adviser—simply by joining FINRA." *Id.*

The same limiting principles apply here. Defendant AFS is registered both as a broker-dealer and as an investment adviser. It enters distinct agreements with customers defining the services it will provide under those separately defined roles. When it provides brokerage services to Plaintiffs under the Brokerage Client Agreement and related governing documents, AFS acts as a broker-dealer, and only as to disputes over those brokerage services do the FINRA-governed dispute-resolution procedures apply— inclusive of FINRA Rules allowing pursuit of class claims in court. When disputes arise concerning AFS's obligations as an investment adviser, FINRA Rules afford Plaintiffs no basis for avoiding their obligations to arbitrate individually before AAA under the CAR Agreement.

As explained above, unless the parties and the Court agree to a judicial determination of arbitrability in accordance with Ameriprise's proposal for a limited waiver of its arbitration rights (as detailed *supra* at 11, 14–15), it will be up to the AAA arbitrators to determine arbitrability and fix the scope of the required AAA arbitration.

But, before AAA, Plaintiffs will not be able to invoke FINRA Rules to avoid arbitrating their investment advisory claims individually. *See generally Bakas*, 651 F. Supp. 2d 997.

## III. Plaintiffs Must Arbitrate Their Investment Advisory Claims Against The Other Defendants As Well.

Finally, to the extent the Complaint alleges liability against AFS's parent company, Ameriprise Financial, Inc. ("AFI"), or its affiliate AEIS, in connection with Ameriprise's investment advisory services, those claims, too, must be arbitrated before AAA, even though AFI and AEIS are not signatories to the AAA arbitration agreements.[13]

As an initial matter, Plaintiffs have asserted a claim against "Ameriprise," which they have defined to encompass all Defendants, for breach of contract, specifically referencing language in the CAR Agreement. Compl. ¶¶ 14, 33, 86, 154. And they do not cite any other contract allegedly governing investment advisory services. As a matter of both established law and common sense, it follows that Plaintiffs cannot seek remedies from AEIS and AFI for breach of a contract with one of their affiliates while contending that the contract's arbitration provision does not apply to them. *PRM Energy Sys., Inc. v.*

---

[13] Under Eighth Circuit law, the question of whether a signatory is required to arbitrate claims against nonsignatories is a question of arbitrability that must be directed to the arbitrators where, as here, the arbitration clause commits arbitrability determinations to the arbitrator and does not expressly confine obligations under the clause to "parties." *Compare Eckert/Wordell Architects Inc. v. FJM Props. of Willmar LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) (affirming signatory's obligation to submit to arbitral resolution of arbitrability under AAA rules in dispute with nonsignatory adversary), *with Burnett v. Nat'l Ass'n of Realtors*, 75 F.4th 975, 982–83 (8th Cir. 2023) (holding that court must resolve dispute over arbitrability between signatory and nonsignatory where arbitration clause narrowly focused on disputes "between the parties"; distinguishing *Eckert/Wordell Architects Inc.*). Nevertheless, Ameriprise is willing to submit to the Court's determination of arbitrability on the conditions stated *supra* at 11, 14–15.

*Primenergy, L.L.C.*, 592 F.3d 830, 835 (8th Cir. 2010) (finding that nonsignatory can compel signatory to arbitrate under equitable estoppel theory where claims are "so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement."); *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005) (holding that nonsignatory can compel arbitration where "the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory" (quotation omitted)). As the Minnesota Supreme Court has explained, the doctrine of "[e]quitable estoppel prevents a signatory from relying on the underlying contract to make his or her claim against the nonsignatory" while avoiding application of the contract's arbitration clause. *Onvoy, Inc. v. SHAL, LLC*, 669 N.W.2d 344, 356 (Minn. 2003).

Minnesota law also provides that "[w]hen the signatory resistant to arbitration with a non-signatory alleges for substantive purposes substantially interdependent and concerted misconduct by the non-signatory-opponent and one or more signatories, the signatory is estopped from denying that the arbitration clause is enforceable in favor of the non-signatory" on that additional ground. *In re Petters Co.*, 480 B.R. 346, 361–62 (Bankr. D. Minn. 2012) (citation omitted). And arbitration of claims against a nonsignatory is likewise warranted when "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke

arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." *CD Partners, LLC*, 424 F.3d at 798 (quotation omitted).

Both circumstances apply here. The conduct that the Complaint attributes to the signatory AFS and the nonsignatories AFI and AEIS is not just "substantially interdependent"; it is indistinguishable. Rather than assign different conduct to different entities, the Complaint lumps them together under the single moniker "Ameriprise" and alleges that all of them did everything. *See, e.g.*, Compl. ¶¶ 14, 75, 84, 102. Nor can Plaintiffs deny that, when it comes to Plaintiffs' claims, Defendants have a sufficiently close relationship that denying them the right to invoke arbitration of claims that "Ameriprise" breached duties as an investment adviser would eviscerate the investment advisory agreements' arbitration provision. Plaintiffs do not allege that any Defendant has had an investment advisory relationship with Plaintiffs independent of the relationship that AFS formed with them through their CAR Agreement. Indeed, the Complaint pleads that AFI "provides financial planning and advice, as well as brokerage services to clients" and "offers [] cash management and banking products, including cash sweep programs." Compl. ¶ 11. But Plaintiffs do not allege that AFI offers the Sweep Programs at issue here and Plaintiffs' contracts expressly state that the Sweep Programs are made available through AFS, not AFI. *See* Ex. V, at 2 ("AIMMA and ABISA are FDIC-insured, interest-bearing bank deposit products offered by Ameriprise Financial Services, LLC[.]"); Ex. G, at 47 ("Sweep Programs made available in Managed Accounts are offered by Ameriprise Financial Services in its capacity as a broker-dealer, and services are provided by our affiliate AEIS as part of the overall brokerage services provided to your Account(s)[.]");

Ex. I, at 46 (same).  And, while the Complaint alleges that AFS is an investment adviser, it makes no similar claim as to AEIS.  *Compare* Compl. ¶ 68 *with id.* ¶ 11.  Thus, while the Complaint asserts that all Defendants, as "Ameriprise," collectively violated duties as an investment adviser, it does so solely on the premise of AFS's investment advisory role. Under such circumstances, allowing Plaintiffs to litigate their investment advisory services claims by targeting AFS's affiliates would essentially render the AFS arbitration provision a nullity.

The Court should thus order Plaintiffs to present the entirety of their investment advisory claims individually to AAA, including any such claims they seek to advance against AEIS and AFI.

## CONCLUSION

For the foregoing reasons, the Court should compel Plaintiffs to submit any dispute concerning investment advisory services offered or delivered by Ameriprise to arbitration under AAA rules on an individualized basis.

Dated:  December 20, 2024          *s/ Edward B. Magarian*

Edward B. Magarian, MN Bar No. 0208796
Jack Huerter, MN Bar No. 0399277
**DORSEY & WHITNEY LLP**
50 South Sixth Street, Suite 1500
Minneapolis, MN
Telephone: (612) 340-2600
Facsimile: (612) 340-2868
magarian.edward@dorsey.com
huerter.jack@dorsey.com

Meaghan VerGow, DC Bar No. 977165*
Brian Boyle, DC Bar No. 419773*

Shannon Barrett, DC Bar No. 476866*
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, DC  20006-4061
Telephone: (202) 383-5300
Facsimile: (202) 383 5414
mvergow@omm.com
bboyle@omm.com

Lauren Wagner, NY Bar No. 5430640*
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY  10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
lwagner@omm.com

* admitted *pro hac vice*

*Attorneys for Defendants*