# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

SUSANNE MEHLMAN, JOY
HULTMAN, MINDY BENDER, and
ROBERT SULLIVAN, Individually and
on Behalf of All Others Similarly Situated,

                    Plaintiffs,

v.

AMERIPRISE FINANCIAL, INC.,
AMERIPRISE FINANCIAL SERVICES,
LLC, and AMERICAN ENTERPRISE
INVESTMENT SERVICES, INC.

                    Defendants.

Case No. 0:24-cv-03018-JRT-DLM

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ...................................................................... 1

FACTUAL BACKGROUND ..................................................... 4

    A.    The Parties ................................................... 4

    B.    Plaintiffs' Brokerage Agreements ..................... 5

    C.    Plaintiffs' Investment Advisory Agreements ............ 11

ARGUMENT ........................................................................ 13

I.    Plaintiffs' Brokerage Services Claims Should Be Dismissed For Failure To State A Claim. ............................... 13

    A.    The Brokerage Services Claims Should Be Dismissed In Their Entirety As To Ameriprise Financial, Inc., Because The Complaint Fails To Plausibly Allege That It Played Any Role In The Alleged Conduct. ............................... 13

    B.    Plaintiffs Fail To State A Breach Of Contract Claim. ............... 16

    C.    Plaintiffs Have Failed To Plead A Violation Of Any Implied Covenant Of Good Faith And Fair Dealing. ............... 27

    D.    The Complaint Fails To State Any Claim For Breach Of Fiduciary Duty With Respect To Ameriprise's Brokerage Services. ................................... 31

    E.    The Complaint Fails To State An Unjust Enrichment Claim. ................................................... 35

II.    To The Extent The Court Denies Defendants' Motion To Compel Arbitration Of Plaintiffs' Investment Advisory Services Claims, Those Claims Should Be Dismissed For Failure To State A Claim As Well. ................................... 40

    CONCLUSION ....................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*A.P.I., Inc. Asbestos Settlement Tr. v. Home Ins. Co.*,
  877 F. Supp. 2d 709 (D. Minn. 2012) ................................................................ 15, 16

*Al-Khaldiya Elects. & Elec. Equip. Co. v. Boeing Co.*,
  571 F.3d 754 (8th Cir. 2009) ..................................................................................... 42

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
  464 F.3d 338 (2d Cir. 2006) ....................................................................................... 28

*Anderson v. Edwards D. Jones & Co., LP*,
  2024 WL 4120941 (E.D. Cal. Sept. 9, 2024) ............................................................. 39

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................................. 13, 14

*Baker v. Best Buy Stores, LP*,
  812 N.W.2d 177 (Minn. Ct. App. 2012) ................................................................. 6, 20

*Brock v. Walton*,
  794 F.2d 586 (11th Cir. 1986) .................................................................................... 22

*Burgmeier v. Farm Credit Bank*,
  499 N.W.2d 43 (Minn. Ct. App. 1993) ....................................................................... 31

*Carlsen v. GameStop, Inc.*,
  833 F.3d 903 (8th Cir. 2016) ...................................................................................... 20

*Cent. Specialties, Inc. v. Minn. Dep't of Transp.*,
  5 N.W.3d 409 (Minn. Ct. App. 2024) ............................................................ 30, 32, 33

*Collins v. United States*,
  2021 WL 5042709 (D. Minn. July 30, 2021) ............................................................... 9

*Corbey v. Grace*,
  605 F. Supp. 247 (D. Minn. 1985) .............................................................................. 35

*Davis v. Wash. Univ. St. Louis*,
  960 F.3d 478 (8th Cir. 2020) ...................................................................................... 27

*DeBlasio v. Merrill Lynch & Co.*,
  2009 WL 2242605 (S.D.N.Y. July 27, 2009) ........................................................ passim

*Dep't of Revenue of Or. v. ACF Indus., Inc.*,
  510 U.S. 332 (1994) .................................................................................................... 23

*Dupree v. Prudential Ins. Co. of Am.*,
  2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ............................................................... 23

*Ellinghaus v. Educ. Testing Serv.*,
  2016 WL 8711439 (E.D.N.Y. Sept. 30, 2016) ............................................................ 22

*Hecker v. Deere & Co.*,
496 F. Supp. 2d 967 (W.D. Wis. 2007), *aff'd*, 556 F.3d 575, 586 (7th Cir. 2009), *abrogated on other grounds by Hughes v. Northwestern Univ.,* 63 F.4th 615 (7th Cir. 2023) ............................................................................................................ 24

*HomeStar Prop. Sols., LLC v. Safeguard Props., LLC*,
370 F. Supp. 3d 1020 (D. Minn. 2019) ......................................................... 42

*In re Fields*,
449 B.R. 387 (Bankr. D. Minn. 2011), *aff'd*, 510 B.R. 227 (B.A.P. 8th Cir. 2014) ............................................................................................................... 16

*In re Hennepin Cnty. 1986 Recycling Bond Litig.*,
540 N.W.2d 494 (Minn. 1995) ........................................................................ 6

*In re Legel, Braswell Gov't Sec. Corp.*,
648 F.2d 321 (5th Cir. 1981) .......................................................................... 26

*In re Lord Abbett Mut. Funds Fee Litig.*,
407 F. Supp. 2d 616 (D.N.J. 2005), *opinion vacated in part on other grounds*, 463 F. Supp. 2d 505 (D.N.J. 2006), *vacated*, 553 F.3d 248 (3d Cir. 2009) .................. 50

*In re Nat'l Arb. F. Trade Pracs. Litig.*,
704 F. Supp. 2d 832 (D. Minn. 2010) ............................................................ 15

*Lassen v. First Bank Eden Prairie*,
514 N.W.2d 831 (Minn. Ct. App. 1994) .................................................. 32, 33

*Marine Bank v. Weaver*, 455 U.S. 551 (1982) .................................................... 48

*Martin v. A'BULAE, LLC*,
2016 WL 3659293 (Minn. Ct. App. July 11, 2016) ....................................... 43

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) .......................................................................... 28

*Midwest Med. Sols., LLC v. Exactech U.S., Inc.*,
21 F.4th 1002 (8th Cir. 2021) .................................................................. 19, 22

*Miller v. Redwood Toxicology Lab'y, Inc.*,
688 F.3d 928 (8th Cir. 2008) ............................................................................ 6

*Minneapolis Emps. Ret. Fund v. Allison-Williams Co.*,
508 N.W.2d 805 (Minn. Ct. App. 1993), *rev'd on other grounds*, 519 N.W.2d 176 (Minn. 1994) ............................................................................................ 35

*NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*,
80 F.4th 413 (2d Cir. 2023) ............................................................................ 49

*Omega Overseas Partners, Ltd. v. Griffith*,
2014 WL 3907082 (S.D.N.Y. Aug. 7, 2014) ................................................. 49

iv

*RBC Dain Rauscher, Inc. v. Fed. Ins. Co.*,
  2003 WL 25836278 (D. Minn. Dec. 2, 2003)........................................................30, 31

*Residential Funding Co. v. Terrace Mortg. Co.*,
  725 F.3d 910 (8th Cir. 2013).................................................................................31

*Rude v. Larson*,
  207 N.W.2d 709 (Minn. 1973) ..............................................................................35

*S. Minn. Mun. Power Agency v. City of St. Peter*,
  433 N.W.2d 463 (Minn. Ct. App. 1988) ................................................................38

*SEC v. Cutter Fin. Grp., LLC*,
  2023 WL 8653927 (D. Mass. Dec. 14, 2023)........................................................39

*SEC v. Langemeier*,
  2024 WL 664452 (D. Nev. Feb. 16, 2024) ............................................................39

*Selective Ins. Co. of S.C. v. Sela*,
  413 F. Supp. 3d 861 (D. Minn. 2019), *aff'd*, 11 F.4th 844 (8th Cir. 2021) .................34

*Sports & Travel Mktg., Inc. v. Chi. Cutlery Co.*,
  811 F. Supp. 1372 (D. Minn. 1993) .......................................................................30

*Stark v. Equitable Life Assur. Soc'y of U.S.*,
  285 N.W. 466 (Minn. 1939)...................................................................................37

*Steady State Imaging, LLC v. Gen. Elec. Co.*,
  2018 WL 461136 (D. Minn. Jan. 17, 2018) ..........................................................33

*Sterling Cap. Advs., Inc. v. Herzog*,
  575 N.W.2d 121 (Minn. Ct. App. 1998) ................................................................31

*Tatone v. SunTrust Mortg., Inc.*,
  857 F. Supp. 2d 821 (D. Minn. 2012)....................................................................14

*Taylor Equip., Inc. v. John Deere Co.*,
  98 F.3d 1028 (8th Cir. 1996).................................................................................30

*Teng Moua v. Jani-King of Minn., Inc.*,
  810 F. Supp. 2d 882 (D. Minn. 2011) ....................................................................30

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013), *vacated on other grounds*, 575 U.S. 523 (2015) .........27

*Transam. Mortg. Advisors, Inc. (TAMA) v. Lewis*,
  444 U.S. 11 (1979).........................................................................................47, 49

*U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*,
  307 N.W.2d 490 (Minn. 1981)...............................................................................42

*U.S. SEC v. W. Int'l Secs., Inc.*,
  2023 WL 2480732 (C.D. Cal. Mar. 13, 2023) ......................................................39

*United States v. Bestfoods*,
   524 U.S. 51 (1998)................................................................ 15

*United States v. Roy*,
   748 F. App'x 712 (8th Cir. 2018)........................................... 24

*Urban ex rel. Urban v. Am. Legion Post 184*,
   695 N.W.2d 153 (Minn. Ct. App. 2005).................................. 15

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   464 F. Supp. 3d 634 (S.D.N.Y. 2020) ............................... 25, 26

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   2023 WL 4239073 (S.D.N.Y. June 28, 2023).......................... 27

*Watson's Props., LLC v. Menard, Inc.*,
   2002 WL 1364064 (Minn. Ct. App. June 19, 2002) ................. 40

*WinRed, Inc v. Ellison*,
   581 F. Supp. 3d 1152 (D. Minn. 2022) ..................................... 9

*Yarborough v. DeVilbiss Air Power, Inc.*,
   321 F.3d 728 (8th Cir. 2003).................................................. 31

## Statutes

15 U.S.C. § 78cc(b) ..................................................................... 49

15 U.S.C. § 80b-1 *et seq.*.....................................................34, 47

15 U.S.C. § 80b-11 ...................................................................... 48

15 U.S.C. § 80b-2(a)(11) ............................................................. 47

15 U.S.C. § 80b-2(a)(18) ............................................................. 48

15 U.S.C. § 80b-3a ...................................................................... 47

15 U.S.C. § 80b-6 ........................................................................ 47

15 U.S.C. § 80b-9 ........................................................................ 48

26 U.S.C. § 4975(d)(4) ...........................................................21, 23

29 U.S.C. § 1104(b)(4) ................................................................. 21

29 U.S.C. § 1108(b)(4) ...........................................................21, 23

## Other Authorities

*Repurchase Agreements (Repos): A Primer*, Cong. Rsch. Serv. (Dec. 9, 2019),
   https://crsreports.congress.gov/product/pdf/IF/IF11383 ............... 26

*Treasury Bills*, TreasuryDirect (last accessed Dec. 20, 2024),
   https://treasurydirect.gov/marketable-securities/treasury-bills/ ..................... 26

*Ulterior*, American Heritage Dictionary of the English Language 1880 (5th ed. 2018) ....................................................................................................... 33

*Value*, Black's Law Dictionary (10th ed. 2014) ............................................. 24

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................... 13

**Regulations**

26 C.F.R § 1.482-2(a)(2) .................................................................................. 24

29 C.F.R. § 2550.408b-4 ............................................................................ 21, 22

84 Fed. Reg. 33318 (July 12, 2019) .......................................................... 38, 40

Defendants Ameriprise Financial, Inc. ("AFI"), American Enterprise Investment Services, Inc. ("AEIS"), and Ameriprise Financial Services, LLC ("AFS")[1] respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Complaint, ECF. No. 58 (the "Complaint"), under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

All four Plaintiffs established Ameriprise brokerage accounts—that is, accounts in which customers make investment decisions with or without point-in-time recommendations from an investment adviser. And three of the four Plaintiffs also established investment advisory accounts in which they made investment decisions with ongoing advice from an Ameriprise financial advisor.

Ameriprise provides certain brokerage services—such as custody of assets, monthly statements, and cash sweep services—to both brokerage accounts and investment advisory accounts. In particular, Plaintiffs' contracts for brokerage services afforded Plaintiffs the opportunity to be credited interest on uninvested cash sitting in Plaintiffs' brokerage or investment advisory accounts, at fully disclosed rates, by providing Ameriprise would automatically sweep the cash into specific FDIC-insured accounts (the "Sweep Programs"). Plaintiffs' contracts expressly state the Sweep Programs' interest rates could be lower than rates paid on sweep products offered by other institutions or on investment

---

[1] For ease of reference, this Memorandum uses the terms "Defendants" and "Ameriprise" to refer to the defendants as a whole or to any subset of them. As discussed below, however, Plaintiffs do not plausibly allege that each defendant played the same (or any) role with respect to the alleged conduct. *See infra* at 13–15.

vehicles such as money market mutual funds and treasury bills. And the contracts further specify that Ameriprise receives compensation through the Sweep Programs that enables Ameriprise to charge lower fees and commissions for its investment advisory and brokerage services. At any time, Plaintiffs can choose to invest their cash, if they prefer to pursue a higher rate. And of course, Plaintiffs are always free to contract with another brokerage firm with different offerings.

Plaintiffs now bring claims challenging the rate they received through the Sweep Programs on cash they chose not to invest, based on the exact comparators their contracts expressly disclaim. Retroactively seeking a higher rate, Plaintiffs contend that the Sweep Programs' interest rates were "unreasonably low" because they were lower than rates allegedly available through investment products, including other brokers hand-picked by Plaintiffs. Based on that core contention, Plaintiffs assert claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment.

The Complaint fails as a matter of law against all Defendants. As a threshold matter, Plaintiffs' claims against AFI—the corporate parent of the other Defendants—must be dismissed because Plaintiffs' allegations do not connect AFI to the disputed conduct. Plaintiffs do not allege that AFI was a party to any of their contracts (it was not), and the Complaint fails to identify any other basis for claiming that AFI owed Plaintiffs any duty whatsoever.

As to Plaintiffs' contractual claims, Plaintiffs do not plausibly allege liability against AEIS and AFS, who provide brokerage services to Ameriprise customers and who were

the actual parties to Plaintiffs' contracts. Plaintiffs' effort to plead contractual breaches, and breaches of the implied covenant of good faith, is foreclosed by the contracts' express terms. Plaintiffs cannot claim a contractual right to the rates available through investment products or alternative brokers when the contract expressly ***disclaims*** such a right. And even if Plaintiffs could blink away those contractual provisions, comparisons to plainly dissimilar products or cherry-picked alternatives—the only benchmarks the Complaint offers—are legally inadequate to infer that the Sweep Programs' features are unreasonable. These pleading failures derail Plaintiffs' implied covenant claim, too: Ameriprise cannot be deemed to have covenanted what the contracts disclaimed.

Plaintiffs' non-contractual claims are likewise defective. Plaintiffs' fiduciary breach claim should be dismissed because Defendants did not owe fiduciary duties when providing brokerage services, including the Sweep Programs, and Plaintiffs plead no facts plausibly establishing otherwise. Plaintiffs' attempt to invoke the SEC's Regulation Best Interest ("Reg BI") goes nowhere because Reg BI expressly disclaims any intent to impose a fiduciary duty on Defendants and it does not create a private right of action. Nor can Plaintiffs invoke the equitable principle of unjust enrichment: it does not apply where, as here, the challenged conduct is governed by contract, and Plaintiffs do not in any event plausibly allege Defendants' receipt of disclosed and contractually authorized compensation was "unjust."

Plaintiffs Mehlman, Hultman, and Sullivan also assert claims relating to their arrangements for investment advisory services. Those claims are subject to mandatory arbitration before the American Arbitration Association ("AAA"), and Defendants have

therefore separately moved to compel these plaintiffs to arbitrate any claims purportedly arising out of Ameriprise's investment advisory services. Defendants do not seek a merits determination from the Court on those claims unless the Court declines to order arbitration, but substantially similar fatal infirmities extend to Plaintiffs' investment advisory claims. Accordingly, if the Court ultimately finds against arbitrability of the Plaintiffs' investment advisory claims, Plaintiffs' claims concerning investment advisory services offered or delivered by Ameriprise should be dismissed for failure to state a claim as well.

## FACTUAL BACKGROUND

### A. The Parties

Plaintiffs Mehlman and Hultman allege they maintained investment advisory and traditional brokerage accounts with Ameriprise; Bender alleges she held an Individual Retirement Account ("IRA") and traditional brokerage account with Ameriprise; and Sullivan alleges he maintained an investment advisory relationship with Ameriprise that includes an Ameriprise Select Separate Account. Compl. ¶¶ 15–18.

Brokerage accounts (including IRAs) feature a commission-based fee structure and enable customers to invest in many different investment products; while financial advisors "may provide [] point-in-time recommendations related to [customers'] investment portfolio[s]" and review customers' brokerage accounts, the "brokerage relationship does not include account monitoring." Ex. G, at 1 (September 2023 Disclosure Brochure); *see also* Exs. R, W, X ("Evaluating differences between brokerage and managed accounts

(advisory solutions)").[2]  Investment advisory accounts, in contrast, feature an asset-based fee structure and allow customers to receive ongoing advice from their financial advisors to "develop and maintain [their] Account(s) investment portfolio" and "meet [their] financial goals and investment objectives."  Ex. G, at 1.  Both types of accounts require services known as brokerage services, which include monthly statements, recordkeeping, custody of assets, settlement services, and clearing functions.  *See id.* at 30–31, 52. Ameriprise provides brokerage services to its investment advisory and brokerage account customers through its registered broker-dealers, AEIS and AFS.  *Id.* at 6, 30–31, 52.  AFI is the indirect corporate parent of both AEIS and AFS.

### B. Plaintiffs' Brokerage Agreements

To open their respective accounts, Plaintiffs submitted a series of applications.  In April and May 2023, Mehlman and Hultman each submitted an Ameriprise Brokerage Individual Retirement Account Application (an "IRA Application") and an "Ameriprise Custom Advisory Relationship for Advisory (Managed) Accounts" application (a "CAR Application").[3]  In July 2020, Bender submitted two brokerage account applications—an Ameriprise Brokerage ONE Financial Non-Qualified Account Application and an IRA

---

[2] All references to Exhibits ("Ex.") refer to the exhibits attached to the Declaration Of Amara Chesson In Support Of Defendants' Motion To Compel Arbitration Of Plaintiffs' Investment Advisory Claims And Defendants' Motion to Dismiss, filed concurrently herewith.

[3] *See* Ex. M (Mehlman's April 2023 CAR Application); Ex. N (Hultman's April 2023 CAR Application); Ex. S (Mehlman's May 2023 Brokerage Application); Ex. T (Hultman's May 2023 Brokerage Application).

Application.[4]  In November 2019, Sullivan submitted a CAR Application, and in February 2020, he submitted an IRA Application.[5]

In opening their brokerage accounts, Plaintiffs acknowledged that they had received and read the Ameriprise Brokerage Client Agreement (the "Brokerage Client Agreement") and the Other Important Disclosures (the "Brokerage Disclosures") and agreed to abide by the terms and conditions of those other documents, including any future amendments.[6] *See* Ex. L, at 15; Exs. M–N, at 18; Ex. R, at 4; Exs. S–T, at 4; Exs. W–X, at 4.[7]  The Brokerage Disclosures identify the disclosures, the Brokerage Client Agreement, and "any account or product application you complete" as "form[ing] the contract governing our relationship."

---

[4] *See* Ex. W (Bender's July 2020 ONE Financial/Non-Qualified Brokerage Application); Ex. X (Bender's July 2020 Brokerage IRA Application).

[5] *See* Ex. L (Sullivan's November 2019 CAR Application); Ex. R (Sullivan's February 2020 Brokerage Application).

[6] The terms of the documents governing Defendants' brokerage and investment advisory relationships with Plaintiffs are integral to the Complaint and so may be considered by the Court as necessarily embraced by the Complaint.  *See, e.g.*, *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2008) (on a motion to dismiss, courts may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned" (quotations omitted)); *Baker v. Best Buy Stores, LP*, 812 N.W.2d 177, 180 (Minn. Ct. App. 2012) ("In deciding a motion to dismiss, the court 'may consider the entire written contract when the complaint refers to the contract and the contract is central to the claims alleged.'" (quoting *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 497 (Minn. 1995))).

[7] *See also, e.g.*, Ex. Y, at 1 (November 2019 Brokerage Client Agreement); Ex. Z, at 1 (November 2019 Brokerage Disclosures); Ex. AA, at 1 (May 2020 Brokerage Client Agreement); Ex. BB, at 1 (May 2020 Brokerage Disclosures); Ex. CC, at 1 (December 2021 Brokerage Client Agreement); Ex. DD, at 1 (December 2021 Brokerage Disclosures); Ex. U, at 1, 7 (December 2022 Brokerage Client Agreement); Ex. V, at 1 (March 2023 Brokerage Disclosures); Ex. EE, at 1, 7 (September 2023 Brokerage Client Agreement); Ex. FF, at 1 (December 2023 Brokerage Disclosures).

*See, e.g.*, Ex. Z, at 1; Ex. FF, at 1 (together with the Brokerage Client Agreement and other applicable disclosures, the "Brokerage Contract.").

The Brokerage Contract provides that Ameriprise "may, but is not required to, offer [Plaintiffs] options for the automatic investment or 'sweep,' of excess cash in your account at [AFS]." *See, e.g.*, Ex. EE, at 2; Ex. Y, at 5. The Brokerage Contract specifies that the Sweep Program applied to an investor's account depends on the type of account and the nature of the ownership. *See, e.g.*, Ex. FF, at 3; Ex. Z, at 14.[8] Plaintiffs' account applications further set forth which Sweep Program applies to which type of account. Exs. S–T, at 2; Exs. W–X, at 2.

Plaintiffs challenge the terms of two Sweep Programs—the Ameriprise Insured Money Market Account ("AIMMA") and the Ameriprise Bank Insured Sweep Account ("ABISA"). *See* Compl. ¶¶ 24–29. The parameters of these Sweep Programs are fully disclosed in the Brokerage Contract.

Under the AIMMA Program, uninvested cash is automatically deposited in interest-bearing accounts according to a third-party algorithm designed to maximize FDIC

---

[8] Indeed, not only is a customer's designated Sweep Program determined solely by account type, but since December 2021, the Brokerage Contract has explicitly stated that, as to Ameriprise's role in the brokerage relationship, customers "understand and agree that [AFS and AEIS] are not acting as a fiduciary when we provide you recommendations related to your brokerage account or with respect to commission-based products we offer and you agree that any advice you receive is not intended to serve as the primary basis for your investment decisions. You understand and agree we are not acting as a fiduciary when you decide to engage us for a new service, including with respect to your decision, or the decision of a plan participant, to roll over assets to an Ameriprise IRA. You understand and agree we are not acting as a fiduciary when you decide to move assets from one type of account held at Ameriprise Financial to another type of account[.]" *See, e.g.*, Ex. EE, at 5.

insurance of the monies swept from an investor's account. *See, e.g.*, Exs. S–T, at 4; Exs. W–X, at 4, Ex. FF, at 5; Ex. Z, at 3. Ameriprise discloses that Ameriprise Bank, FSB, participates in the AIMMA program and "earns revenue based on the difference (or 'spread') between the interest rate it receives from its investment and lending programs and what it pays to obtain the deposits." *See, e.g.*, Ex. FF, at 5.[9] In addition, the Brokerage Contract states that unaffiliated participating banks pay compensation on deposits at negotiated rates to AEIS and that AEIS retains all such compensation less the interest credited to accountholders and the compensation paid to the provider of the third-party algorithm. *See, e.g.*, *id.*; Ex. Z, at 8. The Brokerage Contract also provides a sample calculation of the revenue AEIS receives from unaffiliated banks and/or directs accountholders to a website providing such a calculation. *See, e.g.*, Ex. FF, at 6; Ex. Z, at 8.

Under the ABISA Program, uninvested cash is swept entirely into an interest-bearing, FDIC-insured account with Ameriprise Bank. *Id.* The Brokerage Contract discloses that Ameriprise Bank does not compensate AEIS in connection with deposits but does reimburse AEIS for direct out-of-pocket expenses related to the sweep services. *Id.*[10]

---

[9] The Appendix to the Brokerage Disclosures contains a similar disclosure. Ex. BB, App'x at 2 ("The banks participating in AIMMA earn income by lending or investing the deposits they receive and charging a higher interest rate to borrowers, or earning a higher yield, than the banks pay on the deposits held through AIMMA. This difference is known as the 'spread.' Like the unaffiliated banks participating in AIMMA, Ameriprise Bank earns spread revenue when it participates in AIMMA.").

[10] *See, e.g.*, Ex. V, at 5 ("Ameriprise Bank uses the deposits it receives through its participation in AIMMA and ABISA for its lending and investment programs [and], like unaffiliated Banks in the AIMMA program, it earns revenue based on the difference (or

The Brokerage Contract tells accountholders where they can confirm the applicable interest rates for the Sweep Programs, including by directing accountholders to a public website where the current rates are posted. *See, e.g.*, Ex. FF, at 4, 6 (stating that current rates are available at Ameriprise.com/sweeprates); *id.* at 8 (stating that rates are accessible at Ameriprise.com and a dedicated service line); Ex. Z, at 3, 5, 7 (same).[11] The Brokerage Contract also provides that, under ordinary business conditions, any changes to these rates are published three to five business days before becoming effective. Ex. L, at 7; Exs. S–T, at 4; Exs. W–X, at 4.

The Brokerage Contract states that the interest rates accountholders are credited through the Sweep Programs may be lower than those available "with other depository institutions in comparable accounts." *See, e.g.*, Ex. FF, at 8; Ex. Z, at 5. It similarly states that higher returns may be available with "alternative cash investment products," including "money market mutual funds, certificates of deposit, and treasury securities." *See, e.g.*, Ex. EE, at 2; Ex. Y, at 5.[12]

---

'spread') between the interest it receives from its investment and lending programs and what it pays to obtain the deposits.").

[11]    Ameriprise.com/sweeprates directs customers to https://www.ameriprise.com/products/cash-cards-lending/brokerage-sweep-options?vanity=sweeprates. This webpage is provided as Exhibit GG and contains a chart identifying the current interest rates by Sweep Program and balance. This Court can take judicial notice that the Sweep Programs' interest rates are publicly available. *See, e.g.*, *WinRed, Inc v. Ellison*, 581 F. Supp. 3d 1152, 1167 n.9 (D. Minn. 2022) (considering the content of a website because "a court may take judicial notice of facts in the public record without converting a motion to dismiss into a summary judgment motion"); *Collins v. United States*, 2021 WL 5042709, at *1 (D. Minn. July 30, 2021) (taking judicial notice of publicly available COVID-19 data).

[12]    Ex. EE, at 2 ("You acknowledge that the money settlement options made available to you may offer a lower interest rate than alternative cash investment products made available through Ameriprise Financial. These alternatives include purchased money

Under the Brokerage Contract, accountholders are informed of their ability and responsibility to "compare the terms, conditions, interest rates, any required minimum amounts and other features of the [Sweep Programs] with other accounts and alternative investments to ensure this product meets your needs," *see, e.g.*, Ex. FF, at 8; Ex. Z, at 5, 7, and to "consider whether holding large cash balances in your money settlement account(s) is appropriate," *see, e.g.*, Ex. EE, at 2; Ex. Y, at 5.  Accountholders who prefer not to use the Sweep Programs can invest their cash or place it with a different broker.[13]  Certain accountholders can also direct that uninvested cash be retained as a "free credit balance" as an alternative to the Sweep Programs.[14]

The compensation that Plaintiffs agree to pay for their brokerage services is set forth in the Brokerage Contract.  *See, e.g.*, Ex. EE, at 6; Ex. Y, at 2–3.  The Brokerage Contract explicitly provides that the fees and charges applicable to Ameriprise's brokerage services

---

market mutual funds, certificates of deposit, and treasury securities."); Ex. Y, at 5 (same); *see also* Ex. FF, at 8 ("The interest rates paid with respect to the Deposit Accounts at a bank may be higher or lower than the interest rates available to depositors making deposits directly with the bank, with other depository institutions in comparable accounts, or in other available" sweep options "made available through AEIS."); Ex. Z, at 5 (same); Ex. AA, at 5 ("The amount of cash you maintain in your money settlement option could result in more revenue to us and our affiliates than if you purchased other, higher-yielding cash alternatives available to you."); Ex. Y, at 5 (same).

[13] *See, e.g.*, Ex. FF, at 2 ("Regardless of" the money settlement options "made available, you will always be able to buy and sell certain money market mutual funds; brokered certificates of deposit; treasury bills; and other similar products to manage cash in your account."); Ex. BB, at 6 (same); Ex. EE, at 5 ("you understand that your account may be terminated by you or us at any time."); Ex. Y, at 3 (same).

[14] *See, e.g.*, Ex. Z, at 10 ("You may also direct us at any time to liquidate any assets held in any money settlement option and hold the proceeds as a free credit balance in your account(s) or remit them to you."); Ex. FF, at 2 ("As an alternative to either a Bank Sweep Program or a money market mutual fund sweep program, you may elect to use a free credit balance (e.g., Ameriprise Cash)").

would be different if Ameriprise were unable to derive compensation through the Sweep Programs. *See, e.g.*, Ex. EE, at 2 ("[W]e may receive remuneration based on the cash balance in your money settlement option. This remuneration is part of revenue sharing or other agreements which allow us to earn income and defray expenses relating to the management of the money settlement process."); Ex. Y, at 5 (same); Ex. BB, App'x at 10 ("Our affiliates AEIS and Ameriprise Bank use this revenue to defray the cost of operating our Sweep Programs and the expense of providing other services to our clients . . . [i]n the absence of this revenue Ameriprise Financial Services would likely charge higher fees or other charges to clients for the services AEIS and Ameriprise Bank provide to clients.").

## C. Plaintiffs' Investment Advisory Agreements

While both accounts Plaintiff Bender held with Ameriprise were brokerage accounts, Plaintiffs Mehlman, Hultman, and Sullivan maintained Ameriprise investment advisory accounts as well. When these latter three Plaintiffs signed their account applications, they acknowledged "entering into two separate and distinct relationships with [Ameriprise], an investment advisory relationship and a brokerage relationship, each governed by its own terms and conditions, including separate and distinct arbitration provisions." Exs. M–N, at 18; Ex. L, at 15. As to the brokerage relationship, Plaintiffs acknowledged they had read and understood the Brokerage Client Agreement and Brokerage Disclosures and agreed to abide by the terms and conditions of those documents. *Id.* As to the investment advisory relationship, Plaintiffs Mehlman, Hultman, and Sullivan agreed that they had received, understood, and would abide by the Custom Advisory

Relationship Agreement (the "CAR Agreement") and the Managed Accounts Client Disclosure Brochure (the "Disclosure Brochure"). *Id.*[15]

The Disclosure Brochure specifies that the Sweep Programs associated with Plaintiffs' investment advisory accounts are brokerage services, not investment advisory services, and are offered by AFS in its capacity as broker-dealer. *See* Ex. G, at 47; Ex. I, at 46 (March 2023 Disclosure Brochure). The CAR Agreement describes the Sweep Programs, disclosing Ameriprise's financial interests in the programs and noting the availability of alternatives bearing higher interest rates. *See* Ex. F, at 9 (September 2023 CAR Agreement); Ex. H, at 9 (March 2023 CAR Agreement); Ex. J, at 4, 11 (October 2019 CAR Agreement). The Disclosure Brochure provides additional detail, including how Ameriprise entities receive compensation from the Sweep Programs. *See* Ex. G, at 45–47; Ex. I, at 44–46; Ex. K, at 44–45 (September 2019 Disclosure Brochure).

---

[15] In addition to the CAR Applications described above, Plaintiff Sullivan executed an investment advisory account application for an Ameriprise Active Portfolios IRA Account in February 2010 and two Select Separate Account Applications in February 2020. *See* Exs. A, B, and C. Plaintiffs Mehlman and Hultman each executed investment advisory account applications for SPS Advisor IRA Accounts in April 2023. *See* Exs. D and E. Because Plaintiffs cite it in the Complaint, Defendants are including as exhibits the Select Separate Account Client Agreement. *See* Ex. Q (July 2019 Select Separate Account Client Agreement); Ex. HH (March 2023 Select Separate Account Client Agreement). However, Sullivan's CAR Application and corresponding CAR Agreement, not the Select Separate Account Client Agreement, govern his investment advisory accounts. *See* Ex. Q, at 9 ("This Agreement will terminate automatically when you enter into an Ameriprise® Custom Advisory Relationship Agreement ('Relationship Agreement') and the Relationship Agreement will govern all existing and future Managed Accounts opened and maintained with Ameriprise Financial that are eligible for inclusion in the Custom Advisory Relationship."); Ex. HH, at 10 (same).

**ARGUMENT**

As Defendants address in their separately-filed Motion to Compel, any claims—or portions of claims—arising from Ameriprise's investment advisory services to Plaintiffs ("Investment Advisory Services Claims") are subject to an arbitration clause requiring individualized proceedings before the AAA. The balance of Plaintiffs' claims arises from Plaintiffs' brokerage relationship with Ameriprise ("Brokerage Services Claims"). Because those claims are subject to a separate arbitration clause that includes an exception allowing pursuit of class claims in court, it is proper for the Court to address the claims on the merits. The Court should dismiss those claims now.

To survive a motion to dismiss for failure to state a claim, Plaintiffs must allege sufficient facts to state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint cannot rely on bare legal conclusions but instead must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable" for the alleged conduct. *Ashcroft*, 556 U.S. at 678. Plaintiffs' Brokerage Services Claims fall short of this pleading standard.

**I.    Plaintiffs' Brokerage Services Claims Should Be Dismissed For Failure To State A Claim.**

    **A.    The Brokerage Services Claims Should Be Dismissed In Their Entirety As To Ameriprise Financial, Inc., Because The Complaint Fails To Plausibly Allege That It Played Any Role In The Alleged Conduct.**

The Complaint fails to adequately allege any involvement by AFI in ***any*** of the challenged conduct. Rather than address each of the Defendants individually, the Complaint lumps all of them together under the rubric, "Ameriprise," Compl. ¶ 14, and

then attributes all challenged conduct to that collective, without alleging what role, if any, each entity played in the challenged conduct, or what relationship, if any, each entity had with Plaintiffs. But "[a] complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012).

Here, the contracts that are incorporated by reference in the Complaint identify AFS and AEIS as the Ameriprise entities responsible for delivering brokerage services, including the Sweep Programs, to Plaintiffs. *See, e.g.*, Ex. EE, at 1. But the Brokerage Contract does not identify AFI as a contractual party or indicate that AFI had any role whatsoever with respect to the Sweep Programs.[16] Plaintiffs' conclusory assertions that AFI provides services "through its subsidiaries" including AFS and AEIS, Compl. ¶ 11, or that AFS and AEIS are AFI's "agents," Compl. ¶ 169, do not plausibly implicate AFI. A parent company's ownership of a subsidiary is insufficient to impose respondeat superior liability on the parent for the subsidiary's conduct. *See A.P.I., Inc. Asbestos Settlement Tr. v. Home Ins. Co.*, 877 F. Supp. 2d 709, 724 (D. Minn. 2012) (citing *United States v.*

---

[16] Notably, although Plaintiffs allege that AFI "offers [] cash management and banking products, including cash sweep programs," Compl. ¶ 11, they do not allege that AFI offers the Sweep Programs at issue here and the Brokerage Contract expressly provides that the Sweep Programs are made available through AFS and AEIS, not AFI. *See, e.g.*, Ex. FF, at 2, 6.

*Bestfoods*, 524 U.S. 51, 61–62 (1998)) (noting the "unremarkable principle that, generally, parent corporations are not liable for the acts of their subsidiaries").[17]

Plaintiffs offer no factual allegations to support the legal conclusion that AFI acts as a principal with respect to the Sweep Programs. Plaintiffs, for example, do not (and cannot) allege that AEIS and AFS were carrying out contractual duties owed by AFI, since Plaintiffs contracted directly with AEIS and AFS, not AFI. *See, e.g.*, Ex. EE, at 1; *A.P.I., Inc.*, 877 F. Supp. 2d at 724 (explaining, in case involving effort to hold parent company liable for subsidiary's actions, that "to infer [] an arrangement [permitting respondeat superior liability] the alleged agent must be conducting the alleged principal's business, not its own."). Nor have Plaintiffs pleaded grounds for the "extraordinary remedy" of piercing the corporate veil. *See In re Fields*, 449 B.R. 387, 399 (Bankr. D. Minn. 2011), *aff'd*, 510 B.R. 227 (B.A.P. 8th Cir. 2014) (explaining that piercing the corporate veil requires pleading "a combination of factual circumstances . . . to establish . . . [the] maintain[enance of] the corporation as [an] alter ego, ignoring the separateness of corporate form").

Plaintiffs' Complaint fails to plead any plausible Brokerage Services Claims against AFI, and AFI should therefore be dismissed from this action.

---

[17] *See also In re Nat'l Arb. F. Trade Pracs. Litig.*, 704 F. Supp. 2d 832, 839 (D. Minn. 2010) (explaining that it is "undoubtedly true" that "a parent corporation is not liable for the wrongs of its subsidiaries"); *Urban ex rel. Urban v. Am. Legion Post 184*, 695 N.W.2d 153, 161 (Minn. Ct. App. 2005) ("Generally, a parent corporation cannot be held liable for the wrongdoing of a subsidiary without a showing of improper conduct, fraud, or bad faith.").

**B.      Plaintiffs Fail To State A Breach Of Contract Claim.**

Counts I and II of the Complaint assert distinct breach theories: Count I asserts that the Brokerage Contract obliged Ameriprise to pin the Sweep Program rates to a market rate, Compl. ¶¶ 52–53, while Count II contends that Ameriprise failed to deliver a "reasonable" rate under the Brokerage Contract.  Neither theory can be squared with the plain language of the Brokerage Contract, and thus both Counts should be dismissed.

1.      The Brokerage Contract Precludes Plaintiffs' Theory That Defendants' Sweep Rates Had To Move In Lockstep With A Market Rate.

The Brokerage Contract indicates that sweep rates would or could vary based on a variety of factors.  Compl. ¶¶ 148–52.  In Count I, Plaintiffs leap to the assertion that Defendants were therefore bound to supply rates that fluctuated in unison with a market rate (Compl. ¶¶ 52–53)—but that is not what the Brokerage Contract says, and it is therefore not what the Brokerage Contract requires.

The Brokerage Contract does not promise that rates will move in lockstep with any particular market factor or in any particular way.  To the contrary, the very Brokerage Contract disclosures that Plaintiffs cite state that rates can vary based on a variety of factors, including not only unspecified "economic" factors but also "business conditions."  *See, e.g.*, Ex. FF, at 6 ("Interest rates on the Deposit Accounts are tiered and ***will vary based upon your account cash balance as well as prevailing economic and business conditions***.") (emphasis added); Compl. ¶ 95 (quoting same); Ex. FF, at 7 ("The interest income you receive . . . can fluctuate daily depending on ***prevailing economic and business conditions***.") (emphasis added); Ex. Z, at 5 (same) (emphasis added); Compl. ¶ 96 (quoting

same).  Plaintiffs' effort to elevate disclaimers that rates would "vary" based on these conditions into a promise that they would vary in a ***particular*** way (tracking a market rate) manufactures legal duties out of thin air and thus fails to state a contractual obligation.

2.    <u>Plaintiffs Were Not Contractually Entitled To A Higher Rate.</u>

In Count II, which Plaintiffs purport to assert solely on behalf of investment advisory and IRA accountholders, Plaintiffs contend that Defendants were obliged (and failed) to supply sweep rates in line with the rates provided through investment products and other brokerage firms.  As already noted, to the extent Plaintiffs purport to rely on duties supposedly arising out of their investment advisory agreements, their claims must be arbitrated individually before AAA—and this Court should simply compel arbitration.  To the extent that Plaintiffs instead intend to assert a breach of their ***Brokerage Contract*** with Defendants, their claims find no support in the contractual language and should be dismissed.

a.    *The Brokerage Contract Itself Provides That Sweep Rates May Diverge From Other Offerings.*

Plaintiffs largely base their claim on allegations that the interest rates they were credited under the Sweep Programs were lower than rates offered by investment products— specifically, money market mutual funds and treasury bills, and by selected brokers through their own sweep products.  Compl. ¶ 67.  But the very contracts that Plaintiffs claim were breached expressly state that the rates paid under the Sweep Programs can be lower than the rates available through investment products and through other brokerage firms.  The Brokerage Contract specifically provides that the interest rates credited under the Sweep

17

Programs "may be higher or lower than the interest rates available to depositors making deposits directly with the bank, ***with other depository institutions in comparable accounts***, or in other available money settlement options made available through AEIS." Ex. FF, at 8 (emphasis added); Ex. Z, at 5, 7 (same) (emphasis added). And it cautions that the Sweep Programs (which are not investment vehicles) may pay lower interest than investment vehicles such as treasury bills and money market funds. *See, e.g.*, Ex. FF, at 2; Ex. Z, at 3, 6.

The flaws in Plaintiffs' Federal Funds Rate theory drive home the point: Plaintiffs complain that the Sweep Programs provided lower interest than the Federal Funds Rate, and yet the very contractual provision they cite includes an illustrative example showing that the rate credited to investors can be, and indeed has been, substantially lower than the Federal Funds Rate. *See, e.g.*, Ex. Z, at 8 (providing an example in which investors were credited a rate of 0.35% compared to a Federal Funds Rate of 2.15%).[18]

Plaintiffs cannot plausibly claim their contractual rights were violated when the rates of interest they were offered were precisely as the Brokerage Contract prescribed. *See, e.g.*, *Midwest Med. Sols., LLC v. Exactech U.S., Inc.*, 21 F.4th 1002, 1006 (8th Cir.

---

[18]    Later versions of the Brokerage Disclosures expressly referenced, and provided investors a link to, a website containing a similar illustrative example. *See, e.g.*, Ex. FF, at 6 (directing accountholders to ameriprise.com/products/cash-cards-lending, which provides "if the Program Bank holding your cash sweep balance has agreed to pay AEIS the Federal Funds Rate plus 0.10%, and the Federal Funds Rate is 4.75% AEIS would receive 4.85% on your cash balance. If you are credited with interest of 0.30% on the cash balance, AEIS would retain 4.55% as compensation for its services, from which it would pay its vendors and the internal costs of operating the sweep program. As of October 7, 2024, the rates paid by unaffiliated banks in the program were up to 5.50% but, depending on movement of interest rates, this can change.")

2021) (under Minnesota contract law, provisions must be read "to harmonize all clauses and avoid rendering a portion meaningless," particularly so that the interpretation does not lead to a "harsh and absurd result," or a "windfall of recovery" (quotations omitted)); *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 912 (8th Cir. 2016) (affirming dismissal of breach of contract claim where "the protection [plaintiff] argues [defendant] failed to provide was not among the protections for which he bargained" and thus defendant "could not have breached its contract"); *Baker*, 812 N.W.2d at 182 (finding seller did not breach contract where it replaced a defective product, instead of repairing it, because contract expressly provided seller could repair *or* replace product).  This theory fails out of the gate.

> b.    *Plaintiffs Cannot Overcome The Contract's Clear Language By Imposing Their Own Conflicting "Reasonableness" Requirement.*

Plaintiffs also attempt to infer a contractual commitment to specific rate levels from passages found in the CAR Agreement, Select Separate Account Client Agreement, and in a custodial agreement with an Ameriprise affiliate in which Plaintiffs "authoriz[e]" Ameriprise "to invest … in deposits of itself or its affiliates, including Ameriprise Bank, FSB, that bear a reasonable rate of interest, determined solely by [AFS] to facilitate money settlement option services . . .."  Ex. F, at 9; Ex. H, at 9; Ex. J, at 10; Ex. HH, at 6–7;[19] Compl. ¶ 35 (citing same).  Plaintiffs suggest that "reasonable" means "matches Plaintiffs' cherrypicked comparators," but Plaintiffs' proposed interpretation of this language

---

[19] Plaintiffs' account applications contain similar language.  *See* Ex. L, at 10; Exs. M–N, at 14; Ex. R, at 4; Exs. S–T, at 4; Ex. X, at 4.

contradicts the Brokerage Contract's recognition that the rates paid under the Sweep Programs could be lower than investment products and other sweep programs.

As a threshold matter, this language does not establish any contractual commitment to credit Plaintiffs any particular rate of interest on uninvested cash.  It merely recites Plaintiffs' ***authorization*** of the use of affiliated vehicles in connection with the Sweep Program.  *See* Ex. II, at 8 (Your Guide to IRAs).[20]  If the affiliated vehicle somehow didn't provide a "reasonable rate" within the meaning of the authorization, it would at most affect the validity of the authorization, not entitle Plaintiffs to rates the contract expressly disclaims.  And the contract contains multiple provisions ***apart*** from this authorization recognizing Ameriprise's right to sweep uninvested cash into vehicles that generate earnings for Ameriprise and specifying the use of the very Sweep Programs which Plaintiffs challenge.  *See, e.g.*, Ex. EE, at 2; Ex. FF, at 5.[21]

---

[20] The authorization derives from the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and the Internal Revenue Code. 29 U.S.C. § 1108(b)(4); 26 U.S.C. § 4975(d)(4); *see* 29 C.F.R. § 2550.408b-4 (providing that, for exemption under ERISA § 408(b)(4), 29 U.S.C. § 1104(b)(4), to apply, "in the case of a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument, such authorization must name such bank or similar financial institution and must state that such bank or similar financial institution may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate).").

[21] Plaintiffs try to make hay of the fact that the reference to a "reasonable rate of interest" was at one point removed from the CAR Agreement and the Select Separate Account Client Agreement.  Compl. ¶ 35.  But similar language is in Plaintiffs' CAR Applications and brokerage account applications.  *See* Ex. L, at 10; Exs. M–N, at 14; Ex. R, at 4; Exs. S–T, at 4; Ex. X, at 4.  Thus, the removal of duplicative authorizing language did not materially alter the terms of Plaintiffs' agreements.

In any event, these authorizations cannot be read to impose the measure of reasonableness that Plaintiffs propose—namely, rates equivalent to or greater than the Federal Funds Rate or to the rates paid on Plaintiffs' cherry-picked set of other firms' sweep accounts and investment vehicles—because Plaintiffs' interpretation impermissibly contradicts the Brokerage Contract itself. *Midwest Med. Sols.*, 21 F.4th at 1006; *see also Ellinghaus v. Educ. Testing Serv.*, 2016 WL 8711439, at *5 (E.D.N.Y. Sept. 30, 2016) (dismissing breach of contract claim where contract "explicitly recognize[d] the possibility" about which plaintiffs complained). As discussed, the Brokerage Contract specifically discloses that Plaintiffs' rates could be lower than Plaintiffs' cited comparators, and Plaintiffs' interpretation effectively reads those other provisions out of the agreement altogether, contrary to black-letter principles of contract law.

Further, Plaintiffs' internally contradictory reading is not necessary to give meaning to the authorization provision or its reference to a "reasonable rate of interest." As discussed above, *supra* at 20, the authorization is self-evidently structured to satisfy an ERISA regulatory exemption. *See* 29 C.F.R. § 2550.408b-4 (requiring that the authorization "must state" that any affiliated institution "may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)"). In this context, "reasonable rate of interest" means a rate sufficient merely to establish compliance with the exemption's conditions. And, as the Eleventh Circuit has held, where ERISA specifies a "reasonable rate of interest," it contemplates a wider range of variation than is denoted by the "prevailing or market rate." *See Brock v. Walton*, 794 F.2d 586, 588 (11th Cir. 1986) ("Since we hold that a reasonable rate may be different from the prevailing or market rate,

that evidence alone is insufficient to show that the trustees of a retirement plan have not made their loans at rates which 'bear a reasonable rate of interest.'")[22]

Plaintiffs provide no other standard by which the interest rates they have received may be labeled unreasonable.  On the contrary, the Complaint pleads clear indicia of reasonableness by establishing the widespread willingness of investors to utilize the Sweep Programs under their fully disclosed terms when they were not compelled to do so, and when there were abundant alternatives in the market.  *See, e.g.*, *Dupree v. Prudential Ins. Co. of Am.*, 2007 WL 2263892, at *41 (S.D. Fla. Aug. 7, 2007) (finding fees to be reasonable because multiple plans had freely elected to invest in the at-issue funds on the same terms).[23]  Ameriprise publicly discloses the rates provided through its Sweep Programs, and the contracts instruct investors how to locate those disclosed rates.  *See supra* at 9.  Plaintiffs and other investors were not required to accept those disclosed rates

---

[22] *Brock* addressed the meaning of "reasonable rate of interest" as it appears in ERISA § 408(b)(1) rather than ERISA § 408(b)(4), but it is the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning[.]" *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994) (quotations omitted).  ERISA § 408(b)(4) and IRC § 4975(d)(4), in turn, are parallel provisions containing identical terms and so must logically be read consistently.  *Compare* 29 U.S.C. § 1108(b)(4) *with* 26 U.S.C. § 4975(d)(4).

[23] *See also Hecker v. Deere & Co.*, 496 F. Supp. 2d 967, 976 (W.D. Wis. 2007) (finding no breach of fiduciary duty based on allegedly excessive expense ratios for plan investment options where "[a]ll of the[] funds were also offered to investors in the general public so expense ratios were necessarily set to attract investors in the marketplace"), *aff'd*, 556 F.3d 575, 586 (7th Cir. 2009), *abrogated on other grounds by Hughes v. Nw. Univ.,* 63 F.4th 615 (7th Cir. 2023); *cf. United States v. Roy*, 748 F. App'x 712, 715 (8th Cir. 2018) ("Fair market value is '[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction[.]'" (quoting *Value*, Black's Law Dictionary (10th ed. 2014))); Compl. ¶ 111 (citing 26 C.F.R § 1.482-2(a)(2) to suggest that a reasonable rate of interest is a rate that was paid or would have been paid "in independent transactions with or between unrelated parties under similar circumstances").

22

but were instead free to "compare" them to "other accounts and alternative investments to ensure this product meets [their] needs"—as the Brokerage Contract instructed them to do, *see, e.g.*, Ex. FF, at 8; Ex. Z, at 5—and to reject them by selecting a different broker for their assets*, see, e.g.*, Ex. EE, at 5; Ex. Y, at 3.  Or, as accountholders were told, they could avoid the Sweep Programs' rates while staying with Ameriprise by moving uninvested cash into a different product or, in the case of some accountholders, opting out of the Sweep Programs and using a "free credit balance" instead.  *Supra* at 10.  Despite this freedom of movement, the Complaint asserts that Plaintiffs—and countless other investors they propose to include in their purported class action—have continued to avail themselves of the convenient features of the Sweep Programs at their disclosed rates, along with the other features of Ameriprise's brokerage services.  The willingness of so many market participants to commit to transactions at fully disclosed rates when they are not compelled to do so is itself a confirmation of reasonableness and further underscores why Plaintiffs' claims are not plausible.

In short, even if the authorization language Plaintiffs attempt to invoke could be read to create a contractual obligation of "reasonableness" on credited sweep rates at all— it cannot be read to create one that contradicts other terms in the Brokerage Contract expressly disclaiming the specific notions of reasonableness that Plaintiffs advance.  *See DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *37 (S.D.N.Y. July 27, 2009) (dismissing contract claim because "Plaintiffs have not identified any agreement that could support a reasonable expectation that Defendants were obligated to maximize Plaintiffs' earnings on uninvested funds in their brokerage accounts").

       *c.*     *The Complaint Does Not Adequately Allege That The Sweep Programs' Rates Were Unreasonable By Any Measure.*

Finally, even if one were to ignore the contractual language directly contradicting Plaintiffs' breach of contract theory, the Complaint would still fail to allege facts plausibly supporting Plaintiffs' contention that the Sweep Programs' rates were unreasonable. Plaintiffs attempt to support their contention by alleging that the rates they were credited were less than those paid on money market mutual funds, treasury bills, and repurchase agreements. But, as another district court recognized in *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634 (S.D.N.Y. 2020), money market mutual funds are "entirely distinct investment option[s]" than accounts, like the Sweep Programs here, that enable depositors to enjoy the security of FDIC deposit insurance on their balances. *Id.* at 645; Ex. FF, at 2–4 (explaining access to FDIC insurance). And the same is true of treasury bills and repurchase agreements. Treasury bill yields are only payable after an investment term of four weeks or more and thus do not provide the same liquidity as the Sweep Programs.[24] A repurchase agreement—"essentially a short-term collateralized loan" accomplished when a party sells securities to another for cash with the agreement that the seller will repurchase the securities at a later date for specified price[25]—carries an inherent risk of a default that would leave the accountholder subject to the market risk and liquidity restrictions of whatever securities are used as collateral.[26] And, unlike the Sweep

---

[24] *See Treasury Bills*, TreasuryDirect (last accessed Dec. 20, 2024), https://treasurydirect.gov/marketable-securities/treasury-bills/.

[25] *In re Legel, Braswell Gov't Sec. Corp.*, 648 F.2d 321, 324 n.5 (5th Cir. 1981).

[26] *See Repurchase Agreements (Repos): A Primer*, Cong. Rsch. Serv. (Dec. 9, 2019), https://crsreports.congress.gov/product/pdf/IF/IF11383 ("Repos are a policy concern

Programs, treasury bills and repurchase agreements do not carry the security of FDIC deposit insurance. Plaintiffs do not establish unreasonableness by "[c]omparing apples and oranges[.]" *Davis v. Wash. Univ. St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020) ("Comparing apples and oranges is not a way to show that one is worse than the other."); *Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2023 WL 4239073, at *4–5 (S.D.N.Y. June 28, 2023) (dismissing similar challenge to sweep account rates and explaining that a plaintiff "cannot use the interest rate paid on one vehicle to prove that the interest paid on a different type of investment vehicle is not reasonable"); *cf. Tibble v. Edison Int'l*, 729 F.3d 1110, 1134 (9th Cir. 2013), *vacated on other grounds*, 575 U.S. 523 (2015) (rejecting effort to compare mutual fund expenses to costs of institutional investments as "apples-to-oranges" comparison in light of material distinctions in investment features).

Plaintiffs also suggest that the Sweep Program rates were unreasonable because they were lower than the Federal Funds Rate, claiming that Ameriprise has contractually "acknowledge[d]" it as a benchmark. Compl. ¶ 123. Not so. Ameriprise merely provided in the Brokerage Disclosures that the Federal Funds Rate was sometimes used as a basis for its overall negotiated compensation from the program banks, while, as discussed above, also disclosing that the rates credited to investors could be substantially less. *See, e.g.*, Ex. DD, at 8. The Complaint also alleges no facts to establish that the Federal Funds Rate—the median interest rate at which depository institutions and government-sponsored

---

because they have long been identified as a potential source of systemic risk, meaning that problems in that market could lead to broader financial instability.").

entities make overnight loans to **each other**, Compl. ¶ 124—is used by anyone as a benchmark or basis for sweep rates paid to investors.

As noted earlier, beyond the Complaint's inapt comparisons of Sweep Program rates to the Federal Funds Rate and the rates offered by facially dissimilar investments, Plaintiffs' only effort to establish unreasonableness is to compare the Sweep Programs' rates to the rates on swept cash offered by a small subset of the many brokerage providers in the marketplace cherry-picked by Plaintiffs. Compl. ¶ 67. Yet even if one accepts Plaintiffs' conclusory characterization of those sweep programs as "comparable programs," courts, including the Eighth Circuit, have roundly rejected comparisons to a handful of cherry-picked competitors as a basis for inferring that a challenged rate or product is inappropriate. *See, e.g.*, *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (affirming dismissal of claims that investment options were too expensive because they bore higher fees than allegedly similar Vanguard and Fidelity funds, explaining that plaintiffs did not establish "meaningful benchmark by merely finding a less expensive alternative fund or two with some similarity"); *see also Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345–46 (2d Cir. 2006) ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion."). Plaintiffs offer no factual allegations showing that the rates paid by the other institutions they cite indicate an accepted market rate. Thus, even if this Court held, contrary to the Eleventh Circuit in *Brock*, that a "reasonable rate of interest" means the prevailing market rate, Plaintiffs have provided no allegations as to what the prevailing market rate was or is.

The comparison Plaintiffs offer is particularly inapt here because it does not compare the *other* service features available on these competitors' platforms, or the fees charged for such features. This is a crucial oversight, as the Brokerage Contract makes clear that—under Ameriprise's brokerage services offering—compensation to Ameriprise through the operation of the Sweep Programs is used to support the entire brokerage offering, and that other fees and charges for brokerage services would be different without that Sweep Program compensation. *See supra* at 10–11.

In sum, Plaintiffs fail to adequately allege that they failed to receive a "reasonable rate of interest" by any measure, much less by a measure that is consistent with the other terms of the Brokerage Contract.

### C.  Plaintiffs Have Failed To Plead A Violation Of Any Implied Covenant Of Good Faith And Fair Dealing.

Count III attempts to recast Plaintiffs' challenge to the Sweep Programs as a claim for violation of an implied covenant of good faith and fair dealing. Once again, Plaintiffs' claim does not survive the language of their contracts.

Minnesota law "does not favor claims based on the breach of an implied covenant of good faith and fair dealing." *RBC Dain Rauscher, Inc. v. Fed. Ins. Co.*, 2003 WL 25836278, at *6 (D. Minn. Dec. 2, 2003) (quoting *Sports & Travel Mktg., Inc. v. Chi. Cutlery Co.*, 811 F. Supp. 1372, 1383 (D. Minn. 1993)).[27]  The implied covenant of good

---

[27] Indeed, Minnesota law leaves open the question whether the implied covenant applies to a party's exercise of contractual discretion at all. *Cent. Specialties, Inc. v. Minn. Dep't of Transp.*, 5 N.W.3d 409, 417 (Minn. Ct. App. 2024) (assuming without deciding that "the implied covenant of good faith and fair dealing applies to a contractual grant of discretion" and noting that the Minnesota Supreme Court had not addressed the issue).

faith and fair dealing serves only "to enforce existing contractual duties, and not to create new ones." *Teng Moua v. Jani-King of Minn., Inc*., 810 F. Supp. 2d 882, 893 (D. Minn. 2011) (quotations omitted).  It serves as "a method to fill gaps" in a contract that has "nothing to do with the enforcement of terms actually negotiated" and so cannot "block use of terms that actually appear in the contract." *Taylor Equip., Inc. v. John Deere Co.*, 98 F.3d 1028, 1032 (8th Cir. 1996) (reversing and remanding with instructions to dismiss implied covenant of good faith and fair dealing claim under South Dakota law because "[w]here parties have addressed an issue in the contract, 'no occasion to divine their intent or supply implied terms arises.'" (internal citations omitted)).[28]  "A party to a contract 'does not act in bad faith by asserting or enforcing its legal and contractual rights.'" *Sterling Cap. Advs., Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998) (quoting *Burgmeier v. Farm Credit Bank*, 499 N.W.2d 43, 50 (Minn. Ct. App. 1993)); *Residential Funding Co. v. Terrace Mortg. Co.*, 725 F.3d 910, 918 (8th Cir. 2013) (same).  Rather, "[b]ad faith" is defined as a party's "refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties, but rather by some ulterior motive." *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 837 (Minn. Ct. App. 1994).

---

[28] *See also Yarborough v. DeVilbiss Air Power, Inc.,* 321 F.3d 728, 733 (8th Cir. 2003) ("[W]e believe that in no situation can the implied covenant of good faith and fair dealing limit the way in which a party exercises its discretion when the aggrieved party has specifically disavowed any limitations on that discretion, and the exercise of that discretion (and its consequences) are easily foreseeable."); *RBC Dain Rauscher, Inc.,* 2003 WL 25836278, at *7–8 (quoting *Yarborough* and dismissing Minnesota law implied covenant claim challenging insurer's refusal to assume insured's defense where contract contemplated possibility insurer could issue such refusal).

Plaintiffs' implied covenant theory does not seek to fill any supposed contractual gaps in the Brokerage Contract but rather seeks to negate the contracts' plain terms. Plaintiffs complain that the interest rates on the Sweep Programs were lower than the rates on certain other depository and investment vehicles. But, as discussed above, the Brokerage Contract expressly recognized the Sweep Programs' rates could be lower than those rates. *Supra* at 9–10, 17–18, 20–21, 25. And Ameriprise specifically disclosed, in the Brokerage Contract itself and in linked disclosures, that the Sweep Program rates can be, and indeed have been, lower than the Federal Funds Rate—Plaintiffs' other chosen comparator. *Supra* at 18. Likewise, Plaintiffs' suggestion that an implied covenant to adjust the Sweep Programs' rates in line with market fluctuations is directly at odds with contractual language recognizing Ameriprise's right to consider other factors, including its appraisal of "business conditions." *Supra* at 16. An implied covenant claim cannot be used to contradict express contract terms.

Plaintiffs' implied covenant claim fails for the additional reason that Plaintiffs have failed to allege bad faith. Plaintiffs allege that Ameriprise established lower rates to increase its own revenues. But "a party exercising discretionary decision-making authority pursuant to a contract does not breach the implied covenant of good faith and fair dealing simply because the party makes a decision that is motivated by its own interests." *Cent. Specialties, Inc.*, 5 N.W.3d at 419; *see also Steady State Imaging, LLC v. Gen. Elec. Co.*, 2018 WL 461136, at *4 (D. Minn. Jan. 17, 2018) (holding, in dismissing implied covenant claim, that defendant's alleged self-serving motive in exercising contractual discretion did not amount to bad faith where exercise of discretion did not render contract illusory).

29

Rather, as stated above, "[b]ad faith" is defined as "a refusal to fulfill some duty or some contractual obligation" based on "some ulterior motive[.]" *Lassen*, 514 N.W.2d at 837. The Minnesota courts, in turn, have read "ulterior" to mean, "[l]ying beyond what is evident, revealed, avowed, especially being concealed intentionally so as to deceive." *Cent. Specialties, Inc.*, 5 N.W.3d at 417–18 (quoting American Heritage Dictionary of the English Language 1880 (5th ed. 2018)).

Under that standard, Plaintiffs have not pleaded, and cannot plead, bad faith. Ameriprise did nothing to hide or misrepresent its financial interest in the Sweep Programs. To the contrary, not only does the Brokerage Contract describe in detail how Ameriprise receives compensation through the Sweep Programs, but it also sets forth or links an illustrative example showing how the amount of AEIS's compensation has compared to the interest rates credited to accountholders. *See supra* at 18. The Brokerage Contract also states in clear terms that swept cash can result in more revenue to Ameriprise and its affiliates than an allocation to "other, higher-yielding cash alternatives[.]" *See, e.g.*, Ex. Y, at 5; Ex. EE, at 2; *supra* at 10. Nor has Ameriprise hidden the consequences of its rate-setting decisions. The Brokerage Contract provides precise directions for accountholders to view the Sweep Programs' current rates. *See supra* at 9. It follows that Plaintiffs have failed to allege facts that Ameriprise acted "dishonestly, maliciously, or otherwise in subjective bad faith[,]" *Selective Ins. Co. of S.C. v. Sela*, 413 F. Supp. 3d 861, 863 (D. Minn. 2019), *aff'd*, 11 F.4th 844 (8th Cir. 2021), and cannot do so considering the contracts they signed.

**D.**    **The Complaint Fails To State Any Claim For Breach Of Fiduciary Duty With Respect To Ameriprise's Brokerage Services.**

Plaintiffs' Fourth Claim for Relief asserts that that Defendants breached fiduciary duties arising from the Investment Advisers Act of 1940 ("IAA"), 15 U.S.C. § 80b-1 *et seq.*, as well as under the common law, and acted contrary to Reg BI—which Plaintiffs suggest imposes fiduciary-like duties.  Compl. ¶¶ 163–69.  Once again, any theory of liability deriving from AFS's status as an investment adviser under the IAA is subject to compulsory, individualized arbitration.  *See* Mot. to Compel at 11–18.  The remainder of Plaintiffs' claim—arising out of Plaintiffs' brokerage relationships with Ameriprise—is legally defective and subject to dismissal.  The Complaint fails to allege any basis for ascribing fiduciary status to Defendants in their brokerage services role, and Plaintiffs have no right of action under Reg BI.

   1. <u>Plaintiffs Fail To Adequately Allege That Defendants Assumed Fiduciary Responsibilities In Providing Brokerage Services Generally, Or In Making Available The Sweep Programs In Particular.</u>

The mere existence of a broker-dealer relationship does not give rise to fiduciary duties under Minnesota law.  *Corbey v. Grace*, 605 F. Supp. 247, 253 (D. Minn. 1985) ("In Minnesota, a claim for breach of fiduciary duty requires a showing of more than a simple broker-customer contract.").  Rather, "[a]bsent a special agreement to the contrary, a licensed broker owes his customer only the duty to exercise due care in executing all instructions expressly given to him by the principal."  *Rude v. Larson*, 207 N.W.2d 709, 711 (Minn. 1973); *Minneapolis Emps. Ret. Fund v. Allison-Williams Co.*, 508 N.W.2d 805, 808-09 (Minn. Ct. App. 1993), *rev'd on other grounds*, 519 N.W.2d 176 (Minn. 1994)

(holding that plaintiff could not prevail on breach of fiduciary duty claim where she did not establish that defendant had a "special relationship" with plaintiff beyond ordinary broker-dealer arrangement).

Plaintiffs do not plead the existence of any such "special agreement" enabling them to pursue a fiduciary breach claim here. While Plaintiffs allege that Defendants provided investment advisory services in addition to brokerage services, any claim of fiduciary status and breach stemming from Ameriprise's investment advisory role is subject to compulsory arbitration before the AAA. Setting aside alleged conduct whose lawfulness Plaintiffs agreed to arbitrate, the Complaint offers no facts suggesting anything other than an ordinary broker arrangement.

There is accordingly no basis to assign Defendants fiduciary status with respect to the use of the Sweep Programs offered through Plaintiffs' accounts. The designated Sweep Program used for the uninvested cash in Plaintiffs' accounts was hard-wired into the contracts Plaintiffs signed based on the nature and ownership of each of the accounts Plaintiffs opened. *See, e.g.*, Ex. FF, at 3; Ex. Z, at 14. In addition to dictating the choice of Sweep Program, the Brokerage Contract told Plaintiffs not only where they could view the applicable interest rates[29] but also explained Defendants' financial interests in the Sweeps Programs. The latter disclosures regarding Defendants' own financial interests were exceptionally detailed. *See, e.g.*, Ex. FF, at 5 ("For AIMMA, each Bank will

---

[29] *See, e.g.*, Ex. Z, at 14 ("For current sweep rates, go to ameriprise.com/sweeprates[.]"); Ex. FF, at 8 ("For the most current Bank Sweep Program Interest Rate Tiers, please access our website at ameriprise.com/sweeprates or contact our service line at 800.862.7919 to obtain interest rate information.").

compensate AEIS for the placement of funds based on the average daily deposit balances at that Bank. The total compensation paid by each participating Bank to AEIS is negotiated and is based on a reference rate, such as the Federal Funds Rate, plus or minus a spread. . . . AEIS retains the balance of the amount paid by the participating Banks, less the [amount] of interest paid to you and the compensation to IntraFi."); Ex. V, at 4 ("Ameriprise Bank uses the deposits it receives through its participation in AIMMA for its lending and investment programs, and it earns revenue based on the difference or ('spread') between the interest rates it receives from its investment and lending programs and what it pays to obtain the deposits."); *id.* ("For AIMMA, each Bank will compensate AEIS for the placement of funds based on the average daily deposit balances at that Bank. The total compensation paid by each participating Bank to AEIS is negotiated and is based on a reference rate, such as the Federal Funds Rate, plus or minus a spread. . . . AEIS retains the balance of the amount paid by the participating Banks, less the account of interest paid to you and the compensation to IntraFi."); Ex. Y, at 5 ("The amount of cash you maintain in your money settlement option could result in more revenue to us and our affiliates[.]").

The Brokerage Contract thus not only specified the Sweep Program terms that would apply to each account Plaintiffs opened but also stated that Defendants had financial interests in those Sweep Programs that diverged from Plaintiffs' interests in that the payment of higher interest on swept cash would tend to reduce the compensation retained by Ameriprise. Under Minnesota law, no fiduciary relationship can apply where the contracts so clearly explain the parties' divergent economic interests. *Stark v. Equitable Life Assur. Soc'y of U.S.*, 285 N.W. 466, 470 (Minn. 1939) (holding that allegation that

plaintiff had faith and confidence in defendant's agent was insufficient to establish fiduciary relationship where plaintiff should have known agent was representing "adverse interests"); *S. Minn. Mun. Power Agency v. City of St. Peter*, 433 N.W.2d 463, 468 (Minn. Ct. App. 1988) (fiduciary relationship not established "by plaintiff merely having faith and confidence in defendant where plaintiff should have known defendant was representing an adverse interest"); *cf. DeBlasio*, 2009 WL 2242605, at *28 (explaining, in dismissing claims challenging the cash sweep practices of several brokerage firms, that "when parties deal at arms' length in a commercial transaction, no relation of trust and confidence sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances" (quotations omitted)).

2.    Plaintiffs' Allegation That Defendants Violated Reg BI Likewise Cannot Sustain Plaintiffs' Fiduciary Breach Claim.

Plaintiffs' attempt to leverage Reg BI fails as well. As an initial matter, contrary to Plaintiffs' suggestion, the SEC made clear in adopting Reg BI that it was declining to impose a fiduciary standard on broker-dealers. *See* Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33462 (July 12, 2019) ("***[I]nstead of*** adopting our approach in Regulation Best Interest, the Commission could have ***alternatively*** imposed a form of fiduciary standard on broker-dealers[.]") (emphasis added). Based on the SEC's promulgating statements, courts have consistently held that Reg BI's obligations are non-fiduciary in nature. *SEC v. Cutter Fin. Grp., LLC*, 2023 WL 8653927, at *8 (D. Mass. Dec. 14, 2023) (holding Reg BI imposes "non-fiduciary" obligations on broker-dealers); *Anderson v. Edwards D. Jones & Co., LP*, 2024 WL

4120941, at *4 (E.D. Cal. Sept. 9, 2024), *appeal filed*, 24-6164 (9th Cir. Oct. 9, 2024) (citing Reg BI for explanation of why the SEC has declined to impose a fiduciary duty on broker-dealers); *SEC v. Langemeier*, 2024 WL 664452, at *13 (D. Nev. Feb. 16, 2024) (explaining that pursuant to Reg BI, instead of fiduciary duties, "[b]rokers are subject to a less stringent 'best interest' standard of conduct when dealing with clients and making recommendations as to any securities transaction"); *U.S. SEC v. W. Int'l Secs., Inc.*, 2023 WL 2480732, *1 (C.D. Cal. Mar. 13, 2023) ("[T]he 'best interest' standard is less stringent than the fiduciary standard that applies to registered investment advisers.").

The characterization of Reg BI is academic, in any event, because Reg BI does not create a private right of action—as the SEC recognized in promulgating the regulation.  *See* 84 Fed. Reg. at 33327 ("Regulation Best Interest [does not] create[] any new private right of action or right of rescission, nor do we intend such a result.").  Plaintiffs identify no statutory provision otherwise authorizing them to base a lawsuit on the regulation.  This dooms any claim Plaintiffs purport to assert for alleged Reg BI violations.

### E.    The Complaint Fails To State An Unjust Enrichment Claim.

Plaintiffs argue in their Fifth Claim for Relief that the Sweep Programs unjustly enriched Ameriprise.  But a plaintiff cannot invoke unjust enrichment principles against a defendant where the relationship is governed by an express contract, *see Watson's Props., LLC v. Menard, Inc.*, 2002 WL 1364064, at *4 (Minn. Ct. App. June 19, 2002) (affirming dismissal of unjust enrichment claim where written contract governed parties' relationship), and Plaintiffs' first two claims for relief—for purported breaches of

contract—betray that the parties' relationship is contractual. The conceded presence of an express contract ipso facto dooms Plaintiffs' unjust enrichment claim from the start.

Here, of course, the Brokerage Contract at issue specifies all the protocols that Plaintiffs challenge, providing that Plaintiffs' uninvested cash will be swept into a specific Sweep Program depending on the nature and ownership of their accounts and credited with interest at rates disclosed in advance. *See, e.g.*, Ex. FF, at 3; Ex. Z, at 14 (providing a chart that "lays out the various money settlement options available for your account(s) based on account and ownership types"); *see also supra* at 32. The Brokerage Contract also makes clear that interest credited under the Sweep Programs could be lower than the rates available through comparable accounts with other institutions or through alternatives including money market mutual funds—terms that are directly contrary to the proposed reasonableness measure that Plaintiffs seek to impose through unjust enrichment principles. *See supra* at 19–23. The Brokerage Contract also spells out how Ameriprise entities, including AEIS, use the Sweep Programs as a source of compensation for making available their full suite of brokerage services, and that other brokerage services fees would be different if compensation from the Sweep Programs was not available. *See, e.g.*, Ex. Y, at 5 ("[W]e may receive remuneration based on the cash balance in your money settlement option. This remuneration is part of revenue sharing or other agreements which allow us to earn income and defray expenses relating to the management of the money settlement process."); Ex. EE, at 2 (same); *supra* at 10–11. And the Brokerage Contract identifies means by which Plaintiffs could avoid use of their Sweep Programs for their accounts if

they preferred not to use the Sweep Programs with the rates and terms they agreed to in their Brokerage Contract. *Supra* at 10, 23.

Plaintiffs' unjust enrichment theory is thus particularly suspect: They invoke unjust enrichment principles not just to supplement a formal contract, but to undermine—indeed contradict—its express terms. Such a theory is contrary to law. *See U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) ("[E]quitable relief [based on unjust enrichment] cannot be granted where the rights of the parties are governed by a valid contract."); *HomeStar Prop. Sols., LLC v. Safeguard Props., LLC*, 370 F. Supp. 3d 1020, 1030 (D. Minn. 2019) (explaining that unjust enrichment claims are barred "when there is no dispute that a written contract governs [a] disputed account"); *accord Al-Khaldiya Elects. & Elec. Equip. Co. v. Boeing Co.*, 571 F.3d 754, 759 (8th Cir. 2009) (holding that, under Missouri law (which mirrors Minnesota law), "unjust enrichment claims are precluded by the unambiguous, express terms of the representation agreements").

Plaintiffs' unjust enrichment claim also fails for the independent reason that Plaintiffs cannot show that the benefit any Defendant obtained from the Sweep Programs unfairly enriched them. "Unjust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others"; rather, a plaintiff must show that a defendant "was enriched in a manner that was illegal or unlawful." *Martin v. A'BULAE, LLC*, 2016 WL 3659293, at *5 (Minn. Ct. App. July 11, 2016) (quotations omitted). Here, Plaintiffs plead no facts remotely suggesting that a fully disclosed business model (of

obtaining an economic benefit from the spread between the revenue received by any Defendant and the interest credited to customers) is in any way unlawful or illegal.

*DeBlasio* is instructive.  There, the court observed that an unjust enrichment claim challenging Merrill Lynch's sweep programs as "deceptive and misleading" appeared to be based on a correlation between "(1) the reduced rates of interest [customers] allegedly received in the. . . Sweep Programs, and (2) [d]efendants' increased profits as a result of the implementation of these Programs."  2009 WL 2242605, at *40.  The court rejected that theory, holding that "more of a nexus is required between a defendant's 'enrichment' and a plaintiff's 'expense' to plead a plausible claim to relief on a theory of unjust enrichment."  *Id.*  The court emphasized that the defendants' customers "did receive at least some compensation for these uninvested funds, in the form of a positive rate of interest."  *Id.* (quotations omitted).  The plaintiffs' core argument that "they did not earn as much of a return on their uninvested funds as they believe they that should have," the court held, was "insufficient to demonstrate an equitable entitlement to a share of the profits earned by [d]efendants through disclosed uses of [p]laintiffs' free credit balances."  *Id.* (emphasis omitted).

The same is true here.  Plaintiffs cannot show any entitlement to the profit that any Defendant earned from uninvested cash through the Sweep Programs on fully disclosed terms, particularly since Ameriprise is not required to offer Plaintiffs a Sweep Program at all or to otherwise provide interest on uninvested cash[30] and Plaintiffs at any time could

---

[30] *See, e.g.*, Ex. EE, at 2 ("Ameriprise Financial may, but is not required to, offer you options for the automatic investment or 'sweep,' of excess cash in your account at

have chosen alternative destinations for their cash if they found the disclosed interest rates unsatisfactory—including higher-yielding products available on Ameriprise's investment platform (or other platforms entirely).  *See supra* at 17–18.  Indeed, Defendants specifically advised Plaintiffs to refrain from using the Sweep Programs as a vehicle for ***investing*** free cash.  *See, e.g.*, Ex. FF, at 2 ("Your money settlement option is not intended to be a long-term investment for cash holdings[.]"); Ex. G, at 4 ("A money settlement option is a feature offered by Ameriprise Financial Services that is primarily intended to hold cash (i) pending investment into your Managed Account; (ii) to cover your Asset-based Fee and if applicable, SPS Advisor Investments and Infrastructure Support Fee; (iii) to cover systematic cash withdrawals you have established for your Account(s); (iv) for certain pre-existing nonqualified SPS *Advantage* Accounts check writing or debit card activity and to make bill payments (cash management activities); and (v) for settling transactions in your Managed Account."); *DeBlasio*, 2009 WL 2242605, at *31 ("By definition, free credit balances existed in [p]laintiffs' brokerage accounts because [p]laintiffs chose not to invest these funds and instead left them idle in their accounts.").  The mere fact that Plaintiffs now retroactively feel they would prefer a larger slice of the pie cannot save or support their otherwise fatally flawed unjust enrichment claim.

---

Ameriprise Financial."); *id.* ("We reserve the right, at any time and upon notice to you as provided in this Agreement, to revise the money settlement options available for your account.  This includes the right to limit, terminate or replace any particular money settlement option, or to stop paying interest on your cash balances.").

II.   **To The Extent The Court Denies Defendants' Motion To Compel Arbitration Of Plaintiffs' Investment Advisory Services Claims, Those Claims Should Be Dismissed For Failure To State A Claim As Well.**

Plaintiffs also contend that Defendants breached duties arising from AFS's status as an investment adviser under the Investment Advisers Act.  Any such legal theories arising out of Defendants' investment advisory services to Plaintiffs must be arbitrated before the AAA.  To the extent the Court disagrees, however, Plaintiffs' Investment Advisory Services Claims should be dismissed along with the rest of the Complaint for largely the same reasons as their Brokerage Claims.  Indeed, nowhere in the Complaint do Plaintiffs detail the supposed "investment advice" they received in connection with the Sweep Programs.

**First and Second Claims for Relief:**  Plaintiffs' investment advisory service relationships with Ameriprise have no bearing on their First Claim for Relief, which is solely rooted in their Brokerage Contract.  Plaintiffs' Second Claim for Relief, in turn, attempts to invoke the "reasonable rate of interest" language to retroactively impose their preferred rate by creating a new affirmative contractual commitment.  But, as discussed above, *supra* at 21, that authorization does not exist in a vacuum but is directed toward meeting the conditions of a regulatory exemption, and Plaintiffs cannot sustain a standard of reasonableness that contradicts express terms of Plaintiffs' agreements with Ameriprise. *Supra* Section I.B.

**Third Claim for Relief:**  Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing as to Ameriprise's investment advisory services fails for the same reasons it fails as to Ameriprise's brokerage services.  As addressed above, an implied covenant claim may not be asserted to create new contractual rights or undermine existing

contractual provisions.  *See supra* at 29–30.  As they did in their Brokerage Contracts, Plaintiffs acknowledged in their investment advisory agreements that the Sweep Programs' rates were expected to be lower than those offered by investment products and agreed that they understood the Sweep Programs were not intended to be vehicles for ***investing*** free cash.  Ex. F, at 3  ("[A Sweep Program] may not be an appropriate long-term option for holding large amounts of cash, as other, higher-yielding investments [] available to you."); Ex. H, at 3 (same); Ex. J, at 4 (same); Ex. G, at 45 ("Regardless of the Sweep Program made available to you, you can also buy and sell positional money market mutual funds, brokered certificates of deposit, treasury bills, and other similar cash-equivalent products . . . . These options for the investment of cash balances are generally expected to offer higher returns than the Sweep Program we make available for your Account.").

And, as with their Brokerage Services Claims, Plaintiffs cannot allege bad faith on Ameriprise's part.  *See supra* Section I.C.  Ameriprise provided accountholders with robust disclosures surrounding the Sweep Programs, disclosed their financial interests in the Sweep Programs, detailed the compensation Ameriprise entities receive through those programs, and provided information regarding alternatives available to Plaintiffs offering higher rates of return.  *See*, e.g., Ex. G, at 45; Ex. I, at 44; Ex. K, at 45; Ex. F, at 9; Ex. H, at 9; Ex. J, at 4, 11; Ex. BB, App'x at 2.

**<u>Fourth Claim for Relief:</u>**  Plaintiffs rely on the Investment Advisers Act ("IAA"), 15 U.S.C. § 80b-1 *et seq.*, to anchor their claim of fiduciary breach with respect to the investment advisory services they allegedly obtained from Ameriprise.  The IAA imposes certain registration and disclosure requirements on persons in the business of providing

41

investment advice for compensation and requires that investment advisers act as fiduciaries when furnishing such investment advice. *See* 15 U.S.C. § 80b-2(a)(11) (defining "investment advisers" under the IAA as those "advising others" "as to the value of securities or as to the advisability of investing in, purchasing, or selling securities"). In contrast to some other securities laws, however, the IAA confers only a limited private right of action, *viz.*, to rescind investment advisory agreements that are contrary to its provisions—no other private rights of action are afforded. *Transam. Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979) ("[W]e hold that there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment adviser[']s contract, but that the Act confers no other private causes of action, legal or equitable."). Instead, regulatory and enforcement authority with respect to investment advisers primarily lies with the SEC. *See, e.g.*, 15 U.S.C. §§ 80b-3a, 80b-6, 80b-9, 80b-11. These longstanding features of the IAA expose Plaintiffs' fiduciary breach theory with respect to the investment advisory services as legally baseless: Plaintiffs are unable to identify any respect in which Ameriprise or its personnel provided investment advice concerning the Sweep Programs, and the IAA would not afford them a right of action even if they could.

The Complaint does not identify a single instance in which any of the Plaintiffs received investment advice concerning the choice of Sweep Program. This is not accidental, as customers elect specific Sweep Programs when they open their accounts with Ameriprise, and the type of account they select dictates the applicable Sweep Program; there is no choice among Sweep Programs at the account level, and so there is no room for any advice. *See, e.g.*, Ex. FF, at 3; Ex. Z, at 14 (providing a chart listing the money

settlement option that attaches to an account "based on account and ownership types"). Thus, the Disclosure Brochure states that "[y]our financial advisor does not recommend the Sweep Program offered to you for any particular Account(s) and revenues received by our affiliates related to the Sweep Programs are not shared with financial advisors." Ex. G, at 47; Ex. I, at 46.[31]

Plaintiffs cannot establish a private right of action in connection with Ameriprise's investment advisory role either. As noted, the Supreme Court has held that the only private right of action that the IAA implies is for the rescission of an investment adviser contract that is voidable under IAA § 215(b) of the Act. *TAMA*, 444 U.S. at 24. Section 215(b) "is merely a codification of the common-law principle that illegal contracts are invalid. As such, [Section] 215(b) voids a contract only where the contract would be invalid under that principle—that is, where the contract was made illegally or requires illegal performance." *Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *3 (S.D.N.Y. Aug. 7, 2014); 15 U.S.C. § 78cc(b) ("Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, . . . [or] the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void."); *see also NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 419 (2d Cir. 2023)

---

[31] Even if Plaintiffs could allege that they were furnished advice concerning Ameriprise's Sweep Programs, it would not salvage their fiduciary claims, as recommendations qualify as investment advice under the IAA only when they pertain to "securities"—and the bank deposits used to fulfill the challenged Sweep Programs are not securities. *See* 15 U.S.C. § 80b-2(a)(18) (defining securities under the IAA); *Marine Bank v. Weaver*, 455 U.S. 551, 559 (1982).

(affirming dismissal of claim challenging defendants' performance under investment advisory contract for lack of a private right of action and explaining that "[r]ead as a whole, § 215—again, entitled 'Validity of contracts'—is a statute centered on contracts, not the conduct of parties to contracts" (emphasis omitted)); *In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d 616, 635 (D.N.J. 2005), *opinion vacated in part on other grounds*, 463 F. Supp. 2d 505 (D.N.J. 2006), *vacated*, 553 F.3d 248 (3d Cir. 2009) (holding that investment advisory contracts are voidable under Section 215 only if by their terms they violate some other provision of the IAA or if their performance necessarily results in the violation of some other provision of the IAA). Here, Plaintiffs do not allege that their investment advisory contracts with Defendants violated any provision of the IAA; nor do they allege that those contracts mandated the Defendants act in a violative manner. Accordingly, they have not pleaded a claim for rescission under Section 215.[32]

**Fifth Claim for Relief:** Plaintiffs' attempt to leverage unjust enrichment principles (to supplement, or displace, the terms of their express contracts) fails as to Ameriprise's investment advisory services for the same reasons it fails as to Ameriprise's brokerage services. The existence of an applicable contract precludes application of the equitable

---

[32] In fact, Plaintiffs do not even purport to seek recission but instead seek damages, restitution, disgorgement, and forfeiture of compensation. Compl. at 47. And even if the Court rescinded the investment advisory agreements pursuant to Section 215, the use of the Sweep Programs for Plaintiffs' accounts would still be authorized under the brokerage contracts to which Plaintiffs are also parties.

principle of unjust enrichment.  *See supra* Section I.E.[33]  And Plaintiffs have not, in any event, adequately alleged that Ameriprise was unjustly enriched.  *See id.*

**CONCLUSION**

For the reasons explained, the Court should dismiss with prejudice Plaintiffs' Brokerage Services Claims for failure to state a claim.  The Court should dismiss the remainder of the Complaint, addressed to Plaintiffs' Investment Advisory Services Claims, to the extent it denies Defendants' parallel Motion to Compel Arbitration of such claims and legal theories.

Dated:  December 20, 2024

*s/ Edward B. Magarian*

Edward B. Magarian, MN Bar No. 0208796
Jack Huerter, MN Bar No. 0399277
**DORSEY & WHITNEY LLP**
50 South Sixth Street, Suite 1500
Minneapolis, MN
Telephone: (612) 340-2600
Facsimile: (612) 340-2868
magarian.edward@dorsey.com
huerter.jack@dorsey.com

Meaghan VerGow, DC Bar No. 977165*
Brian Boyle, DC Bar No. 419773*
Shannon Barrett, DC Bar No. 476866*
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, DC  20006-4061
Telephone: (202) 383-5300

---

[33] Like the Brokerage Contract, the contract materials governing Ameriprise's investment advisory services specified the Sweep Programs applicable to Plaintiffs' accounts, recognized that the Sweep Programs could provide lower interest than other vehicles, and stated that Ameriprise receives compensation through the Sweep Programs.  *See supra* at 9–10, 17–18, 20–21, 25.  In addition, Plaintiffs Mehlman, Hultman, and Sullivan agreed, in signing their CAR Applications, to be bound by the Brokerage Client Agreement and Brokerage Disclosures.  *See supra* at 5–6.

Facsimile: (202) 383 5414
mvergow@omm.com
bboyle@omm.com
sbarrett@omm.com

Lauren Wagner, NY Bar No. 5430640*
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
lwagner@omm.com

* admitted *pro hac vice*

*Attorneys for Defendants*