# EXHIBIT Y

*Provide this form to the client. Do NOT send it to the Corporate Office.*



# AMERIPRISE BROKERAGE CLIENT AGREEMENT

1. **General Information.** This Agreement contains Ameriprise Financial Services, Inc. Account Agreements and Disclosures required to open a brokerage account. Depending on the features you select when you open your account, this Agreement may contain Terms and Conditions which may not apply to your account. The Terms and Conditions in this Agreement will apply to any features that you add to this account in the future. You agree that any future amendments and/or modifications made to the Ameriprise Brokerage Client Agreement shall apply to this account and to any subsequent accounts you ask us to establish for you in the future.

   As used in this Agreement, the words "you", "your" and "yours" refer to the applicant, who is the person or entity to whom we address account statements, as well as any person or entity who agrees to be liable on the Account. "We", "our" and "us" mean Ameriprise Financial Services, Inc. ("Introducing Broker" or "Ameriprise Financial") and/or American Enterprise Investment Services, Inc. ("Clearing Broker" or "AEIS"). As used in this Agreement, the singular shall include the plural where appropriate.

   For purposes of this Agreement, "securities and other property" shall include but not be limited to money, securities, and financial instruments of every kind and nature, and all contracts and options relating thereto, whether for present or future delivery.

   Brokerage, investment and financial advisory services are made available through Ameriprise Financial Services, Inc., Member FINRA and SIPC.

   Not all products and services discussed in this Agreement may be available to you depending upon the ownership type of the account you open.

   Please read the document titled "Other Important Brokerage Disclosures", incorporated herein by this reference, for additional information related to these products and services: Checkwriting and Ameriprise debit card, Ameriprise Insured Money Market Account, Ameriprise Bank Insured Sweep Account, and Electronic Services and Electronic Fund Transfer.

   We provide a service called "householding". We will deliver to clients who reside at the same address and who own the same security a single copy of certain shareholder documents, such as prospectuses, supplements, annual and semiannual reports and proxies. To opt out of this service, call 866.273.7429 and reference the client ID located on your statement. Multiple mailings will resume within 30 days of opting out.

2. *Ameriprise ONE*® **Financial Account**. The *Ameriprise ONE* Financial Account offers integrated financial services including a brokerage account, a cash management account, and any of the following, as selected by you: (1) a checking account and/or a debit card with ATM functionality; (2) an Online Bill Payment Service; and (3) electronic funds transfer services and online brokerage services.

   You may open an *Ameriprise ONE* Financial Account if the ownership on the application is an eligible account registration type. Eligible Account Registration Types include: Individual, Community Property, Joint Tenants, Tenants in Common, Tenants by Entirety, Sole Proprietorship, and Revocable Trust. We will establish a checking account on your behalf at our processing bank so you may access funds in your account with a check-writing redemption, debit/ATM card, and/or Online Bill Payment privileges.

   Please review your Ameriprise debit card agreement for additional information and disclosures related to your debit card.

   If you select an *Ameriprise ONE* Financial Account, you agree that the taxpayer information you certify to us shall be used for tax reporting by AEIS for your brokerage account. The Agreement is sent to you with your debit card.

   If a fiduciary has been appointed on any of your accounts (e.g., a trustee, guardian, custodian, etc.), the fiduciary acknowledges and agrees that all disbursements from the ONE Financial Account will be made for the benefit of the beneficial owner of the account, in accordance with the fiduciary's authority as outlined in applicable statutes in effect.

   When an *Ameriprise ONE* Financial Account is opened, the Introducing Broker will establish a checking account to provide you with access to your cash via the ONE Account features you select. The Introducing Broker, its affiliates, and third parties engaged by the Introducing Broker may receive compensation for the services they provide.

3. **Relationship of Introducing Broker and Clearing Broker.** Your Introducing Broker and the Clearing Broker have an agreement in which the Introducing Broker introduces customer accounts to the Clearing Broker on a fully disclosed basis. This means that the Introducing Broker is responsible for opening, approving and monitoring your account and for accepting securities orders. The Clearing Broker will provide recordkeeping; delivery and receipt of securities and funds; receive and distribute payments thereof; and safeguard all funds and securities received. The Clearing Broker also receives and distributes dividends and other distributions and processes exchange offers, rights offerings, warrants, tender offers and redemptions.

   **IN CONSIDERATION OF AMERIPRISE FINANCIAL ACCEPTING YOUR BROKERAGE ACCOUNT, YOU AGREE TO THE FOLLOWING WITH RESPECT TO ANY OF YOUR ACCOUNTS WITH US:**

4. **Amendments**. You agree that we shall have the right to amend this Agreement and any other document relating to your accounts with us, by modifying or rescinding any existing provisions or by adding any new provision. We may modify or change the terms and conditions of this Agreement by mailing a written notice of the modification or change or a new printed Agreement to you at your address as reflected on the application or postal or electronic mail address you provide to us or, if you have agreed to use the electronic services provided by us, by posting such modifications or changes online. You agree that it is your obligation to promptly inform us of any change to your U.S. postal and/or electronic mail address(es) of record. Such written notice or posting of the amendment will include the effective date of the modification or change. No such amendment shall become effective prior to 30 days from the date of such notice unless required or otherwise permitted by law or regulation. You agree that any future amendments and/or modifications made to the Ameriprise Brokerage Client Agreement shall apply to this account and to any subsequent accounts you ask us to establish for you in the future. The use of your account after the effective date of the proposed modification or change shall constitute your acknowledgement and agreement to be bound thereby.

   This Agreement is not subject to any oral modification. This Agreement, along with the Application(s) and any other documents you have signed, constitutes the entire Agreement between you and us.

   This Agreement and its terms, as modified by us from time to time, shall be binding upon your heirs, successors, executors, beneficiaries, administrators and assigns.

5. **Terms and Conditions.** You appoint us as your Broker for the purpose of carrying out your directions in accordance with the terms and conditions of this Agreement. To carry out our duties, you authorize us to open and close your brokerage accounts; place and cancel orders for you and take such other steps as are reasonable to carry out your directions. You understand and agree that we may at our discretion and for our protection reject or cancel any order to purchase securities.

© 2012 - 2019 Ameriprise Financial, Inc.
All rights reserved.

You understand that the Clearing Broker will clear transactions under this Agreement and your account will be carried with it. You understand the Introducing Broker also serves as the Executing Broker and will execute transactions under this Agreement. You authorize us and our affiliates to accept from an Ameriprise financial advisor or paraplanner telephone or online instructions for exchanges, funds transfers, redemptions, and surrenders.

6. **Transactions with Affiliates and Third Parties.** You agree that you have read the sections applicable to the account feature(s) you have selected and that you understand the terms and conditions related to the account feature(s) you have selected.

   You understand that account features or services may be provided by one or more financial institutions which we may select from time to time.

7. **Ameriprise *Achiever Circle*.** We maintain a program, currently known as the "Achiever Circle" that offers various services and benefits to our clients based upon their "primary household asset" level at Ameriprise Financial. A full description and terms and conditions of the services and benefits for which you may be eligible and the various levels of the program will be e-mailed to you after your program status has been established.

8. **Monitoring of Conversations and Activity.** You understand and agree that any telephone conversation with us may be recorded and monitored for accuracy and quality assurance. You also understand that any electronic communication with us may be maintained or monitored as well.

9. **Password and Security.** You are responsible for all payments and/or transactions initiated using any password or other means of access to your account. You agree not to give or make available your password or other means to access your account to any unauthorized individuals. If you permit another person(s) to use your password or other means to access your account, you are responsible for any transactions they initiate.

   If you believe that your password or other means to access your account has been lost or stolen or that someone may attempt to use your password or other means to access your account without your consent or has transferred money without your permission, you must notify us immediately by calling Ameriprise Financial client service at 800.862.7919 during client service hours.

10. **Disclosures of Account Information to Third Parties**. It is our general policy to treat your account information as confidential. However, we will disclose to third parties information about your account or the transactions you make in the following situations:
    - where it is necessary for completing transactions
    - where it is necessary for activating additional services
    - In order to verify the existence and condition of your account to a third party, such as a credit bureau or Payee
    - to a consumer reporting agency for research purpose only
    - in order to comply with a court order or with any request by a regulatory authority with jurisdiction over our operations
    - if you give your written permission
    - if you, or an authorized person on the account, have identified yourself as an "associated person" (as defined by FINRA Rule 3210) and your or the authorized person's employer requests from us duplicate confirmations of your account activity

11. **Investment Performance.** You may receive advice or securities recommendations from an advisor of the Introducing Broker, but you agree that any advice received will not serve as the primary basis for your investment decisions. The Introducing Broker and Clearing Broker cannot guarantee or project the performance of any security or investment. Your advisor will not review or monitor the day-to-day performance of your investments and will not execute any transaction without your prior direction.

12. **Risk, Volatility and Market Conditions.** You acknowledge that trading securities carries substantial risk; that securities markets can be volatile, and that investment losses may be substantial in a short period of time. You assume full responsibility for all of your investment decisions.

    Equity markets may experience high trading volumes in a particular security or groups of securities, at the opening of the market or at any time during the trading day. High trading volumes may cause delays in execution, or executions at prices significantly away from any displayed quotations. Automated execution processes may be overridden during high volatility, including manual executions or reduction of order size guarantees. Orders you enter via electronic systems made available by us do not guarantee prompt processing or execution. Such orders may be subject to trading halts or delays during periods of extreme volatility. You are responsible for all orders you place to buy or sell securities in your account, whether you enter them directly via an electronic or other system, or through your advisor or our customer service representatives, including all "cancellation" or "replacement" orders.

    Fixed income markets may experience conditions where it could be difficult for us to determine the prevailing market price for a fixed income security. These situations can occur due to a lack of liquidity, volatility in market prices due to ratings changes, significant changes in interest rates, or other, broad-based market events. We are under no obligation to provide liquidity (that is, to buy a security from or sell a security to you) under any market conditions.

    In order to preserve the quality of execution of a customer order in a manner consistent with firm policy and industry regulation, we will, on a best efforts basis, furnish bids and offers only when a prevailing market price can reasonably be determined.

    As such, when extreme market conditions exist, our order handling procedures will change as follows:
    - Unlike normal market conditions, where the fixed income trading desk aggregates numerous bids prior to communicating the best bid to clients, in an extreme trading environment the fixed income trading desk will communicate bids to clients as they are received to provide transparency of the marketplace.
    - Should a client attempt to sell a security at a price where the prevailing market price may be difficult to determine, we will confirm the client's intent to sell the security at an agreed price prior to the fixed income trading desk executing the order on behalf of the client on a best efforts basis.

    These procedures will remain in place until market conditions return to normal, at which point our procedures revert to business as usual. Please see the "Market Volatility" section on ameriprise.com for more information. The Introducing Broker and the Clearing Broker and their respective officers, directors, employees, agents and affiliates will have no liability with respect to any transactions in or for your account or for your investment decisions.

13. **The Introducing Broker is not a bank, and securities offered by it are not backed or guaranteed by any bank nor are they insured by the FDIC. Investments in your brokerage account are subject to investment risk, including loss of principal, and may lose value. If you have an Ameriprise ONE Financial Account,** you understand that the check-writing, debit card and bill payment features of your *Ameriprise ONE* Financial Account are intended to afford you access to the assets in your brokerage accounts, and that your brokerage account is not a bank account.

14. **Legal, Tax or Accounting Advice.** You acknowledge that the Introducing Broker and Clearing Broker will not provide you with any legal, tax, or accounting advice regarding any security or investment. You understand that you should consult your own tax advisor regarding tax consequences with respect to transactions in or for your account.

15. **Account Fees and Charges, Security Interest**. You understand and agree that your account(s) may be assessed recurring account maintenance fees as specified within this or other Agreements, product disclosures, fee schedules or applications. We may also assess transaction or order handling fees for transactions in your account(s).

    A transaction fee may be charged on redemptions of mutual fund shares bought with no transaction fee and held for less than 90 days. Ameriprise Financial Services, Inc. may assess transaction fees for excessive short term trading in mutual fund shares.You agreed to pay all brokerage commissions and other fees for transactions and services you receive. We reserve the right to assess on a pass-through basis any applicable Depository and Transfer Agent custodial fees against your account. You also agree to pay all applicable state and local excise taxes. A fee schedule is available upon request or on our website.

You agree that all securities and other property carried or maintained by us in your non-qualified account or your non-qualified trade settlement account shall be subject to a general lien for the discharge of your obligations to us, and shall be held by us as security for the payment of any liability or indebtedness of you to us in any of your non-qualified accounts. Should any of your non-qualified accounts with us contain a negative balance due to an unpaid trade balance, delinquency in paying fees and/or any other charges, we shall have the right to liquidate assets in any of your non-qualified accounts without notice to you. We shall have the right to transfer securities and other property so held by us from or to any other of your non-qualified accounts whenever in our judgment we consider such a transfer necessary for our protection or due to an erroneous transfer. We are hereby authorized to sell and/or purchase any and all property in your non-qualified accounts without notice to you to satisfy such general lien.

In order to limit transaction costs associated with such liquidations, we reserve the right to liquidate a sufficient amount of securities in your non-qualified account to cover a current fee assessment and up to one year's worth of anticipated recurring account maintenance fees, and to transfer the proceeds of such liquidations to your cash sweep account. Shares of any investment company securities in which you have an interest (other than such shares held in any qualified accounts) and for which we or an affiliate serve as investment adviser are also subject to a general lien for the discharge of your obligation (relating to a non-qualified account) to the Introducing Broker or the Clearing Broker. The Introducing Broker or the Clearing Broker may redeem any such shares to satisfy your obligation without further notice or demand. You acknowledge that we will not be liable for tax consequences, liabilities or penalties, if any, resulting from the liquidation of appreciated collateral to satisfy any indebtedness to us. Nothing in this section or any other section of this Agreement shall be construed to grant us any security interest or right of set-off as it relates to any qualified account you hold with us. Any liability or indebtedness to us that relates to a qualified account can only be satisfied from property held within such qualified account. Any liability or indebtedness to us that relates to a non-qualified account cannot be satisfied from property held within a qualified account. For these purposes, the term "qualified account" shall include any account subject to the prohibited transaction rules found under section 4975 of the Code or section 406 of ERISA (e.g. IRAs and ERISA governed retirement accounts).

16. **Settlement.** On each sale order other than a short sale, you represent that you own the security and, if the security is not in our possession at the time of the contract for sale, you agree to deliver the negotiable security to us by the settlement date. In the case of non-delivery of the security by settlement date, you authorize us to purchase the security to cover your position and to charge any loss to your account. It is further agreed that if we fail to receive payment for securities purchased for other services rendered to you or your account(s), we may sell securities held by us or our affiliates in any of your accounts sufficient to cover the amount owed, and you will be responsible for any loss resulting.

17. **Custodial Fees.** An annual custodial fee may be charged in an account that is part of a tax-qualified plan, including an individual retirement account, tax sheltered custodial account, or other pension or profit-sharing plan. Other incidental service fees may be applied.

18. **Collections.** To the extent permitted by the Employee Retirement Income Security Act of 1974, as amended, (ERISA), the Internal Revenue Code of 1986 (the "Code") (including the prohibited transaction rules under section 406 of ERISA or section 4975 of the Code) as applicable, and the laws of the State of Minnesota, the reasonable costs and expenses of collection of any debit balance and any unpaid deficiency in your accounts with us or any of our affiliates, including but not limited to attorney's fees incurred and payable or paid by us, shall be payable to us by you.

19. **Vulnerable Client Program:** Ameriprise Financial maintains a Vulnerable Client Program. To assist in protecting our senior and vulnerable clients' property, interests, and securities, you acknowledge and agree that we have the right to freeze an account for a reasonable period of time to investigate and/or verify the circumstances around a request to disburse or withdraw funds, securities or other property from your account(s) which appears to be either out of character or inconsistent with previous account history or activity.

20. **Death, Divorce, Incompetence or Disability; Other Court Orders.** We reserve the right to restrict access to your account(s) in the event of certain changes in ownership, such as the death of an account owner, divorce proceedings, the appointment of a Guardian or Conservator, or when we receive other court orders. You acknowledge and agree that we have the right, in our sole discretion, to restrict activity in an account for a reasonable period of time to investigate and/or verify the circumstances around a request to disburse or withdraw funds or securities and other property from your account(s). Such restrictions may include but are not limited to the ability to trade securities or other property, to access your cash balance, or to utilize your Ameriprise ONE Financial Account features, if any.

   In the event of your death, incompetence or disability, we may cancel or close any open orders for the purchase or sale of any securities or other property; we may place orders for the sale of securities or other property which we may be carrying for you and for which payment has not been made, or buy any securities or other property of which your accounts may be short, or any part thereof, under the same terms and conditions as herein stated as though you were alive and competent, without prior notice to your heirs, executors, beneficiaries, administrators, assigns, committee, or conservators and without prior demand upon any of them.

21. **Clients Outside of the United States:** Our business activities are governed by various government agencies and self-regulatory organizations. Our ability to accept transactions may require us or our affiliates to be registered in the jurisdiction in which you are physically located at the time a transaction is entered. As a result, we may not be able to execute requested transaction(s) if you are living or traveling outside of the U.S at the time the transaction is requested. If you know you will be outside the United States for an extended period of time, we encourage you to appoint an attorney-in-fact with a U.S. address who can transact on your behalf while you are abroad. If you reside outside the U.S. you will be required to appoint an attorney-in-fact in the U.S. who can issue trading and other instructions and otherwise act on your behalf for your account(s). Failure to appoint a U. S.-based attorney-in-fact may result in restrictions on your account. Please consult with an attorney and speak with your advisor for more information regarding specific circumstances and the potential impact on your accounts.

22. **Termination of Account.** We reserve the right to terminate your accounts if you fail to provide us a signed application or other information required in connection with opening or maintaining an account. Further, you understand that your account may be terminated by you or us at any time. Termination will result in the closing of your securities account(s) and the termination of all other features or privileges. If dividends or other income or payments are received for your account after it is closed, we will either a) transmit the payment to the firm to which your account was transferred, or b) issue a check to you at your last address as reflected on our records. If any payment is received in the form of shares and we are unable to transmit the shares to your account at another firm, you understand and agree that we will liquidate the shares (including any fractional share) and issue a check to you at your last address as reflected on our records. You understand that you remain responsible for all charges, debit items or other transactions initiated or authorized by you, whether arising before or after termination. Any payments received for your account after it is closed may be used to reduce any open debit balance in the account.

23. **Notices.** You may contact us using the following address and telephone number.
    **Ameriprise Financial Services, Inc.**
    **70400 Ameriprise Financial Center**
    **Minneapolis, MN 55474**
    **800.862.7919**

24. **Applicable Rules and Regulations**. All transactions for your account shall be subject to the regulations of all applicable federal, state, and self-regulatory agencies, including the U.S. Securities and Exchange Commission (SEC), Financial Industry Regulatory Authority (FINRA), the Board of Governors of the Federal Reserve System, and the constitution, rules and customs of the exchange or market (and its clearing house, if any) where executed.

25. **Governing Law.** THIS AGREEMENT AND ITS ENFORCEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF MINNESOTA WITHOUT

GIVING EFFECT TO ITS CHOICE OF LAW OR CONFLICTS OF LAW PRINCIPLES, UNLESS SUPERSEDED BY FEDERAL LAW OR STATUTE; AND SHALL COVER INDIVIDUALLY AND COLLECTIVELY ALL BROKERAGE ACCOUNTS WHICH YOU MAY OPEN OR REOPEN WITH US, OR WHICH MAY BE INTRODUCED TO US, INCLUDING OUR SUBSIDIARIES AND AFFILIATES, THROUGH THE COURTESY OF THE AFOREMENTIONED INTRODUCING BROKER.

26. **Assignment.** You may not assign this Agreement to any other party. We may assign this Agreement to any future, directly or indirectly affiliated company. We may also assign or delegate certain rights and responsibilities under this Agreement to independent contractors or other third parties. This Agreement shall inure to the benefit of the successors and assigns of Ameriprise Financial, whether by merger, consolidation, or otherwise. Ameriprise Financial may transfer your account to its successors and assigns, and this Agreement shall continue to be binding on you, your heirs, executors, administrators and assigns.

27. **Disputes.** In the event of a dispute regarding the Account, you agree to resolve the dispute by looking to this Agreement. You agree that this Agreement is the complete and exclusive statement of the Agreement between us and you which supersedes any proposal or prior agreement, oral or written, and any other communications between us relating to the subject matter of this Agreement. If there is a conflict between what an agent or employee says and the terms of this Agreement, the terms of this Agreement will prevail.

28. **This Agreement contains a predispute arbitration clause.  By signing this Agreement the parties agree as follows:**

    **(A) All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**
    **(B) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.**
    **(C) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.**
    **(D) The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.**
    **(E) The panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry.**
    **(F) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.**
    **(G) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.**

    **By reading and accepting the terms of this Agreement, you acknowledge that, in accordance with this Arbitration section, you agree in advance to arbitrate any controversies that may arise with Ameriprise Financial or AEIS. You agree that all controversies that arise between us (including but not limited to those related to your brokerage account and any service or advice provided by a broker or representative), whether arising before, on or after the date you opened your Account, shall be determined by arbitration in accordance with the terms of this Agreement and the rules then prevailing of the Financial Industry Regulatory Authority. Any arbitration pursuant to this provision shall be conducted only before the Financial Industry Regulatory Authority, Inc.**

    **Federal and state statutes of limitation, repose, and/or other rules, laws, or regulations impose time limits for bringing claims in federal and state court actions and proceedings.  The parties agree that all federal or state statutes of limitation, repose, and/or other rules, laws, or regulations imposing time limits that would apply in federal or state court, shall apply to any dispute, claim or controversy brought under this Agreement, and such time limits are hereby incorporated by reference.  Therefore, to the extent that a dispute, claim, or controversy arises under this Agreement and would be barred by a statute of limitation, repose or other time limit if brought in a federal or state court action or proceeding, the parties agree that such dispute, claim, or controversy shall be barred in an arbitration proceeding.**

    **You understand that judgment upon any arbitration award may be entered in any court of competent jurisdiction.  The parties agree that venue and personal jurisdiction is proper in Minneapolis, Minnesota.**

    No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce any agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

29. **Extraordinary Events.** We shall not be liable for loss caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, strikes or other conditions beyond our control, including but not limited to computer, communication system or telephone failure, market volatility or trading volumes.

30. **Captions.** The caption of each provision of this Agreement is for descriptive purposes only and shall not be deemed to modify or qualify any of the rights or obligations set forth in each such provision.

31. **Severability.** If any provision or condition of this Agreement shall be held to be invalid or unenforceable by any court, arbitrator, or regulatory or self-regulatory agency or body, such invalidity or unenforceability shall attach only to such provision or condition. The validity of the remaining provisions and conditions shall not be affected thereby and this Agreement shall be carried out as if any such invalid or unenforceable provision or condition was not contained herein.

32. **No Waiver.** We shall not be deemed to have waived any of our rights or remedies hereunder unless such waiver is in writing and is signed by a person specifically authorized by us to do so. No delay or omission on our part in exercising any rights or remedies shall operate as a waiver of such rights or remedies or any other rights or remedies. A waiver on any one occasion shall not be construed as a waiver or a bar against enforcement of any rights or remedies on future occasions.

33. **Limited Warranty.** THERE IS NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR USE, AND NO OTHER WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, REGARDING THE INFORMATION OR ANY ASPECT OF THE SERVICE (INCLUDING BUT NOT LIMITED TO INFORMATION ACCESS AND ORDER EXECUTION).

34. **Limitations of Liability.** YOU AGREE THAT IN NO EVENT WILL THE INTRODUCING BROKER, THE CLEARING BROKER, THE INFORMATION PROVIDERS, THE INFORMATION TRANSMITTERS OR THE SERVICE FACILITATORS BE LIABLE TO YOU OR ANYONE ELSE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES (INCLUDING BUT NOT LIMITED TO LOST PROFITS, TRADING LOSSES AND DAMAGES THAT RESULT FROM INCONVENIENCE, DELAY OR LOSS OF THE USE OF THE SERVICE), EVEN IF THE INTRODUCING BROKER, THE INFORMATION PROVIDERS, THE INFORMATION TRANSMITTERS OR THE SERVICE FACILITATORS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES. YOU FURTHER AGREE THAT THE LIABILITY OF THE INTRODUCING BROKER, THE INFORMATION PROVIDERS, THE INFORMATION TRANSMITTERS AND THE SERVICE FACILITATORS ARISING OUT OF ANY KIND OF LEGAL CLAIM (WHETHER IN CONTRACT, TORT OR OTHERWISE) IN ANY WAY CONNECTED WITH THE SERVICE OR THE INFORMATION, WILL NOT EXCEED THE AMOUNT YOU ORIGINALLY PAID FOR THE SERVICE.

35. **Right to Interplead Your Account.** Where a dispute arises as to the rightful ownership or distribution of account assets and the dispute cannot be resolved by the parties, at its discretion, we may initiate legal proceedings in a court of competent jurisdiction to interplead the account assets and deposit them with the court pending judicial resolution of the dispute. We reserve the right to seek from the accountholder(s) or their representatives reimbursement of any fees and costs we may incur as a result, including reasonable attorney fees.

36. **Receipt of Communications.** We will send transaction confirmations and periodic account statements to you at your address of record or electronically to the secure site, if you have requested electronic delivery. You agree that you will promptly review the transaction confirmations and periodic account statements that we send you. If you should find any inaccuracies or discrepancies on your transaction confirmations or periodic account statements, you agree that you will immediately report them to us. Any oral communications should be reconfirmed in writing to us.

   Communications by mail, electronic means, messenger, or otherwise sent to you at the U.S. postal or electronic mail address of record listed on the application or any other address you provide us are presumed to be delivered to and received by you, whether actually received or not, and you agree to waive all claims resulting from failure to receive such communications.

   If we receive communications or instructions relating to your account which are in our sole opinion incomplete, unclear, or conflicting, we, in our sole discretion and for our sole protection, may require other communications, instructions or information including written consent from any or all authorized persons, prior to acting upon the communications or instructions of any one authorized person. Pending receipt of any such other communications, instructions, or information, Ameriprise Financial shall not be liable to anyone for any loss resulting from any delay, action, or inaction on our part.

37. **Returned and Uncashed Checks.** Any check issued from your account shall be negotiable for a period of 180 days from the date of the check. If the check remains uncashed after that period of time, the check shall become null and void and the funds re-deposited into either the account against which the check was drawn or into another account of which the disbursing account owner(s) are also owner(s).

   If no such account is available, or if the check is drawn against a tax-qualified account, the money will be submitted into Ameriprise's abandoned property process.

38. **Money Settlement Options.** Ameriprise Financial may, but is not required to, offer you options for the automatic investment or "sweep," of excess cash in your account at Ameriprise Financial. Cash deposited or received in your brokerage account is swept daily on the business day following the date of deposit, and will be applied to the money settlement option you have designated or which has been made available to you. These sweep or money settlement options may include deposit accounts at one or more FDIC-insured depository institutions (including any bank that is our affiliate), money market mutual funds, or as a free credit balance (Ameriprise Cash) in your account. Ameriprise Financial may establish and may from time to time change eligibility requirements for the money settlement options it makes available to you. In addition, we may, in our discretion, pay interest on any free credit in your account. You agree that the cash balances in your account are maintained for securities investment purposes and not solely for the purpose of receiving interest income.

   You understand that as part of the services provided to your account and pursuant to contractual agreements, we may receive remuneration based on the cash balance in your money settlement option. This remuneration is part of revenue sharing or other agreements which allow us to earn income and defray expenses relating to the management of the money settlement process. If your money settlement option is Ameriprise Cash or other free credit balance, you understand that your cash balances are held unsegregated and, subject to limitations and restrictions of SEC Rule 15c3-3, may be used by the Clearing Broker in the conduct of its business, for example to fund its margin lending. As such, your cash balances in Ameriprise Cash or other free credit balance provide the Clearing Broker with a lower-cost source of funds and thus contribute to its profitability.

   You acknowledge that the money settlement options made available to you may offer a lower interest rate than alternative cash investment products made available through Ameriprise Financial. These alternatives include purchased money market mutual funds, certificates of deposit, and treasury securities. You should consider whether holding large cash balances in your money settlement account(s) is appropriate.

   The amount of cash you maintain in your money settlement option could result in more revenue to us and our affiliates than if you purchased other, higher-yielding cash alternatives available to you.

   We reserve the right, at any time and upon notice to you as provided in this Agreement, to revise the money settlement options available for your account. This includes the right to limit, terminate or replace any particular money settlement option, or to stop paying interest on your cash balances. In the event we terminate or otherwise limit the availability of a money settlement option selected by you, or you no longer qualify for a particular money settlement option, you authorize us to liquidate your position in the terminated money settlement option and transfer the proceeds to an available alternative for which your account qualifies.

   **Brokerage 529 Plan Account Money Settlement:** Cash balances in Ameriprise Brokerage 529 Plan accounts will be held as a free credit balance until a trade instruction is received to purchase shares offered by the 529 Plan. Free credit balances in Brokerage 529 Plan accounts do not earn interest. If you do not provide a trade instruction to purchase shares offered by the 529 Plan, any cash held as a free credit balances will, upon notification from us, be invested in the 529 Plan's money market portfolio or equivalent. Neither AFSI nor your financial advisor will have any discretionary authority over the selection and timing of investments into the 529 Plan. You agree that you will immediately notify your financial advisor if you wish to exchange some, or all, of an investment in the 529 Plan's money market portfolio or equivalent into another investment option offered by the 529 Plan, subject to applicable rules and limitations for such exchanges.

39. **Good Funds.** Ameriprise Financial applies a "Good Funds" policy on deposits (ACH, Checks, Money orders) drawn against external financial services firms (i.e., banks, other broker-dealers, mutual fund companies, insurance companies, etc.). The policy includes a hold period, during which any request to transfer funds outside of Ameriprise Financial is not permitted. Requests to transfer funds internally to other Ameriprise Financial products are permitted during the hold period. Deposits subject to the Good Funds policy typically become available for withdrawal on the next business day following the hold period. Ameriprise Financial reserves the right to modify the hold period at its sole discretion. If you have further questions or wish to learn more about the policy please contact your advisor.

40. **Alternative Periodic Reporting.** You authorize us to send you a monthly or quarterly summary of all money market fund sweep activity tied to your brokerage account, as well as any systematic arrangements you have in place for mutual funds, in lieu of sending you confirmations for each transaction. While you will not receive separate confirmations for this activity, you can write us at the address listed in the paragraph titled "Notices" to receive additional information about any money market fund movement or systematic arrangement transactions.

41. **SIPC Information.** American Enterprise Investment Services, Inc. and Ameriprise Financial Services, Inc. are each members of the Securities Investor Protection Corporation ("SIPC"). SIPC is a non-profit, membership corporation, created by the Securities Investor Protection Act of 1970, funded by its member securities brokerage firms. SIPC protects against the loss of customer securities and cash, up to a total of $500,000, including up to $250,000 on claims for cash, per customer in each separate capacity under SIPC rules.

   In addition, we have obtained excess SIPC insurance to provide up to $750 million additional aggregate coverage if basic SIPC is insufficient to cover loss of customer cash. Excess SIPC coverage is subject to a $1.9 million per-client limit for any cash shortfall.
   If you have questions about SIPC coverage, please contact your financial advisor or visit our website at ameriprise.com. You may also obtain information about SIPC coverages, including a brochure that describes SIPC and SIPC insurance, by accessing the SIPC website at sipc.org or by calling 202.371.8300

42. **Credit Information.** You authorize us to make inquiries for the purpose of verifying your creditworthiness and the creditworthiness of any joint account holder. Such inquiries may include verifying information you have provided in your new account application, contacting your employer(s) and obtaining credit reports or reviewing any of the foregoing for any legitimate business purpose deemed by us. Upon request, we will inform you of the name and address of each credit agency, if any, from which we obtained a credit report.

43. **Taxpayer Identification Number. Your Taxpayer Identification Number (TIN) is important.  As with any financial account you open, you must list your current and correct TIN, for example, your Social Security or Employer Identification Number. The TIN must be certified under penalties of perjury on your application when you open an account at the Introducing Broker.**

    **If you don't provide the TIN, or the TIN you report is incorrect, you could be subject to backup withholding of 24% of certain taxable distributions and proceeds from certain sales and exchanges. You also could be subject to backup withholding because you failed to report interest or dividends on your tax return as required by the Internal Revenue Service.**
    **In addition, the Internal Revenue Service may assess the following penalties:**

    - **a $50 penalty for each failure to supply your correct TIN.**
    - **A civil penalty of $500 if you make a false statement that results in no backup withholding**
    - **Criminal penalties for falsifying documents**

    **Special rules apply to non-resident aliens and foreign entities.**

44. **Joint Accounts.** Laws governing joint ownership of property vary from state to state. You acknowledge that you are responsible for verifying that the joint registration you and any joint account holder select is valid in your state. You agree to consult your tax or legal advisor for information about what form of ownership is appropriate for you.

    Whether joint tenants or tenants-in-common, each joint account holder shall have full authority to act in all respects with reference to this account, including: to purchase and sell securities (including short sales); to receive for the account money, securities and other property and to dispose of the same; to receive for the account confirmations, statements of account and agreements relating to these matters, and to terminate, modify or waive any of the provisions thereof.

    The liability of each joint account holder on the account shall be joint and several and shall be binding upon your heirs, successors and assigns. The survivor(s) will give us immediate notice of the death of any other joint account holder. We may, before or after receiving such notice, take such proceedings, require such documents, retain such portion of and/or restrict transactions in the account as we may deem advisable to protect us against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of you who have died shall be liable, and each survivor shall be liable, jointly and severally, to us for any debt or loss in the joint account resulting from the completion of transactions initiated prior to our receipt of a written notice of such death or incurred in the liquidation of the account or the adjustment of the interests of the respective parties.

    In the event of death of a Joint Tenant With Rights of Survivorship, the entire interest in the joint account shall be vested in the survivor(s) on the same terms and conditions as therefore held, without in any manner releasing the decedent's estate from any liability. In the event of the death of a Tenant in Common Without Right of Survivorship, the interests in the account shall be determined as of the close of business on the date of death of the decedent (or on the next business day).

45. **Location of Securities.** Securities may be held by another brokerage firm, bank or financial institution as custodian.

46. **Trading Limitations/Excessive Trading Activity.** You agree that you will not use the brokerage account for excessive trading activity such as day trading, mutual fund trading based on market timing, overuse of stop or limit orders, or excessive order splitting of the same stock on the same day.

    The brokerage account is not intended for excessive trading activity. If you engage in excessive trading activity, as determined by Ameriprise Financial in its sole discretion, you may be subject to additional charges, restrictions, and/or termination of your account, as Ameriprise Financial determines in its sole discretion on a case-by-case basis.

    You further agree that you will not use this account as a securities broker-dealer, investment advisor, futures commission merchant, commodities introducing broker, or commodity trading advisor, member of a securities exchange or association or futures contract market, or an owner, partner or associated person of any of the foregoing.

47. **Callable Securities.** When we hold bonds or preferred stock in street or bearer form which are callable in part on your behalf, you agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the exchange on which the security trades and in compliance with industry rules. For further details about the allocation process please go to Ameriprise.com/callable-securities.

48. **Restricted Stock.** You understand that, in our sole discretion, we may accept or refuse securities subject to Rule 144 or Rule 145(d) of the Securities Act of 1933. You agree to advise us as to the status of any restricted securities eligible for sale under Rule 144 or 145 of the Securities Act of 1933, and to deliver the appropriate documentation to ensure clear legal transfer of such securities if they are to be sold. You agree to promptly provide to us documentation that we may request in connection with any transaction or activity relating to restricted securities. You understand that special handling for these transactions may take several weeks, during which time prices may fluctuate. You agree that we will have no responsibility for any losses incurred by delays during the transfer process.

49. **Order Execution.** Orders are usually routed to the marketplace automatically via our automated system. However, you acknowledge and agree that at AEIS sole discretion, certain orders may be subject to manual review and routing, which may cause delays in the processing of those orders. You also acknowledge and agree that your order will receive the price at which it executes in the marketplace, which may be different from the price at which the security is quoted or trading when your order is entered into our system. With respect to transactions in mutual fund shares, you understand that such transactions will be effected at a price based on the net asset value next determined after receipt of your order by the fund or its authorized agent in accordance with the terms of the fund's prospectus and Statement of Additional Information.

    **Good-till-canceled Order.** Good-till-canceled orders remain in force for the period specified on your transaction confirmation and your account statement. At the end of the specified time, we will cancel the order, unless we have executed the transaction or you have canceled the order. If the order has not executed within the specified time and you wish to maintain the order, you or your advisor must place the order again.

    You acknowledge and agree that we have the right to reject any transaction for your account where the transaction may be prevented from promptly settling due to acts or operations of any third-party clearing or settlement agency, such as the Depository Trust and Clearing Corporation (DTCC) or its affiliates.

50. **Compensation for Clearing and Execution.** We may receive remuneration for directing orders to a particular broker or dealer through which your transactions are executed. Such remuneration is considered compensation to us, and the source and amount of any compensation will be disclosed to you upon your written request. With respect to Over The Counter (OTC) equity transactions and listed option transactions, compensation may be in the form of a per share or per contract cash payment. The Executing Broker has selected certain market makers to provide execution of OTC securities transactions that have agreed to accept orders transmitted electronically up to a specified size, and to execute them at or better than the national best bid or offer (NBBO). On larger orders, or if designated market makers do not make a market in the subject security, the Executing Broker directly contacts market makers to obtain an execution.

    The designated market makers to whom orders are automatically routed are selected based on the consistently high quality of their OTC

executions in one or more market segments and their ability to provide opportunities for executions at prices superior to the NBBO. If an order for an exchange-listed equity security or listed option transaction is not immediately executable on the exchange to which it is routed, the Clearing Broker may represent the order in the national marketplace using the various means available for price discovery. You agree to pay for brokerage commissions and other transaction fees for execution services you receive. You also agree to pay all applicable state and local excise taxes.

## CONTACTING AMERIPRISE FINANCIAL

You may contact us using the following address and phone number. You may also write to us at the Introducing Broker location identified on the client application.
**Ameriprise Financial Services, Inc.**
**70400 Ameriprise Financial Center**
**Minneapolis, MN 55474**
**800.862.7919**

## MARGIN AGREEMENT

You acknowledge that you have carefully examined your financial resources, investment objectives, and tolerance for risk, along with the terms detailed below, and have determined that margin trading is appropriate for you. You understand that trading on margin involves your borrowing money or securities from us, that the extension of credit to you increases your financial exposure, and that your losses could exceed the value of your securities.

**If you choose to open a margin account, in consideration of our accepting and carrying one or more brokerage accounts for you, you hereby consent and agree to the additional terms and conditions:**

1. **Representation.** You represent that with respect to securities and other property against which margin credit is or may be extended by us: (a) you are not the beneficial owner of more than three percent (3%) of the number of outstanding shares of any class of equity securities, and (b) do not control, are not controlled by and are not under common control with, the issuer of any such securities. In the event that any of the foregoing representations is inaccurate or becomes inaccurate, you will promptly so advise us in writing.

2. **Mutual Funds Margin Eligibility**. Mutual Funds must be purchased in a cash account, not in your margin account or on margin. After you have purchased and held mutual fund shares for at least 30 days, you may transfer them into your margin account. Mutual funds may be used as collateral in your margin account to buy additional securities and other property, but not to buy mutual funds.

   Securities and other property purchased using mutual funds as collateral must comply with all margin rules applicable to this account. Mutual funds are not margin eligible if the share price falls below $2/share.

3. **Liens and Additional Collateral.** You understand that any securities held in any of your non-qualified brokerage accounts with us may be used as collateral for any debit balances or any outstanding margin obligation in any of your accounts. A lien is created by such debits to secure the amount of money owed to us. We retain the right to require additional margin at any time we deem it necessary for our protection. These margin calls can be met by the prompt delivery of either cash or additional securities acceptable to us. In accordance with the terms of this Agreement, should the equity in your margin account fall below our minimum margin maintenance requirements, or if you fail to promptly meet any maintenance requirement, securities and other property in any of your non-qualified accounts may be sold to reduce or satisfy your debit balance or any outstanding margin obligation.

   At present, our minimum maintenance requirement for stocks and mutual funds approved for margin is:

- 30% of current market value for securities priced at $5.01 or more.
- 50% of current market value for securities priced at or below $5/share.
- 100% of current market value for securities below $2/share.

As to our minimum requirements for other types of securities or transactions, you will contact the Clearing Broker.

The Clearing Broker reserves the right in its sole discretion, on a case by case basis, to change the maintenance requirements (which may be as high as 100%) or position limits that are applicable to a particular customer or group of customers or with respect to a particular security or group of securities. We shall have the right to transfer securities and other property held in non-qualified ownership from or to any other of your non-qualified accounts whenever in our judgment we consider such a transfer necessary for our protection. In enforcing our lien, we shall have the discretion to determine which securities and other property are to be sold and which contracts are to be closed. All Ameriprise Financial clients with a margin account may receive what is called a "payment in lieu of dividends (PLD)" instead of a regular dividend payment on securities held in their margin account. PLDs are reported as ordinary income and are taxed at your ordinary tax rate, not at potentially lower qualified dividend rates. Contact your financial advisor or consult your tax advisor if you have questions regarding PLDs.

4. **Margin Interest.** You will maintain such securities and other property in your accounts for margin purposes as we shall require from time to time; and the monthly debit balance of such accounts shall be charged, in accordance with our usual custom, with interest at a rate permitted by the laws of the State of Minnesota. Negotiated margin interest rates may be available. Contact your financial advisor to discuss pricing of your margin loan.

5. **Computation of Charges.** At the close of each charge period during which credit was extended to you in your margin account, an interest charge is computed by multiplying each daily debit balance by the applicable scheduled rate for that day (based upon the sliding scale rate structure), divided by 360. Each daily computation is then totaled and posted with a blended rate. The blended rate is an average of each daily rate used in the computation for the period. If there has been a change in the base rate, a separate computation will be made with respect to each rate of charge for the appropriate number of days at each rate during the charge period. The interest charge for credit extended to your account at the close of the charge period is added to the opening debit balance for the next charge period unless paid.

6. **Collections.** You shall at all times be liable for payment upon demand of any debit balance or other obligations owing in any of your accounts with us, and you shall be liable to us for any deficiency remaining in any such accounts in the event of the liquidation thereof, in whole or in part, by us or by you; and you shall make payment of such obligation and indebtedness upon demand.

7. **Margin Collateral.**
   (a)  We shall have the right to require additional collateral:
   
   (1)  in accordance with our general policies regarding our margin maintenance requirements, as such may be modified, amended or supplemented from time to time.
   (2)  if in our discretion we consider it necessary for our protection at an earlier or later point in time than called for by said general policies.
   (3)  in the event that a petition in bankruptcy or for appointment of a receiver is filed by or against you.
   (4)  if any attachment is levied against your accounts.
   (5)  in the event of your death.
   
   (b)  If you do not provide us with additional Collateral as we may require in accordance with (a) (1) or (2), or should an event described in (a) (3), (4) or (5) occur (whether or not we elect to require additional collateral), we shall have the right:
   
   (1) To sell any or all securities and other property in your non-qualified accounts with us or any of our affiliates, whether carried individually or jointly with others.

    (2) To buy any or all securities and other property which may be short in such accounts.
    (3) To cancel any open orders and to close any or all outstanding contracts.

We may exercise any or all of our rights under (b) (1), (2) or (3) without further demand for additional collateral, or notice of sale or purchase, or other notice or advertisement.

Any such sales or purchases may be made at our discretion on any exchange or other market where such business is usually transacted, or at public auction or private sale; and we may be the purchaser for our own account. It is understood that our giving of any prior demand or call or prior notice of the time and place of such sale or purchase shall not be considered a waiver of our right to sell or buy without any such demand, call or notice as herein provided.

8. **Margin Interest Rates.** Interest will be charged by us for any credit extended to you for the purpose of buying, trading or carrying any securities or other property, or if you want to borrow cash for a non-securities purpose using your securities and other property as collateral. An interest charge will be made to your account for each period during which credit was extended to you in your account. The rate at which interest is charged to your margin account is based upon a sliding scale of percentages added to or subtracted from the base rate.

The following structure and rates apply:

| Average daily debit balances | Margin Rate* |
|---|---|
| $500,000 or more | Base - 1.00% |
| $100,000 - $499,999 | Base - 0.50% |
| $50,000 - $99,999 | Base |
| $25,000 - $49,999 | Base + 1.25% |
| $0 - $24,999 | Base + 2.00% |

This information is subject to change.

* Margin interest charges will be calculated based on a sliding scale of percentages added to or subtracted from a "base lending rate," set at the discretion of American Enterprise Investment Services, with reference to commercially recognized interest rates, industry conditions regarding the extension of margin credit and general credit conditions. For current rate information see https://www.ameriprise.com/financial-planning/our-fees/brokerage-accounts-custodial-fees/. Margin rate information is available in the "Margin Lending" section.

Your statement of account will indicate the specific rate of charge, the average daily debit balance of your account, the number of days during which a debit balance was outstanding in your account, and the actual interest charge made for the charge period. For each charge period in which there is a change in the base rate, your statement of account will separately itemize that information with respect to each rate of interest that was applied to your account during the charge period. The foregoing rates may vary in individual situations, as warranted, at our discretion.

9. **Adjustment of Rate Without Prior Notice.** The rate of charge applicable to your account is subject to change without prior notice in accordance with changes in the base rate. If there is a change in the base rate during the charge period, the rate of interest applied to your account will automatically be increased or decreased accordingly for the remainder of the charge period or until another change in the base rate occurs. If your rate is to be changed for any other reason, you will receive at least thirty (30) days' written notice prior to such change.

10. **Short Sales and Short Sales Against the Box.** The market values of securities which are sold "short" by a customer are adjusted daily for credit purposes by a process called "marking to the market." Short sales against the box are treated in exactly the same way as short sales. The market values of all securities sold short in your account, including securities sold "short against the box," are treated as a debit for the purpose of calculating interest charges. In other words, the closing market value of the securities which were sold "short against the box" is determined each business day and, depending upon whether the market value increased or decreased, the change in the market value is either added to the net debit balance or subtracted from the net credit balance in order to calculate interest charges.

The market value of long securities in your account against which a short sale is made is not included in the computation of interest charges. If the total market value of the securities sold short increases, then the debit adjustment to the net balance will increase by the same amount for the calculation of interest charges. Conversely, if the total market value of the securities sold short decreases, then the debit adjustment to the net balance will also decrease by a like amount for the calculation of interest charges. You note that these upward or downward adjustments of balances are for credit calculation purposes only. Upon your request, interest charges which we compute may be offset against any credit balance in any of your securities accounts carried by us in the same name.

11. **Right to Pledge Assets.** All securities and other property now or hereafter held, carried or maintained by us in our possession or control in any of your margin accounts may be pledged and repledged by us from time to time, without notice to you, either separately or in common with other such securities and other property, for any amount due in your accounts, or for any greater amount, and we may do so without retaining in our possession or under our control for delivery a like amount of similar securities or other property.

Within the limitations imposed by applicable laws, rules and regulations, we are hereby authorized to lend to ourselves, as principal or otherwise, or to hypothecate to others, any securities held by us on margin for any accounts of yours or as collateral therefore, either separately or with other securities.

You agree that certain of your securities may be loaned to us or loaned out to others. It is recognized that any losses or other detriments, or gains or other benefits, arising from any such lending of securities shall not accrue to your account. You acknowledge that in certain circumstances such loans may limit, in whole or in part, your ability to exercise voting rights of the securities lent. In connection with such loans and in connection with securities loans made to you associated with short sales, you acknowledge that we are authorized to receive and retain certain benefits (including but not limited to interest on collateral posted for such loans) to which you will not be entitled.

12. **Treatment of Fees within a Margin Account.** You understand and agree that on a periodic basis various fees may be assessed to your account(s) (i.e., account maintenance fees; brokerage service fees; investment advisory asset-based fees), as specified in applicable fee schedules, the Ameriprise Brokerage Client Agreement, or other applicable agreements. You understand and agree that if you requested to have margin capability added to your account, and we have approved such request and there is insufficient cash in your Sweep Account to pay any fees assessed, you authorize us, and we reserve the right, to journal any unpaid fees to your margin account. An interest charge will be assessed to your account, at the above-referenced rate schedule, for each period during which credit was extended to you in your account for such fees.

## NOTE FOR MASSACHUSETTS RESIDENTS

The following disclosures apply to Massachusetts residents only:

**General Disclosure Statement.** Any documentation provided to you that indicates that an electronic fund transfer was made shall be admissible as evidence of such transfer and shall constitute prima facie proof that such transfer was made. The initiation by you of certain electronic fund transfers from your account will, except as otherwise provided in this Disclosure, effectively eliminate your ability to stop payment of the transfer.

**Unless otherwise provided in this Disclosure, you may not stop payment of electronic fund transfers; therefore, you should not employ electronic access for purchases or services unless you are satisfied that you shall not need to stop payment.**

No interest is paid on the cash balance in your account. Dividends, at a rate that varies daily, are paid on any mutual fund balances in your account. You may terminate this Agreement by notifying us in writing at the address indicated below. If a problem or error with respect to your account concerns a transfer to or from a third party (for example a Social Security payment), our investigation may be limited to a review of our own records. If we decide that there was no error, you may want to contact such third party to pursue

the matter further. If you comply with the conditions set forth above, in cases in which you think that a transfer from your account was initiated by a third party that was not authorized to initiate any transfers from your account, we will request a copy of the third party's authorization. If we do not request it within 30 calendar days, we will recredit your account for the transfer you think is unauthorized, so you will have the use of your money until we determine whether you had authorized the transfer.

If we do not request it within 30 calendar days, we will recredit your account for the transfer you think is unauthorized, so you will have the use of your money until we determine whether you had authorized the transfer.

**Disclosure of Account Information to Third Parties.** If you give us your written authorization to disclose information about you, your account or the transactions that you make to any person, that authorization shall automatically expire 45 days after we receive it. If an unauthorized disclosure has been made, we must inform you of the particulars of the disclosure within three days after we have discovered that an unauthorized disclosure has occurred.

**Protected Consumer Use of Electronic Fund Transfer Services.**
Chapter 167B of the Massachusetts General Laws was enacted to provide a means for financial institutions, businesses and consumers to conduct their business relations more conveniently. Transferring funds electronically will supplement the use of checks, credit and cash and will not replace these methods of doing business. As a consumer, you should be aware of your rights if you choose to utilize this system.

1. **Prohibition of Compulsory Use.** No person may require you to use a preauthorized electronic fund transfer as a condition for the extension of credit unless the credit is being extended in connection with an overdraft checking plan or is being extended to maintain a specified balance in your account; or require you either to accept a transfer service or to establish an account that is accessed electronically as conditions of employment or receipt of governmental benefit; or require you to pay electronically for the purchase of goods or services. If your account is to be credited by a preauthorized transfer, you may choose the financial institution to which the transfer may be made if the institution is technically capable of receiving such preauthorized transfer.

2. **Waiver of Rights.** No writing or agreement signed by you can waive the rights conferred to you by Chapter 167B of the Massachusetts General Laws unless you decide to waive these rights in settlement of a dispute or action.

3. **Discounts.** No store or retail business may offer a discount to you for making payment on any purchase or goods or services by electronic payment, rather than by cash, check or charge.

4. **Refunds.** If it is the policy of a store or retail business to give cash refunds in return for an item purchase by cash, then this policy must also cover refunds for items purchased by electronic fund transfer unless it is clearly disclosed at the time the transaction is consummated that no cash or credit refunds are given for payments made by electronic fund transfers.

5. **Suspension of Obligations.** If a person agrees to accept payment by means of an electronic fund transfer and the system malfunctions preventing such a transfer, then the consumer's obligation is suspended until the transfer can be completed, unless that person, in writing, demands payment by other means.

6. **Prohibited Means of Identification.** Your Social Security number cannot be used as the primary identification number although it can be used as a secondary aid to identify you.

7. **Criminal Liability.** Procuring or using a card, code or other means of electronic access to an account with the intent to defraud is basis for criminal liability.

## The Ameriprise Financial Business Continuity Plan

Ameriprise Financial, Inc. has developed a comprehensive business continuity program that covers operations performed by Ameriprise Financial, Inc. and all of its entities and subsidiaries.

Ameriprise Financial, Inc., dedicates significant resources to the business continuity program. The Program's framework addresses every level of the organization by remediating facilities, technology, applications, data, processes, governance and corporate strategy -- making continuity and recovery a part of the way we do business.

We maintain an appropriate crisis management structure that allows for an efficient and effective response should there be a business disruption or crisis event. We have dedicated resources who proactively monitor worldwide events that may affect our staff, facilities, client assets, operations and financial solvency. Training and education is provided to help prepare the firm for possible business disruptions, as well as validate a response for a variety of possible incidents with key personnel. Our dedicated Crisis Response Team coordinates response, communication and escalation procedures to help safeguard assets, protect the well-being of staff and provide continuity of critical processes.

Each line of business creates business continuity plans designed to address the unit's specific needs and potential risks. Plans are based upon a proactive "all hazards" approach to preparing for disruptions of varying severity and scope, and address both short- and long-term disruptions. All plans are updated annually or upon a material change through a series of plan enhancement workshops facilitated by a certified subject matter expert from the Ameriprise Business Continuity Management (ABCM) team, with participation from the business areas and senior leaders.

As part of the planning process, we conduct a business-impact analysis with each business area, which helps determine critical processes and appropriate recovery strategies and capabilities are in place; aligned to the business recovery objectives.

We have developed multiple recovery solutions and strategies that enable us to activate a single recovery solution or multiple recovery solutions based upon the event's severity and duration. Key components include alternate workplace recovery facilities, remote workplace strategies and access, corporate office partnerships, and alternate communication methods. We believe our flexible, multifaceted approach allows us to respond appropriately based on the type of event.

Regular exercises and testing is conducted to validate the plans are effective, and that critical applications and back up recovery procedures are in place. Disaster Recovery Plans (DRPs) are designed and tested by our technology teams to address the specific risks to technology applications and ensure adequate redundancy is in place.

Should there be a significant business disruption, contact your advisor or our service center at 800.862.7919 or visit ameriprise.com for additional information.

**Changes and Modifications**
The Ameriprise Financial business continuity plan is subject to modification. We will promptly post information about updates or modifications to the plan on our website. You can also obtain updated information about the plan by requesting a written copy by mail. All requests for updated information should be sent to the following address:

**Ameriprise Financial Services, Inc.
70400 Ameriprise Financial Center
Minneapolis, MN 55474**