## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

SUSANNE MEHLMAN, JOY HULTMAN,
MINDY BENDER, ROBERT SULLIVAN, and
FRANK R. TRIPSON, *individually and on
behalf of all others similarly situated*,

Civil No. 24-3018 (JRT/DLM)

                                              Plaintiffs,

v.

AMERIPRISE FINANCIAL, INC.; AMERICAN
ENTERPRISE INVESTMENT SERVICES, INC.;
and AMERIPRISE FINANCIAL SERVICES,
LLC,

                                              Defendants.

**MEMORANDUM OPINION AND ORDER
GRANTING MOTION TO COMPEL
ARBITRATION AND GRANTING IN PART
AND DENYING IN PART MOTION TO
DISMISS**

---

F. Paul Bland, Jr., **BERGER MONTAGUE PC**, 1001 G Street Northwest, Suite
400 East, Washington, DC 20001; John G. Albanese, E. Michelle Drake, and
Joseph Hashmall, **BERGER MONTAGUE PC**, 1229 Tyler Street Northeast,
Suite 205, Minneapolis, MN 55413; Michael Dell'Angelo and Alex B. Heller,
**BERGER MONTAGUE PC**, 1818 Market Street, Suite 3600, Philadelphia, PA
19103; Adam H. Wierzbowski, Avi Josefson, Emily An-Li Tu, John Rizio-
Hamilton, Michael D. Blatchley, and Salvatore J. Graziano, **BERNSTEIN
LITOWITZ BERGER & GROSSMANN LLP**, 1251 Avenue of the Americas,
Forty-Fourth Floor, New York, NY 10020; Bailey Twyman-Metzger, Daniel E.
Gustafson, and Karla M. Gluek, **GUSTAFSON GLUEK PLLC**, 120 South Sixth
Street, Suite 2600, Minneapolis, MN 55402; Bruce D. Oakes and Richard B.
Fosher, **OAKES & FOSHER, LLC**, 1401 South Brentwood Boulevard, Suite
250, Saint Louis, MO 63144; Alan L. Rosca and Jonathan Korte, **ROSCA
SCARLATO LLC**, 2000 Auburn Drive, Suite 200, Beachwood, OH 44122; Paul
J. Scarlato, **ROSCA SCARLATO LLC**, Four Tower Bridge, 200 Barr Harbor
Drive, Suite 400, West Conshohocken, PA 19428; Michael J. Angelides,
**SIMMONS HANLY CONROY**, One Court Street, Alton, IL 62002; Sona Shah
and Thomas I. Sheridan, III, **SIMMONS HANLY CONROY LLP**, 112 Madison
Avenue, Seventh Floor, New York, NY 10016; Claire Terrebonne, Clinton
Mann, and Matthew L. Dameron, **WILLIAMS DIRKS DAMERON LLC**, 1100

Main Street, Suite 2600, Kansas City, MO 64105, for Plaintiffs Susanne Mehlman, Joy Hultman, Mindy Bender, and Robert Sullivan.

Andrew T. Rees, **ROBBINS GELLER RUDMAN & DOWD LLP**, 120 East Palmetto Park, Suite 500, Boca Raton, FL 33432; Rene Alan Gonzalez, Scott Dion and Stephen R. Astley, **ROBBINS GELLER RUDMAN & DOWD LLP**, 225 Northeast Mizner Boulevard, Suite 720, Boca Raton, FL 33432, for Plaintiff Frank R. Tripson.

Edward B. Magarian and John F. Huerter, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402; Meaghan McLaine VerGow, Brian D. Boyle, and Shannon Barrett, **O'MELVENY & MYERS LLP**, 1625 Eye Street Northwest, Washington, DC 20006; Lauren Wagner, **O'MELVENY & MYERS LLP**, 1301 Avenue of the Americas, Suite 1700, New York, NY 10019, for Defendants.

This is a putative class action involving Bank Sweep Programs offered by Defendants Ameriprise Financial, Inc.; Ameriprise Financial Services, LLC; and American Enterprise Investment Services, Inc. (collectively "Ameriprise"). Plaintiffs Susanne Mehlman, Joy Hultman, Mindy Bender, Robert Sullivan, and Frank R. Tripson (collectively "Plaintiffs") bring this action individually and on behalf of a class of similarly situated individuals, alleging that they were paid unreasonably low interest payments on uninvested cash that was swept into interest-bearing deposit accounts through the Bank Sweep Programs. Plaintiffs bring claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment. Ameriprise moves to compel arbitration of Plaintiffs' investment advisory claims and moves to dismiss the operative complaint. Because the arbitration clause in the investment advisory agreements is valid and Plaintiffs' claims with respect to investment

advisory services fall within its scope, the Court will grant the motion to compel arbitration. Because Plaintiffs have failed to plausibly allege the existence of a fiduciary relationship, the Court will grant Ameriprise's motion to dismiss the claim for breach of fiduciary duty. However, because Plaintiffs have adequately stated a claim for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, the Court will deny the motion to dismiss those claims.

## BACKGROUND

### I. FACTS

#### A. The Parties

Plaintiffs are clients who held a variety of accounts with Ameriprise, including Individual Retirement Accounts ("IRA"), investment advisory accounts, and traditional brokerage accounts, since July 29, 2018. (Am. Compl. ¶¶ 15–18, 133–34, Nov. 4, 2024, Docket No. 58; *see also* Order to Consolidate Cases, Jan. 22, 2025, Docket No. 77; Compl. ¶ 8, Dec. 31, 2024, Docket No. 1 in ECF No. 24-4669.)

Defendant Ameriprise Financial, Inc. ("AFI") provides financial planning, advice, and brokerage services, which include cash management and banking products like cash sweep programs. (Am. Compl. ¶ 11.) Defendants Ameriprise Financial Services, LLC ("AFS") and American Enterprise Investment Services, Inc. ("AEIS") are wholly owned subsidiaries of AFI. (*Id.* ¶¶ 12–13.) AFS operates as AFI's "introducing broker-dealer," and AEIS operates as AFI's "clearing broker-dealer." (*Id.*) Ameriprise Bank, FSB

("Ameriprise Bank"), a national banking association and wholly owned subsidiary of AFI, is a relevant non-party to this litigation.  (*Id.* ¶ 19.)

### B.    Ameriprise Accounts

The two types of accounts offered by Ameriprise that are primarily at issue are brokerage accounts and investment advisory accounts.

### 1.    Brokerage Accounts

Brokerage accounts, which can include IRAs, "feature a commission-based fee structure where investors typically pay commissions, sales charges and/or other fees on products purchased and sold in [their] brokerage account."  (Decl. of Amara Chesson ("Chesson Decl.") ¶ 8, Ex. G at 1, Dec. 20, 2024, Docket No. 72; *see also id.* ¶ 19, Ex. R; *id.* ¶ 36, Ex. II.)[1]  Brokerage accounts allow clients to invest in a variety of investments, including mutual funds, stocks, and bonds.  (Chesson Decl. ¶ 8, Ex. G at 1.)  Financial advisors may provide "point-in-time recommendations" to clients related to their investment portfolios, but brokerage accounts do not include account monitoring in the way that investment advisory accounts do.  (*Id.*)

There are multiple documents that govern the brokerage relationship between Ameriprise and accountholders: the Ameriprise Brokerage Client Agreement, the Brokerage Disclosures, and "any account or product application [clients] complete" (collectively "Brokerage Contract").  (Chesson Decl. ¶ 27, Ex. Z at 1.)  The Brokerage

---

[1] The Court cites to the original pagination of the documents.

Contract appoints Ameriprise as a broker and authorizes it "to open and close [clients']
brokerage accounts; place and cancel orders for [clients] and take such other steps as are
reasonable to carry out [clients'] directions." (Chesson Decl. ¶ 22, Ex. U at 1.)

Notably, the Brokerage Contract contains an arbitration clause under which the
parties agree that "all controversies that arise between [a client and Ameriprise] . . . shall
be determined by arbitration in accordance with the terms of this Agreement and the
rules then prevailing of the [Financial Industry Regulatory Authority]." (*Id.* at 7.)
However, there is an exception for class actions, which are exempted from the arbitration
agreement. (*Id.* at 8.)

In opening their brokerage accounts, Plaintiffs acknowledged the Brokerage
Contract's terms and conditions. (*E.g.*, Chesson Decl. ¶ 13, Ex. L at 15.)

### 2.    Investment Advisory Accounts

Investment advisory accounts enable clients "to receive ongoing investment
advice and feature an asset-based fee structure." (Chesson Decl. ¶ 8, Ex. G at 1.) Clients
pay an annual asset-based fee based on the total value of the assets in their account, so
the higher the total value of assets, the higher the annual fee that a client will pay for his
or her account. (*Id.*) Many of the investment advisory accounts offered by Ameriprise
"feature professional portfolio management including asset allocation, risk management,
investment selection, tax-harvesting and dynamic Account rebalancing." (*Id.*) Contrary
to brokerage accounts, financial advisors provide "Account monitoring and ongoing
advice" for investment advisory accounts to help clients "develop and maintain [their]

-5-

Account(s) investment portfolio." (*Id.*) Similar to brokerage accounts, multiple documents govern the advisory relationships between Ameriprise and accountholders, including the Custom Advisory Relationship Agreement and the Select Separate Account Agreement (collectively "Advisory Agreements"). (Chesson Decl. ¶ 7, Ex. F at 1; *id.* ¶ 18, Ex. Q at 2.)

The Advisory Agreements contain an arbitration clause providing that "[a]ny controversy or claim arising out of the investment advisory services offered or delivered pursuant to this Agreement shall be resolved solely by arbitration on an individual basis." (Chesson Decl. ¶ 7, Ex. F at 20; *id.* ¶ 18, Ex. Q at 13.) The arbitration clause also includes disputes regarding whether any controversy or claim is subject to the arbitration agreement. (*Id.*) Unlike the clause in the Brokerage Contract, the arbitration clause in the Advisory Agreements prohibits claims from being brought as a class action and requires arbitration to occur only on an individualized basis. (*See id.*)

In opening their brokerage accounts, Plaintiffs acknowledged that their investment advisory accounts and brokerage accounts were governed by different terms and conditions, including distinct arbitration clauses. (*E.g.*, Chesson Decl. ¶ 14, Ex. M at 18.)

### C.    Bank Sweep Programs

Ameriprise clients have the option to participate in Bank Sweep Programs, which sweep uninvested cash daily from clients' individual accounts to interest-bearing accounts insured by the Federal Deposit Insurance Corporation ("FDIC"). (Am. Compl. ¶ 26.) The Bank Sweep Program that applies to a client's account depends on the type of

account and the nature of the ownership. (Chesson Decl. ¶ 33, Ex. FF at 3; *id.* ¶ 22, Ex. Z at 14.)

Ameriprise offers two primary Bank Sweep Programs: the Ameriprise Insured Money Market Account ("AIMMA") and the Ameriprise Bank Insured Sweep Account ("ABISA"). (Am. Compl. ¶ 24.) AIMMA is available to most Ameriprise accounts. (*Id.* ¶ 25.) Under the AIMMA program, AEIS sweeps cash from clients' individual accounts into money market deposit accounts, which are described as "a type of savings deposit" bank account. (*Id.* ¶ 27; *e.g.*, Chesson Decl. ¶ 20, Ex. S at 4.) Funds of Ameriprise clients who participate in AIMMA are automatically swept to Ameriprise Bank, unless they exceed the FDIC limit (which is rare), in which case the funds are swept to a non-affiliated participating bank. (Am. Compl. ¶¶ 27–28.)

In contrast, ABISA is only available for certain Ameriprise accounts, in particular "for discretionary investment advisory accounts in a tax-qualified ownership, and for certain non-discretionary investment advisory qualified accounts with trustee-directed pooled investment 401(a) ownership." (*Id.* ¶ 25; *e.g.*, Chesson Decl. ¶ 33, Ex. FF at 6.) Funds of Ameriprise clients who participate in ABISA are automatically swept to Ameriprise Bank, which is the only bank option in the ABISA program. (Am. Compl. ¶ 29.)

The average client balance in Ameriprise Bank Sweep Programs ranges from $6,000 to $8,000. (*Id.* ¶ 30.) The aggregate total of Ameriprise cash sweep balances at Ameriprise Bank as of June 2024 was $21.5 billion. (*Id.*)

Both the Brokerage Contract and the Advisory Agreements discuss the Bank Sweep Programs and the way that interest rates apply to individual client accounts participating in those programs.  In particular, the Brokerage Contract provides that "[i]nterest rates on the Deposit Accounts will be tiered and will vary based upon prevailing economic and business conditions." (Chesson Decl. ¶ 33, Ex. FF at 5.)  Clients are invited "to view the current interest rates for each Interest Rate Tier." (*Id.*)  Furthermore, the Brokerage Contract discloses that "[t]he interest rates paid with respect to the Deposit Accounts at a bank may be higher or lower than the interest rates available to depositors making deposits directly with the bank, with other depository institutions in comparable accounts, or in other available money settlement options made available through AEIS." (*Id.* at 7.)  The Advisory Agreements have clients "authorize [Ameriprise] or its affiliates to invest, directly or indirectly, in deposits of itself or its affiliates, including [Ameriprise Bank], that bear a reasonable rate of interest, determined solely by [Ameriprise], to facilitate money settlement option services." (Chesson Decl. ¶ 7, Ex. F at 9; *id.* ¶ 18, Ex. Q at 7.)

In addition, the Brokerage Contract and Advisory Agreements also disclose that AEIS is compensated by banks participating in the AIMMA program or else reimbursed by Ameriprise Bank for direct out-of-pocket expenses in the ABISA program.  (*See* Chesson Decl. ¶ 33, Ex. FF at 5–6; *id.* ¶ 7, Ex. F at 9; *id.* ¶ 18, Ex. Q at 6.)  Clients are also informed that Ameriprise Bank earns spread revenue, or "the difference between what it pays in

interest and what it earns on its investments," through the Bank Sweep Programs. (Chesson Decl. ¶ 7, Ex. F at 9.)

Though the Advisory Agreements discuss the Bank Sweep Programs, they explain that the programs are further described in the Brokerage Contract documents. (Chesson Decl. ¶ 7, Ex. F at 9; *id.* ¶ 18, Ex. Q at 3.) Furthermore, the Brokerage Contract explains that "Sweep Programs made available in Managed Accounts are offered by Ameriprise Financial Services in its capacity as a broker-dealer, and services are provided by our affiliate AEIS as part of the overall brokerage services provided to your Account(s) pursuant to the 'Money Settlement Options' section of the Ameriprise Brokerage Client Agreement." (Chesson Decl. ¶ 10, Ex. I at 46.)

### D.    SEC Investigation

In 2023, the Securities and Exchange Commission ("SEC") launched an investigation into cash sweep programs across the United States. (Am. Compl. ¶ 35.) The SEC scrutiny prompted several other brokerages to increase the interest rates they secure through their cash sweep programs. (*Id.* ¶¶ 63–64.) During the investigation, Ameriprise attempted to remove language from the Advisory Agreements related to its clients' authorization of Ameriprise to sweep uninvested cash from client accounts to deposits that bear a reasonable rate of interest. The specific language that was deleted is emphasized in the following: "You further authorize Sponsor [i.e., AFS] or its affiliates to invest, directly or indirectly, in deposits of itself or its affiliates, including Ameriprise Bank, FSB, **that bear a reasonable rate of interest, determined solely by Sponsor, to facilitate**

**money settlement option services**." (*Id.* ¶ 35 (emphasis added).) Ameriprise apparently added this language back in after Plaintiffs filed this action. (Decl. of Adam H. Wierzbowski ¶ 2, Ex. 1 at 23, Jan. 31, 2025, Docket No. 83-1.)

## II.    PROCEDURAL HISTORY

This action was initiated on July 29, 2024, by Susanne Mehlman and Joy Hultman and has since been consolidated with other cases into the operative complaint. (*See generally* Compl., Docket No. 1; Order, Oct. 3, 2024, Docket No. 50; Order to Consolidate Cases, Jan. 22, 2025, Docket No. 77; Order to Consolidate Cases, Feb. 21, 2025, Docket No. 92; Joint Update, May 5, 2025, Docket No. 122.) Plaintiffs allege that Ameriprise established unreasonably low interest rates on their cash sweep balances, which violated Ameriprise's alleged contractual, implied, and fiduciary duties and unjustly enriched Ameriprise at its clients' expense. (Am. Compl. ¶¶ 31–32, 52, 54–55, 58, 102, 110.)

Ameriprise filed a motion to compel arbitration and a motion to dismiss on December 20, 2024. (Defs.' Mot. Compel Arbitration, Docket No. 62; Defs.' Mot. Dismiss, Docket No. 67.)

## DISCUSSION

## I.    MOTION TO COMPEL ARBITRATION

### A.    Standard of Review

A party who believes that a dispute is subject to arbitration may move for an order compelling arbitration under the Federal Arbitration Act ("FAA"). 9 U.S.C. § 3. In considering such a motion, the Court does not determine the merits of the substantive

issues, but simply whether the parties have agreed to submit a particular grievance to arbitration. *Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*, 516 F.3d 695, 699 (8th Cir. 2008). Specifically, the Court is limited to determining: (1) whether a valid agreement to arbitrate exists between the parties and (2) whether the specific dispute is within the scope of that agreement. *Pro Tech Indus. Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004). The Court may consider agreements stating arbitration terms whether or not those agreements are cited in the complaint. *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017). The party seeking to avoid arbitration bears the burden of proving that the claims at issue are not suitable for arbitration. *Green Tree Fin. Corp.– Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000). There is a strong federal policy in favor of enforcing arbitration agreements. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

### B.    Analysis

Ameriprise moves to submit any dispute concerning the investment advisory services offered or delivered by Defendants to arbitration under American Arbitration Association rules on an individualized basis. The Court need only determine which claims fall within the scope of the arbitration clause in the Advisory Agreements, as the validity of the arbitration clause is undisputed.[2]

---

[2] The Advisory Agreements' arbitration clause provides that the threshold question of "whether any controversy or claim is subject to this arbitration agreement" is subject to

Generally, an arbitration agreement should be construed liberally, with any doubts resolved in favor of arbitration. *See MedCam, Inc. v. MCNC*, 414 F.3d 972, 976 (8th Cir. 2005). If an arbitration clause is broad, the "liberal federal policy favoring arbitration agreements requires that a district court send a claim to arbitration . . . as long as the underlying factual allegations simply touch matters covered by the arbitration provision." *Unison Co. v. Juhl Energy Dev., Inc.*, 789 F.3d 816, 818 (8th Cir. 2015) (quoting *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir. 2008)).

As an initial matter, the Advisory Agreements' arbitration clause is broad. The arbitration clause states that "[a]ny controversy or claim arising out of the investment advisory services offered or delivered pursuant to" the Advisory Agreements shall be arbitrated. (Chesson Decl. ¶ 7, Ex. F at 20; *id.* ¶ 18, Ex. Q at 13.) The broadness of the arbitration clause is demonstrated by the language stating that **any** controversy or claim **arising out of** the investment advisory services shall be arbitrated. *See Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 874 (8th Cir. 2018) ("Arbitration clauses covering claims 'arising out of' or 'relating to' an agreement are broad." (quoting *Zetor N. Am., Inc. v. Rozeboom*, 861 F.3d 807, 810 (8th Cir. 2017)); *see also Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997) (same).

---

arbitration. (Chesson Decl. ¶ 7, Ex. F at 20.) But Ameriprise offered to waive its rights as to threshold arbitrability without waiving its right to arbitral determinations on the merits.

Considering the broadness of the arbitration clause, the Court finds that some of Plaintiffs' claims fall within its scope.  Plaintiffs argue that the Brokerage Contract's arbitration clause—which excepts class actions from its scope—applies because the Brokerage Contract is the "umbrella" agreement governing the parties' relationship with respect to the Bank Sweep Programs. *See Dental Assocs., P.C. v. Am. Dental Partners of Mich., LLC*, 520 F. App'x 349, 351–52 (6th Cir. 2013) (adopting a narrower test of arbitrability and determining that the agreement that defined the ongoing relationship between the parties governed).  Yet while the parties agree that the Bank Sweep Programs constitute brokerage services offered by Ameriprise in its capacity as a broker-dealer, it is unclear at this juncture the extent to which Plaintiffs also bring claims against Ameriprise arising out of its investment advisory services.  The Amended Complaint challenges Ameriprise's alleged breach of duties with respect to its role as a broker-dealer and an investment advisor for the Bank Sweep Programs.  (*E.g.*, Am. Compl. ¶¶ 68, 76–77, 83–84, 102.)  "Look[ing] past the labels the parties attach to their claims to the underlying factual allegations," the Court cannot ignore the numerous references to Ameriprise's investment advisory role and services that underlie Plaintiffs' claims. *Parm*, 898 F.3d at 874 (quoting *Amtex*, 542 F.3d at 1199).  Given the ambiguity in Plaintiffs' claims, the Court cannot say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 873–74 (quoting *Unison Co.*, 789 F.3d at 818).  Accordingly, to the extent Plaintiffs bring claims with respect

to Ameriprise's investment advisory services, such claims fall within the scope of the Advisory Agreements' arbitration clause and must be submitted to arbitration.

Furthermore, the Court's arbitration ruling applies to claims with respect to investment advisory services asserted against AFS and its subsidiaries, AFI and AEIS, even though AFI and AEIS are nonsignatories to the Advisory Agreements. This is because of the interchangeable relationship between the Defendants with respect to Plaintiffs' claims. *See Onvoy, Inc. v. SHAL, LLC*, 669 N.W.2d 344, 356 (Minn. 2003) (holding that a signatory cannot rely on a contract in bringing a claim against a nonsignatory without submitting to arbitration if the contract's arbitration clause applies); *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005) (holding that a nonsignatory can compel arbitration against a signatory when "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided").

The Court will grant Ameriprise's motion to compel arbitration. Plaintiffs are granted leave to amend the Amended Complaint to remove facts and claims arising out of Ameriprise's investment advisory services.

II.    **MOTION TO DISMISS**

A.    **Standard of Review**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint

states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court construes the complaint in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), or mere "labels and conclusions or a formulaic recitation of the elements of a cause of action," *Iqbal*, 556 U.S. at 678 (quotation omitted). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* At this stage, the Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

### B.    Analysis

Ameriprise argues that the claims against AFI should be dismissed, and that Plaintiffs otherwise failed to state a claim for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment. The Court will take each argument in turn.

### 1.    Claims Against Ameriprise Financial, Inc.

Ameriprise argues that the claims against AFI should be dismissed because the Amended Complaint fails to plausibly allege that AFI played any role in the alleged conduct.  The Court disagrees.

Under the doctrine of respondeat superior, "an employer is vicariously liable for the [acts] of an employee committed within the course and scope of employment." *Popovich v. Allina Health Sys.*, 946 N.W.2d 885, 890 (Minn. 2020).  A parent company can be vicariously liable for the acts of its subsidiary if there is a sufficient showing of improper conduct, fraud, or bad faith.  *Ass'n of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 449 (Minn. Ct. App. 1996).  It is important that the parent had the right to control the subsidiary.  *Urban ex rel. Urban v. Am. Legion Post 184*, 695 N.W.2d 153, 160 (Minn. Ct. App. 2005), *aff'd on other grounds*, 723 N.W.2d 1 (Minn. 2006).  Minnesota's two-part test to pierce the corporate veil under such circumstances first requires that "a number of [certain] factors be present" related to the parent company and subsidiary's relationship.  *Barzen*, 553 N.W.2d at 449–50; *see also Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979) (listing factors).  The second prong requires that there also "be an element of injustice of fundamental unfairness." *Barzen*, 553 N.W.2d at 450.

Here, the Amended Complaint alleges that AFI is vicariously liable under the doctrine of respondeat superior for AFS and AEIS's alleged conduct.  Specifically, Plaintiffs allege that AFS and AEIS are wholly-owned subsidiaries of AFI, that AFI primarily engages

-16-

in business through its subsidiaries, including AFS and AEIS, and that AFS and AEIS are agents of AFI. (Am. Compl. ¶¶ 11–13, 169.) The Amended Complaint also provides several statements by AFI's CFO regarding AFI's participation in, control over, and benefits from the Bank Sweep Programs. (*Id.* ¶¶ 46, 48, 58, 59.) Moreover, the Brokerage Contract documents are all stamped with AFI's logo and copyright. (Chesson Decl. ¶¶ 22–24, Exs. U–W.)

These allegations are sufficient to plausibly allege vicarious liability against AFI. There are fact questions regarding whether AFI controlled or had the right to control AFS and AEIS, such that dismissal would be inappropriate at this stage. *See Good v. Ameriprise Fin., Co.*, No. 06-1027, 2006 WL 8445107, at *7 (D. Minn. Dec. 21, 2006) (recommending denial of motion to dismiss claims against AFI given allegations of subsidiary relationship with AFS), *report and recommendation adopted*, 2007 WL 628196 (D. Minn. Feb. 8, 2017).

The Court will deny Ameriprise's motion to dismiss the claims against AFI.

### 2.    Breach of Contract

Under Minnesota law, plaintiffs must demonstrate four elements to show breach of contract: (1) a contract was formed, (2) the plaintiffs performed any required conditions precedent, (3) the defendants materially breached the contract, and (4) the plaintiffs suffered damages as a result. *See Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 789 F. Supp. 2d 1148, 1155 (D. Minn. 2011) (citing *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000)).

-17-

The Amended Complaint brings two claims for breach of contract: Count 1 and Count 2.

### a.    Count 1

Count 1 alleges that Ameriprise failed to secure for and pay clients "a rate of interest on cash deposits or balances maintained in the Bank Sweep Programs that properly takes into account prevailing economic, market, and business conditions" as required. (Am. Compl. ¶¶ 149–50.)

Ameriprise argues that it is not contractually obligated to secure for and pay clients interest rates that move in lockstep with a particular market rate in any particular way. Ameriprise also argues that it discloses that rates may vary based on prevailing economic and business conditions, so the fact that its rates varied from other rates does not mean it breached any contractual obligations.

The Court finds Count 1 to be sufficient. The Brokerage Contract provides that "[i]nterest rates on the Deposit Accounts will be tiered and will vary based upon prevailing economic and business conditions." (Chesson Decl. ¶ 33, Ex. FF at 5.) Based on this contractual language, it is plausible that Ameriprise was contractually obligated to secure for and pay clients interest rates that took prevailing economic and business conditions into consideration—instead of remaining relatively flat, as Plaintiffs allege. Moreover, while it is true that the Brokerage Contract discloses that interest rates and interest income will vary and fluctuate based on prevailing economic and business conditions, those disclosures do not obviate any alleged contractual obligation Ameriprise had to

secure for and pay clients rates of interest that considered prevailing economic and business conditions.  *Cf. Dey v. Robinhood Markets, Inc.*, No. 24-7442, 2025 WL 1322716, at *5 (N.D. Cal. Apr. 28, 2025) (finding disclaimer that interest rates could differ from rates available elsewhere did not foreclose claim for breach the implied covenant of good faith and fair dealing).  Both things can be true: the rates varied day-to-day, and Ameriprise's rates were unreasonable when considering prevailing economic and business conditions.  Count 1 plausibly states a claim for breach of contract.

### b.    Count 2

In contrast to Count 1, Count 2 is only brought on behalf of a subclass of Plaintiffs: those with IRA and investment advisory accounts.  Count 2 alleges that the Advisory Agreements required Ameriprise to "'invest' [its] clients' cash sweep deposits in accounts that bear a 'reasonable rate of interest'" and "make 'reasonable' arrangements with Ameriprise Bank or Ameriprise affiliates and delegates regarding the Ameriprise Bank Sweep Programs."[3]  (Am. Compl. ¶¶ 154–55.)

Ameriprise argues that Plaintiffs failed to plausibly allege that it had a duty to secure reasonable rates of interest.  Ameriprise also claims that, even if it had such a contractual obligation, Plaintiffs failed to establish that its interest rates were unreasonable.

---

[3] To the extent Plaintiffs bring this claim based on duties arising out of the investment advisory services offered or delivered pursuant to the Advisory Agreements, such claims must be submitted to arbitration.

But Plaintiffs have plausibly alleged that Ameriprise had a duty to secure reasonable interest rates for clients in the Bank Sweep Programs. A plausible reading of the Advisory Agreements' language suggests that clients' authorization of Ameriprise to invest their cash in deposits that bear a reasonable rate of interest in the Bank Sweep Programs is tied to a duty of Ameriprise to secure for and pay clients a reasonable rate of interest. *See Midwest Med. Sols., LLC v. Exactech U.S., Inc.*, 21 F.4th 1002, 1006 (8th Cir. 2021) (refusing to "rewrite or modify unambiguous contract language" under Minnesota law. It is true that clients are informed that cash sweep interest rates may diverge from other offerings, that the Federal Funds Rate may be higher, and that alternative money settlement options may offer higher returns than the Bank Sweep Programs. But those disclosures do not automatically obviate Ameriprise's alleged contractual duty to invest clients' cash sweep deposits in accounts that bear a reasonable rate of interest. Indeed, the fact that "a reasonable rate may be different from the prevailing or market rate" does not necessarily mean that Ameriprise had no duty to secure reasonable interest rates (or that Ameriprise's rates were reasonable). *Brock v. Walton*, 794 F.2d 586, 588 (11th Cir. 1986).

Moreover, Plaintiffs have plausibly alleged that Ameriprise's interest rates were unreasonable. Under Minnesota law, reasonableness is generally a question of fact. *Cf. Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990) (holding that the reasonableness of a settlement agreement is "a question of fact . . . to be decided by the

court as the factfinder").  Here, the Amended Complaint compares Ameriprise's cash sweep interest rates against rates paid by brokerages that did not sweep clients' cash sweep deposits to an affiliated bank.  (Am. Compl. ¶ 115–21.)  Plaintiffs allege that Ameriprise's rates "had minimal movement," "stay[ing] consistently low with miniscule increases while the rates paid by brokerages that swept cash to unaffiliated banks increased consistent with the market."  (*Id.* ¶ 116.)  In particular, the comparators' interest rates ranged from 1.58% to 5% between 2022 and 2024, whereas Ameriprise's rates only fluctuated between 0.25% and 0.30%.  (*Id.* ¶¶ 118–21.)  Though discovery may reveal these allegations to be "apples to oranges" comparisons that shed little light on the reasonableness or unreasonableness of Ameriprise's cash sweep rates, the Court finds that they plausibly allege unreasonableness at the pleading stage.  *Cf. Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (finding comparison to one other fund with a different investment strategy insufficient); *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 19-7998, 2021 WL 240737, at *1 (S.D.N.Y. Jan. 25, 2021) (finding amended allegations with comparable comparisons sufficient).

In addition to comparisons of interest rates paid by other brokerages, the Amended Complaint also compares Ameriprise's rates to the Federal Funds Rate and rates paid on U.S. Treasury Bills and repurchase agreements as benchmarks.  (Am. Compl. ¶¶ 122–32.)  While such comparisons are relevant, they are not as helpful in assessing reasonableness as the more comparable comparisons discussed above.  *See Amron v.*

*Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344–45 (2d Cir. 2006) (affirming dismissal where allegations of insufficient performance were unsupported by comparisons to comparable funds); *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 644–45 (S.D.N.Y. 2020) (dismissing breach of contract claim without prejudice because rate comparisons were from "entirely distinct" investment options unlike the account into which the plaintiff's money was swept).    Nonetheless, construing the Amended Complaint in the light most favorable to Plaintiffs and drawing all inferences in their favor, the Court finds that all of the alleged comparisons, taken together, are sufficient to plausibly allege unreasonableness.    Whether Ameriprise's interest rates violated Ameriprise's alleged contractual obligation to invest clients' cash in deposits bearing a reasonable rate of interest is a fact question that cannot be resolved at the pleading stage.    Count 2 plausibly alleges a breach of contract.

The Court will deny Ameriprise's motion to dismiss the breach of contract claims.

### 3.    Breach of Implied Covenant of Good Faith and Fair Dealing

Minnesota recognizes an implied covenant of good faith and fair dealing inherent in every contract, *In re Wren*, 699 N.W.2d 758, 765 n.10 (Minn. 2005), which requires that one party not "unjustifiably hinder" the other party's performance of the contract, *White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F. Supp. 878, 881 (D. Minn. 1997).    The covenant cannot be used to expand the scope of the underlying contract.    *See In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 503 (Minn. 1995).    To survive the motion to dismiss, Plaintiffs must allege "sufficient facts which, if proven, would

-22-

support an inference of bad faith." *White Stone Partners*, 978 F. Supp. at 885. Bad faith includes "evasion of the spirit of the bargain." *Id.* at 881.

Plaintiffs allege that Ameriprise was required "to deal fairly with [its] clients, to fulfill [its] obligations under the contract in good faith, and to not deprive Class members of the fruits of their bargain." (Am. Compl. ¶ 160.) More specifically, Plaintiffs allege that Ameriprise was "obligated to pay to or secure for Class members a fair and reasonable rate of interest on their cash balances; and to properly account for current or prevailing economic, market and business conditions and competitive interest rates," but failed to do so. (*Id.* ¶ 161.)

Ameriprise accuses Plaintiffs of attempting to use the covenant to expand the scope of the Brokerage Contract. In particular, Ameriprise argues that Plaintiffs' implied covenant theory conflicts with the Brokerage Contract's disclosure that the Bank Sweep Programs' interest rates could be lower than the rates on other investment options and the Federal Funds Rate. Ameriprise also argues that Plaintiffs failed to allege bad faith because it disclosed its financial interest in the Bank Sweep Programs to clients and thus has not deceptively hidden the consequences of its rate-setting decisions.

The Court finds that Plaintiffs are not using the covenant to expand the scope of the contracts. The Brokerage Contract provides that cash sweep rates "will vary based upon prevailing economic and business conditions," and the Advisory Agreements authorize Ameriprise to invest clients' swept cash in deposit accounts "that bear a

reasonable rate of interest." (Chesson Decl. ¶ 33, Ex. FF at 5; *id.* ¶ 7, Ex. F at 9.) Together, these documents plausibly suggest that Ameriprise was obligated to not deprive clients of the fruits of their bargain in the Bank Sweep Programs—i.e., by taking prevailing economic and business conditions into consideration when securing interest rates and securing rates that were reasonable. The disclosure that cash sweep rates could be lower than other rates does not automatically negate the plausibility of these obligations. Indeed, Ameriprise's contracts do not provide it with unfettered discretion to set any interest rate it chooses. Instead, the contracts provide that Ameriprise must take prevailing economic and market conditions into consideration when setting cash sweep rates and that the rates must be reasonable. *See Alcorn v. BP Prods. N. Am., Inc.*, No. 04-120, 2004 WL 1745761, at *2 (D. Minn. Aug. 2, 2004) ("[A]lthough BP is free to set the price it charges its dealers, it is not free to set a price that is unreasonable or is otherwise not a good faith price."). Thus, Plaintiffs can use the covenant of good faith and fair dealing to impose such obligations on Ameriprise.

Furthermore, the Court is not inclined, at this stage, to find that Plaintiffs failed to plausibly allege bad faith. Under Minnesota law, "bad faith means a refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties, but rather by some ulterior motive." *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 837 (Minn. Ct. App. 1994) (citation modified). "[S]uspicious circumstances alone are insufficient to prove that an instrument was handled in bad faith." *Id.*

Meanwhile, "good faith means that a person's actions are done honestly, whether it be negligently or not." *Cent. Specialties, Inc. v. Minn. Dep't of Transp.*, 5 N.W.3d 409, 415 (Minn. Ct. App. 2024).

Here, Plaintiffs allege that Ameriprise "improperly ke[pt] the interest rates paid by Ameriprise Bank on cash sweep accounts artificially low," thereby "usurp[ing] that opportunity for itself, leveraging its clients' cash for its own benefit and earning massive profits for itself." (Am. Compl. ¶ 6.) By allegedly ignoring prevailing market conditions and failing to secure reasonable interest rates, Ameriprise "appropriate[ed] for itself the profits that belong to its own clients" and breached the implied covenant. (*Id.* ¶¶ 7–8, 32, 100–01.) Though Ameriprise discloses that it profits from the Bank Sweep Programs, clients can also profit from these programs—albeit not as much as they apparently could if they invested their swept cash elsewhere (as disclosed to them in the Brokerage Contract). Despite this conflict of interest, the Court finds that Plaintiffs have plausibly alleged that Ameriprise abused its power over the Bank Sweep Programs by seeking financial gain for itself at its clients' expense. Plaintiffs are not asking for Ameriprise to maximize Plaintiffs' earnings with higher interest rates. *Cf. DeBlasio v. Merrill Lynch & Co.*, No. 07-318, 2009 WL 2242605, at *37 (S.D.N.Y. July 27, 2009) (dismissing breach of contract claim in cash sweep program action where plaintiffs alleged defendants improperly used free credit balances to earn a profit as opposed to maximizing plaintiffs' earnings). But they are alleging that Ameriprise's rates were unreasonably low and

-25-

deprived them of the benefit of the bargain.  The Court finds this sufficient to plausibly allege bad faith under these circumstances.

The Court will deny Ameriprise's motion to dismiss the claim for breach of the implied covenant of good faith and fair dealing.

### 4.    Breach of Fiduciary Duty

The elements for breach of fiduciary duty are "duty, breach, causation, and damages."  *Hansen v. U.S. Bank Nat'l Ass'n*, 934 N.W.2d 319, 327 (Minn. 2019).  Under Minnesota law, "[a] fiduciary relationship is characterized by a 'fiduciary' who enjoys a superior position in terms of knowledge and authority and in whom the other party places a high level of trust and confidence."  *Carlson v. Sala Architects, Inc.*, 732 N.W.2d 324, 330 (Minn. Ct. App. 2007) (citation omitted).

Plaintiffs allege that Ameriprise breached its fiduciary duties in three ways: (1) by failing to secure for or pay clients a reasonable rate of interest on cash sweep balances that considered prevailing economic, market, and business conditions, (2) by failing to act in the best interests of clients, and (3) by recommending that clients continue to utilize the Bank Sweep Programs to Ameriprise's benefit at their expense.  (Am. Compl. ¶ 166.)

Whether a fiduciary relationship exists is determined by state law.  *Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206, 1215 (8th Cir. 1990).  Under Minnesota law, a "fiduciary relationship exists 'when confidence is reposed on one side and there is resulting superiority and influence on the other; and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal.'"  *Hope v.*

*Klabal*, 457 F.3d 784, 791 (8th Cir. 2006) (quoting *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985)).   Minnesota law recognizes two categories of fiduciary relationships: "relationships of a fiduciary nature per se, and relationships in which circumstances establish a de facto fiduciary obligation." *Swenson v. Bender*, 764 N.W.2d 596, 601 (Minn. Ct. App. 2009).   Here, the relevant inquiry is whether a de facto fiduciary relationship exists, which is generally a question of fact.   *Toombs*, 361 N.W.2d at 809.   Evidence of financial control, assurances and invited consequences, and disparities in business experience are factors that can demonstrate the existence of a de facto fiduciary relationship.  *Id.*

Plaintiffs primarily[4] allege that a fiduciary relationship existed because Ameriprise was  designated as its clients' agent with respect to the cash sweep programs, and agents can have fiduciary duties under Minnesota law.  *See U.S. Bank Nat'l Ass'n v. San Antonio Cash Network*, 252 F. Supp. 3d 714, 721 (D. Minn. 2017); *Fairview Health Servs. v. Armed Forces Off. of Royal Embassy of Saudi Arabia*, 753 F. Supp. 3d 733, 752 (D. Minn. 2024) (finding allegations that defendant owed fiduciary duty as agent to be sufficient).   But courts have found that an ordinary broker-dealer relationship is insufficient to establish

---

[4] Plaintiffs also allege that AFS owed a fiduciary duty through its investment advisor role, through which AFS is bound by the duties of care and loyalty imposed by the Investment Advisers Act of 1940. *See* 18 U.S.C. § 80b-6.  However, the investment advisor relationship cannot support Plaintiffs' fiduciary duty claim because any claims arising out of Ameriprise's investment advisory services must be submitted to arbitration pursuant to the arbitration clause in the Advisory Agreements.

a fiduciary relationship. *See Corbey v. Grace*, 605 F. Supp. 247, 253 (D. Minn. 1985) ("In Minnesota, a claim for breach of fiduciary duty requires a showing of more than a simple broker-customer contract."); *Rude v. Larson*, 207 N.W.2d 709, 711 (Minn. 1973) ("Absent a special agreement to the contrary, a licensed broker owes his customer only the duty to exercise due care in executing all instructions expressly given to him by the principal. He is not a guarantor or insurer against loss sustained by his customer."). Plaintiffs do not adequately allege any particular special relationship authorizing Ameriprise to act as a fiduciary above and beyond the typical broker-customer relationship. *See DeBlasio*, 2009 WL 2242605, at *28–29 (rejecting allegations that brokerage defendants owed clients fiduciary duties with respect to cash sweep programs). Furthermore, Ameriprise disclosed that it had financial interests in the Bank Sweep Programs that diverged from Plaintiffs' interests, and a fiduciary relationship is not established "by the plaintiff having faith and confidence in the defendant where the plaintiff should have known the defendant was representing an adverse interest." *Hope*, 457 F.3d at 791. Indeed, the Brokerage Contract explicitly states that Ameriprise does not act as a fiduciary when providing recommendations related to brokerage accounts or commission-based products, when clients engage Ameriprise for a new service, and when clients choose to move assets from one type of account to another. While general language attempting to

release an agent from fiduciary obligations is not generally enforceable,[5] such language, in combination with the disclosure that Ameriprise had divergent financial interests from Plaintiffs, supports a finding that no fiduciary relationship existed between the parties.

The Court finds that the parties' mere broker-dealer relationship is insufficient to establish a fiduciary relationship.  Accordingly, the Court will grant Ameriprise's motion to dismiss the claim for breach of fiduciary duty.

### 5.    Unjust Enrichment

To state a claim for unjust enrichment under Minnesota law, a plaintiff must allege facts showing "(1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it."  *Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195 (Minn. Ct. App. 2007).  Claims for unjust enrichment "do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully."  *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981).

Plaintiffs allege that Ameriprise was unjustly enriched by accepting the Plaintiffs' swept cash and investing it in deposit accounts with unfair and unreasonably low interest

---

[5] *See* Restatement (Third) Of Agency § 8.06 (2006) ("[A]n agreement that contains general or broad language purporting to release an agent in advance from the agent's general fiduciary obligation to the principal is not likely to be enforceable.").

rates so that it achieved "significantly greater Net Interest Income than it would have but for its wrongful conduct."  (Am. Compl. ¶¶ 171–72.)

Ameriprise argues that Plaintiffs cannot seek unjust enrichment when there is an adequate remedy at law—i.e., Plaintiffs' breach of contract claims.  Ameriprise also claims that Plaintiffs cannot show that Ameriprise was unjustly enriched by any benefit obtained from the Bank Sweep Programs.

Unjust enrichment is not available when there is an alternative adequate remedy at law.  *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996).   But that does not preclude Plaintiffs from pleading equitable relief in the alternative.  *See* Fed. R. Civ. P. 8(d)(2)–(3); *see also United States v. R.J. Zavoral & Sons, Inc.*, 894 F. Supp. 2d 1118, 1127 (D. Minn. 2012) (concluding that a plaintiff "may maintain this [unjust-enrichment] claim as [an] alternative claim for relief under Rule 8 of the Federal Rules of Civil Procedure"); *Cummins L. Off., P.A. v. Norman Graphic Printing Co.*, 826 F. Supp. 2d 1127, 1130 (D. Minn. 2011) (observing that courts "routinely permit the assertion of contract and quasi-contract claims together" and declining to dismiss plaintiff's unjust-enrichment claim on that basis).  Though Plaintiffs may not ultimately recover on their breach of contract and unjust enrichment claims, they may plead unjust enrichment in the alternative "until it is conclusively decided 'that a valid and enforceable contract exists between the parties which governs the specific dispute before the court.'" *Knotts v. Nissan N. Am., Inc.*, 346 F. Supp. 3d 1310, 1323 (D. Minn. 2018) (quoting *Spectro*

*Alloys Corp. v. Fire Brick Eng'rs Co.*, 52 F. Supp. 3d 918, 932 (D. Minn. 2014)).  Plaintiffs clearly assert their claim for unjust enrichment in the alternative.  (*See* Am. Compl. ¶ 170 (bringing the unjust enrichment claim "in the alternative").)  The unjust enrichment claim need not be dismissed on this basis.

The Court also finds that Plaintiffs plausibly alleged that Ameriprise was unjustly enriched at their expense.  Plaintiffs allege that, in exchange for their authorization of Ameriprise to invest their swept cash in deposit accounts, Ameriprise prioritized its own financial gains over its clients' interests by paying unreasonably low interest rates and funneling clients' cash through its own affiliated bank.  (Am. Compl. ¶¶ 5–9, 43–67.) Unjust enrichment can be based on "situations where it would be morally wrong for one party to enrich himself at the expense of another."  *Cady v. Bush*, 166 N.W.2d 358, 361–62 (Minn. 1969).  In other words, "where a plaintiff's conduct 'has been unconscionable by reason of a bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others.'"  *Park-Lake Car Wash, Inc. v. Springer*, 394 N.W.2d 505, 514 (Minn. Ct. App. 1986).  Here, the allegations plausibly suggest that Ameriprise took advantage of its clients' swept cash by ignoring its obligations to secure reasonable interest rates based on prevailing market and economic conditions in order to pad its own pockets.  Though Ameriprise disclosed to clients that it profits from the Bank Sweep Programs, Plaintiffs have plausibly alleged that the level of

profits Ameriprise achieved was unjust and at the clients' expense.  The Court finds this sufficient at this stage.

The Court will deny Ameriprise's motion to dismiss the unjust enrichment claim.

## CONCLUSION

Ameriprise clients bring this action individually and on behalf of a class of similarly situated individuals, alleging that they were paid unreasonably low interest payments on uninvested cash that was swept into Ameriprise's Bank Sweep Programs.  Ameriprise moves to compel arbitration of Plaintiffs' investment advisory claims and moves to dismiss the operative complaint.  Because the arbitration clause in the investment advisory agreements is valid and Plaintiffs' claims with respect to investment advisory services fall within its scope, the Court will grant the motion to compel arbitration. Because Plaintiffs have failed to plausibly allege the existence of a fiduciary relationship, the Court will grant Ameriprise's motion to dismiss the claim for breach of fiduciary duty. However, because Plaintiffs have adequately stated a claim for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, the Court will deny the motion to dismiss those claims.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Compel Arbitration [Docket No. 62] is **GRANTED**. Plaintiffs are granted leave to amend the Amended Complaint to remove facts and claims arising out of Defendants' investment advisory services.

2. Defendants' Motion to Dismiss [Docket No. 67] is **GRANTED in part and DENIED in part** as follows:

    a. The Motion is **GRANTED with prejudice** as to Count 4.

    b. The Motion is **DENIED** as to Counts 1, 2, 3, and 5.


DATED:  August 18, 2025                          _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                       JOHN R. TUNHEIM
                                                 United States District Judge